## MORRIS *v.* UNITED STATES.

### APPEAL FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

No. 49.   Argued October 26, 27, 28, 31, November 1, 2, 3, 4, 7, 1898. — Decided May 1, 1899.

The grant by Charles I to Lord Baltimore on the 20th of June, 1632, included in unmistakable terms the Potomac River, and the premises in question in this suit, and declared that thereafter the province of Maryland, its freeholders and inhabitants, should not be held or reputed a member or part of the land of Virginia; and the territory and title thus granted were never divested, and upon the Revolution the State of Maryland became possessed of the navigable waters of the State, including the Potomac River, and of the soils thereunder, and, by the act of cession to the United States, that portion of the Potomac River with the subjacent soil, which was appurtenant to and part of the territory granted, became vested in the United States; and the court, in consequence, affirms the judgment of the court below in respect of the Marshall heirs, denying their claims.

It was not the intention of Congress by the resolution of February 16, 1839, to subject lands lying beneath the waters of the Potomac, and within the limits of the District of Columbia, to sale by the methods therein provided; and the recent decisions of the courts of Maryland to the contrary, made since the cession to the United States, and at variance with those which prevailed at the time of the cession, cannot control the decision of this court on this question; but as the invalidity of the patent in the present case was not apparent on its face, but was proved by extrinsic evidence, and as the controversy respecting the patent was not abandoned by the defendants, they are not entitled to a decree for the return of the purchase money or for costs.

It was the intention of the founders of the city of Washington to locate it upon the bank or shore of the Potomac River, and to bound it by a street or levee, so as to secure to the inhabitants and those engaged in

commerce free access to the navigable water, and such intention has never been departed from.

As to land above high-water mark in Washington, the title of the United States must be found in the transactions between the private proprietors and the United States.

The proprietors of such land, by their conveyances, completely divested themselves of all title to the tracts conveyed, and the lands were granted to the trustees.

The Dermott map was the one intended by President Washington to be annexed to his act of March 2, 1797; but the several maps are to be taken together as representing the intentions of the founders of the city; and, so far as possible, are to be reconciled as parts of one scheme or plan.

From the first conception of the Federal City, the establishment of a public street, bounding the city on the south, and to be known as Water street, was intended, and such intention has never been departed from; and it follows that the holders of lots and squares, abutting on the line of Water street, are not entitled to riparian rights, nor are they entitled to rights of private property in the waters or the reclaimed lands lying between Water street and the navigable channels of the river, unless they can show valid grants to the same from Congress, or from the city on the authority of Congress, or such a long protracted and notorious possession and enjoyment of defined parcels of land, as to justify a court, under the doctrine of prescription, in inferring grants.

The Chesapeake and Ohio Canal Company, having entered Washington long after the adoption of the maps and plans, cannot validly claim riparian rights as appurtenant to the lots or parts of lots which it purchased in Water street; as it was the persistent purpose of the founders of the city to maintain a public street along the river front; and Congress and the city only intended to permit that company to construct and maintain its canal within the limits of the city, and to approve its selection of the route and terminus.

No riparian rights belonged to the lots between Seventh street west and Twenty-seventh street west.

There is no merit in the claim of the descendants of Robert Peter.

It is impossible to reconcile the succession of acts of Congress and of the city council with the theory that the wharves of South Water street were erected by individuals in the exercise of private rights of property.

The failure of the city to open Water street created no title in Willis to the land and water south of the territory appropriated for that street.

The court does not understand that it is the intention of Congress, in exercising its jurisdiction over this territory, to take for public use, without compensation, the private property of individuals, and therefore, while affirming the decree of the court below as to the claims of the Marshall heirs, and as to the Kidwell patent and as to the claims for riparian rights, it remands the case to the court below for further proceedings.

THE act of Maryland, entitled "An act to cede to Congress a district of ten miles square in this State for the seat of the Government of the United States," 1788, c. 46, was in the following terms : " Be it enacted by the General Assembly of Maryland, that the representatives of this State in the House of Representatives of the Congress of the United States, appointed to assemble at New York, on the first Wednesday of March next, be and they are hereby authorized and required, on behalf of this State, to cede to the Congress of the United States any district in this State, not exceeding ten miles square, which the Congress may fix upon and accept for the seat of Government of the United States." (Kilty's Laws of Maryland.)

On December 3, 1789, 13 Hening, c. 32, by an act entitled " An act for the cession of ten miles square, or any lesser quantity of territory within this State, to the United States, in Congress assembled, for the permanent seat of the General Government," Virginia ceded to the Congress and Government of the United States a tract of country not exceeding ten miles square, or any lesser quantity, to be located within the limits of the State, and in any part thereof as Congress may by law direct, in full and absolute right, and exclusive jurisdiction, as well of soil as of persons residing or to reside thereon ; providing that nothing therein contained should be construed to vest in the United States any right of property in the soil, or to affect the rights of individuals therein, otherwise than the same shall or may be transferred by such individuals to the United States ; and providing that the jurisdiction of the laws of the Commonwealth, over the persons and property of individuals residing within the limits of the said concession, should not cease or determine until Congress should accept the cession, and should by law provide for the government thereof under their jurisdiction.

Congress, by an act entitled "An act for establishing the temporary and permanent seat of the Government of the United States," approved July 16, 1790, c. 28, accepted a district of territory, not exceeding ten miles square, to be located on the river Potomac ; and authorized the President

of the United States to appoint Commissioners, who should, under the direction of the President, survey, and by proper metes and bounds, define and limit the district, which, when so defined, limited and located, should be deemed the district so accepted for the permanent seat of the Government of the United States. It was further thereby enacted that the said Commissioners should have power to purchase or accept such quantity of land on the eastern side of said river, within the said district, as the President should deem proper for the use of the United States, and according to such plans as the President should approve, and that the Commissioners should, prior to the first Monday in December in the year 1800, provide suitable buildings for the accommodation of Congress, and of the President, and for the public offices of the Government; and that on the said first Monday in December, in the year 1800, the seat of the Government of the United States should be transferred to the district and place aforesaid, and that all offices attached to the Government should be removed thereto and cease to be exercised elsewhere. The act contained the following proviso: "That the operation of the laws of the State within said district shall not be affected by this acceptance until the time fixed for the removal of the Government thereto, and until Congress shall otherwise by law provide." 1 Stat. 130.

On January 22, A.D. 1791, Thomas Johnson and Daniel Carroll, of Maryland, and Daniel Stuart, of Virginia, were appointed by President Washington commissioners to carry the foregoing legislation into effect.

On March 3, 1791, Congress passed an amendatory act, by which, after reciting that the previous act had required that the whole of the district of territory, not exceeding ten miles square, to be located on the river Potomac, should be located above the mouth of the Eastern Branch, the President was authorized to make any part of the territory below said limit, and above the mouth of Hunting Creek, a part of the said district, so as to include a convenient part of the Eastern Branch and of the lands lying on the lower side thereof, and also the town of Alexandria, and that the territory so to be

included should form a part of the district not exceeding ten miles square for the seat of the government, but providing that nothing contained in the act should authorize the erection of the public buildings otherwise than on the Maryland side of the river Potomac.

On March 30, A.D. 1791, President Washington issued a proclamation, describing the territory selected by him for the location of the seat of government, as follows:

"Beginning at Jones' Point, being the upper cape of Hunting Creek in Virginia, and at an angle, in the outset, of forty-five degrees west of the north, and running in a direct line ten miles for the first line; then beginning again at the same Jones' Point and running another direct line at a right angle with the first across the Potomac ten miles for the second line; then from the terminations of the said first and second lines, running two other direct lines of ten miles each, the one crossing the Eastern Branch aforesaid and the other the Potomac, and meeting each other in a point."

The Commissioners were accordingly instructed by the President to have the said four lines run, and to report their action.

In the meantime intercourse was had between the Commissioners and the principal owners of property within the district, looking to the sale and conveyance by the latter of land on which a Federal City was to be erected. And the following agreement was signed by the proprietors:

"We, the subscribers, in consideration of the great benefits we expect to derive from having the Federal City laid off upon our lands, do hereby agree and bind ourselves, heirs, executors and administrators, to convey in trust, to the President of the United States, or commissioners, or such person or persons as he shall appoint, by good and sufficient deed in fee simple, the whole of our respective lands which he may think proper to include within the lines of the Federal City, for the purposes and on the conditions following:

"The President shall have the sole power of directing the Federal City to be laid off in what manner he pleases. He may retain any number of squares he may think proper for public improvements, or other public uses, and the lots only

which shall be laid off shall be a joint property between the trustees on behalf of the public and each present proprietor, and the same shall be fairly and equally divided between the public and the individuals, as soon as may be, after the city shall be laid out.

"For the streets the proprietors shall receive no compensation, but for the squares or lands in any form which shall be taken for public buildings or any kind of public improvements or uses, the proprietors, whose lands shall be so taken, shall receive at the rate of twenty-five pounds per acre, to be paid by the public. The whole wood on the land shall be the property of the proprietors, but should any be desired by the President to be reserved or left standing, the same shall be paid for by the public at a just and reasonable valuation exclusive of the twenty-five pounds per acre, to be paid for the land on which the same shall remain.

"Each proprietor shall retain the full possession and use of his land, until the same shall be sold and occupied by the purchasers of the lots laid out thereupon, and in all cases where the public arrangements as to streets, lots, etc., will admit of it, each proprietor shall possess his buildings and other improvements and graveyards, paying to the public only one half the present estimated value of the lands, on which the same shall be, or twelve pounds ten shillings per acre. But in cases where the arrangements of the streets, lots and squares will not admit of this, and it shall become necessary to remove such buildings, improvements, etc., the proprietors of the same shall be paid the reasonable value thereof by the public.

"Nothing herein contained shall affect the lots which any of the parties to this agreement may hold in the towns of Carrollsburgh or Hamburgh.

"In witness whereof we have hereto set our hands and seals, this thirteenth day of March, 1791."

Among the signers of this agreement were Robert Peter, David Burns, Notley Young and Daniel Carroll.

Subsequently, in pursuance of the agreement, the several proprietors executed deeds of conveyance to Thomas Beall and John Mackall Gantt as trustees.

It will be found convenient, in view of the questions that arise in the case, to have the deeds of David Burns and Notley Young transcribed in full:

"This Indenture, made this twenty-eighth day of June, in the year of our Lord one thousand seven hundred and ninety-one, between David Burns of the State of Maryland, of the one part, and Thomas Beall (son of George) and John Mackall Gantt of the State of Maryland, of the other part, Witnesseth: That the said David Burns, for and in consideration of the sum of five shillings to him in hand paid by the said Thomas Beall and John Mackall Gantt, before the sealing and delivery of these presents, the receipt whereof he doth hereby acknowledge and thereof doth acquit the said Thomas Beall and John Mackall Gantt, their executors and administrators, and also for and in consideration of the uses and trusts hereinafter mentioned to be performed by the said Thomas Beall and John Mackall Gantt and the survivor of them, and the heirs of such survivor, according to the true intent and meaning thereof, hath granted, bargained, sold, aliened, released and confirmed, and by these presents doth grant, bargain, sell, alien, release and confirm unto the said Thomas Beall and John Mackall Gantt and the survivor of them, and the heirs of such survivor, all the lands of him the said David Burns, lying and being within the following limits, boundaries and lines, to wit: Beginning on the east side of Rock Creek at a stone standing in the middle of the road leading from Georgetown to Bladensburgh, thence along the middle of the said road to a stone standing on the east side of the Reedy Branch of Goose Creek, thence southeasterly making an angle of sixty-one degrees and twenty minutes, with the meridian to a stone standing in the road leading from Bladensburgh to the Eastern Branch Ferry, thence south to a stone eighty poles north of the east and west line already drawn from the mouth of Goose Creek to the Eastern Branch, thence east parallel to the said east and west line to the Eastern Branch, Potomack River and Rock Creek, to the beginning, with their appurtenances, except all and every lot and lots of which the said David Burns is seized or to which he is entitled lying in

Carrollsburgh or Hamburgh. To have and to hold the hereby bargained and sold lands, with their appurtenances, to the said Thomas Beall and John Mackall Gantt, and the survivor of them, and the heirs of such survivor, forever, to and for the special trusts following, and no other, that is to say, that all the said lands hereby bargained and sold, or such parts thereof as may be thought necessary or proper to be laid out, together with other lands within the said limits, for a Federal City, with such streets, squares, parcels and lots as the President of the United States for the time being shall approve, and that the said Thomas Beall and John Mackall Gantt, or the survivor of them, or the heirs of such survivor, shall convey to the Commissioners for the time being appointed by virtue of an act of Congress, entitled 'An act for establishing the temporary and permanent seat of the Government of the United States,' and their successors, for the use of the United States forever all the said streets and such of the said squares, parcels and lots, as the President shall deem proper, for the use of the United States, and that as to the residue of the lots into which the said lands hereby bargained and sold shall have been laid off and divided, that a fair and equal division of them shall be made, and if no other mode of division shall be agreed on by the said David Burns and the Commissioners for the time being, then such residue of the said lots shall be divided, every other lot alternate to the said David Burns, and it shall in that event be determined by lot whether the said David Burns shall begin with the lot of the lowest number laid out on his said lands or the following number, and all the said lots which may in any manner be divided or assigned to the said David Burns shall thereupon together with any part of the said bargained and sold lands, if any which shall not have been laid out in the said city, be conveyed by the said Thomas Beall and John Mackall Gantt, or the survivor of them, or the heirs of such survivor to him, the said David Burns, his heirs and assigns, and that the said other lots shall and may be sold at any time or times in such manner and on such terms and conditions as the President of the United States for the time being shall direct, and that the said Thomas

Beall and John Mackall Gantt, or the survivor of them, or the heirs of such survivor will, on the order and direction of the President, convey all the said lots so sold and ordered to be conveyed to the respective purchasers in fee simple, according to the terms and conditions of such purchasers, and the produce of the sales of the said lots when sold as aforesaid shall, in the first place, be applied to the payment in money to the said David Burns, his executors, administrators or assigns, for all the part of the lands hereby bargained and sold, which shall have been in lots, squares or parcels, and appropriated as aforesaid, to the use of the United States, at the rate of twenty-five pounds per acre, not accounting the said streets as part thereof, and the said twenty-five pounds per acre being so paid, or in any other manner satisfied, that the produce of the same sales or what thereof may remain as aforesaid in money or securities of any kind shall be paid, assigned, transferred and delivered over to the President for the time being, as a grant of money, and to be applied for the purposes and according to the act of Congress aforesaid, but the said conveyances to the said David Burns, his heirs or assigns, as well as the conveyances to the purchasers, shall be on and subject to such terms and conditions as shall be thought reasonable by the President for the time being, for regulating the materials and manner of the buildings and improvements on the lots generally in the said city, or in particular streets or parts thereof for common convenience, safety and order; provided such terms and conditions be declared before the sales of any of the said lots under the direction of the President and in trust farther, and on the agreement that he, the said David Burns, his heirs and assigns, shall and may continue his possession and occupation of the said land hereby bargained and sold, at his and their will and pleasure until the same shall be occupied under the said appropriations for the use of the United States as aforesaid, or by purchasers, and when any lots or parcels shall be occupied under purchase or appropriations as aforesaid, then, and not till then, shall the said David Burns relinquish his occupation thereon. And in trust also as to the trees, timber and woods on the premises that he,

the said David Burns, his heirs or assigns, may freely cut down, take and use the same as his and their property, except such of the trees and wood growing as the President or Commissioners aforesaid may judge proper and give notice, shall be left for ornament, for which the just and reasonable value shall be paid to the said David Burns, his executors, administrators or assigns, exclusive of the twenty-five pounds per acre for the land, and in case the arrangements of the streets, lots and like will conveniently admit of it, he, the said David Burns, his heirs and assigns, shall, if he so desire it, possess and retain his buildings and graveyard, if any, on the hereby bargained and sold lands, paying to the President at the rate of twelve pounds ten shillings per acre, of the lands so retained, because of such buildings and graveyards to be applied as aforesaid, and the same shall be thereupon conveyed to the said David Burns, his heirs and assigns, with the lots, but if the arrangements of the streets, lots and the like will not conveniently admit of such retention and it shall become necessary to remove such buildings then the said David Burns, his executors, administrators or assigns, shall be paid the reasonable value thereof in the same manner as squares or other ground appropriated for the use of the United States are to be paid for. And because it may so happen that by deaths and removals of the said Thomas Beall and John Mackall Gantt, and from other causes difficulties may occur in fully perfecting the said trust by executing all the said conveyances, if no eventual provision is made, it is therefore agreed and covenanted, between all the said parties, that the said Thomas Beall and John M. Gantt, or either of them, or the heirs of either of them, lawfully may, and they at any time, at the request of the President of the United States for the time being, will convey all or any of the said lands hereby bargained and sold which shall not then have been conveyed in execution of the trusts aforesaid to such person or persons as he shall appoint in fee simple, subject to the trusts then remaining to be executed, and to the end that the same may be perfected. And it is further agreed and granted between all the said parties, and each of the said parties doth for himself respectively and

for his heirs covenant and grant to and with the others of them that he and they shall, and will, if required by the President of the United States for the time-being, join in and execute any further deed or deeds for carrying into effect the trusts, purposes and true intent of this present deed.

"In witness whereof, the parties to these presents have hereunto interchangeably set their hands and affixed their seals the day and year first above written."

The deed of Notley Young is in substantially similar terms.

On December 19, 1791, an additional act was passed by Maryland, ratifying the previous act of cession, and reciting that Notley Young, Daniel Carroll of Duddington, and many other proprietors of the part of the land thereinafter mentioned to have been laid out in a city, had come into an agreement, and had conveyed their lands in trust to Thomas Beall and John Mackall Gantt, whereby they subjected their lands to be laid out as a city, given up part to the United States, and subjected other parts to be sold to raise money, as a donation, to be employed according to the act of Congress for establishing the temporary and permanent seat of the Government of the United States, under and upon the terms and conditions contained in each of said deeds; that the President had thereafter directed to be laid out upon such lands a city, which has been called the city of Washington, comprehending all the lands beginning on the east side of Rock Creek, at a stone standing in the middle of the road leading from Georgetown to Bladensburgh, thence along the middle of said road to a stone standing on the east side of the Reedy Branch of Goose Creek, thence southeasterly, making an angle of sixty-one degrees and twenty minutes with the meridian, to a stone standing in the road leading from Bladensburgh to the Eastern Branch Ferry, thence south to a stone eighty poles north of the east and west line already drawn from the mouth of Goose Creek to the Eastern Branch, then east parallel to the said east and west line to the Eastern Branch, then with the waters of the Eastern Branch, Potomac River and Rock Creek, to the beginning.

By section 2, that portion of the "territory called Colum-

bia," lying within the limits of the State, there was ceded and relinquished to the Congress and the Government "full and absolute right and exclusive jurisdiction, as well of soil as of persons residing or to reside thereon," but providing that nothing therein contained should be so construed to vest in the United States any right of property in the soil as to affect the rights of individuals therein otherwise than the same shall or may be transferred by such individuals to the United States, and that the jurisdiction of the laws of the State over the persons and property of individuals residing within the limits of the cession should not cease or determine until Congress should by law provide for the government thereof.

By section 3, it was provided that "all persons to whom allotments and assignments of land shall be made by the Commissioners, or any two of them, on consent and agreement, or, pursuant to this act, without consent, shall hold the same in their former estate and interest, and as if the same had been actually reconveyed pursuant to the said deed in trust."

By section 5, it was enacted that "all the lots and parcels which have been or shall be sold to raise money shall remain and be to the purchasers, according to the terms and conditions of their respective purchase;" and that a purchase, when made from one claiming title and, for five years previous to the statute, in possession, either actually or constructively, through those under whom he claimed, was rendered unassailable, and that the true owner must pursue the purchase money in the hands of the vendor.

Section 7 enacted that the Commissioners might appoint a clerk of recording deeds of land within the said territory, who shall provide a proper book for the purpose, and therein record, in a strong, legible hand, all deeds, duly acknowledged, of lands in the said territory delivered to him to be recorded, and in the same book make due entries of all divisions and allotments of lands and lots made by the Commissioners in pursuance of this act, and certificates granted by them of sales, and the purchase money having been paid, with a proper alphabet in the same book of the deeds and entries aforesaid.

By section 9, it was enacted that the Commissioners "shall direct an entry to be made in the said record book of every allotment and assignment to the respective proprietors in pursuance of this act."

By section 12, it was declared that until the assumption of legislative power by Congress the Commissioners should have power to "license the building of wharves in the waters of the Potowmack and the Eastern Branch, adjoining the said city, of the materials, in the manner and of the extent they may judge durable, convenient and agreeing with general order; but no license shall be granted to one to build a wharf before the land of another, nor shall any wharf be built in the said waters without a license as aforesaid; and if any wharf shall be built without such license, or different therefrom, the same is hereby declared a common nuisance; they may also, from time to time, make regulations for the discharge and laying of ballast from ships or vessels lying in the Potowmack River above the lower line of the said territory and Georgetown, and from ships and vessels lying in the Eastern Branch." 2 Kilty Laws of Maryland, c. 45.

While the transactions were taking place between the Commissioners and the several proprietors, which culminated in the deeds of conveyance by the latter to Beall and Gantt, negotiations were going on between the President and the Commissioners on the one hand, and the owners of the lots in Carrollsburgh and Hamburgh on the other. Without following these negotiations in detail, it seems sufficient to say that an agreement, substantially similar to the one of March 13, 1791, was reached with those lot owners, and that the territory of those adjacent villages was embraced in the President's proclamation of March 30, 1791.

By a letter, contained in the record, dated March 31, 1791, from President Washington to Thomas Jefferson, Secretary of State, it appears that Major L'Enfant was, after the aforesaid agreements had been reached, directed by the President to survey and lay off the city; and the President further stated in that letter that "the enlarged plan of this agreement having done away the necessity, and indeed postponed

the propriety, of designating the particular spot on which the public buildings should be placed until an accurate survey and subdivision of the whole ground is made," he has left out of the proclamation the paragraph designating the sites for the public buildings.

On August 19, 1791, Major L'Enfant presented to the President his plan of the city, accompanied with a letter, describing the plan as still incomplete, and making several suggestions, particularly one to the effect that sales should not be made till the completion of his scheme for the city and the public buildings should be completed.

On December 13, 1791, the President sent to Congress a communication in the following terms: "I place before you the plan of the city that has been laid out within the district of ten miles square, which was fixed upon for the permanent seat of the Government of the United States."

Afterwards, on February 20, 1797, on the occasion of a complaint by Mr. Davidson of certain deviations from this plan by Major Ellicott, who succeeded Major L'Enfant as surveyor, President Washington, in a letter to the Commissioners, said : "Mr. Davidson is mistaken if he supposed that the transmission of Major L'Enfant's plan of the city to Congress was the completion thereof. So far from it, it will appear by the message which accompanied the same that it was given as matter of information to show what state the business was in, and the return of it requested. That neither house of Congress passed any act consequent thereupon. That it remained, as before, under the control of the executive. That afterwards several errors were discovered and corrected, many alterations made, and the appropriations, except as to the Capitol and the President's House, struck out under that authority, before it was sent to the engraver, intending that work and the promulgation thereof were to give it the final and regulating stamp."

Subsequently dissensions arose between the Commissioners and L'Enfant, which resulted in the dismissal of the latter, and the employment of Andrew Ellicott, who, on February 23, 1792, completed a plan of the city and delivered it to the

President, who, in a letter to the Commissioners dated March 6, 1792, said : " It is impossible to say with any certainty when the plan of the city will be engraved. Upon Major L'Enfant's arrival here, in the latter part of December, I pressed him in the most earnest manner to get the plan ready for engraving as soon as possible. Finding there was no prospect of obtaining it through him, at least not in any definite time, the matter was put into Mr. Ellicott's hands to prepare about three weeks ago. He has prepared it, but the engravers who have undertaken to execute it say it cannot certainly be done in less than two — perhaps not under three months. There shall, however, be every effort made to have the thing effected with all possible dispatch."

This so-called Ellicott's plan was engraved at Boston and at Philadelphia — the engraved plans differing in that the latter did and the former did not show the soundings of the creek and river.

Subsequently, James R. Dermott was employed to make a plan of the city, which he completed prior to March 2, 1797, and on that day President Washington, by his act, requested and directed Thomas Beall and John M. Gantt, the trustees, to convey all the streets in the city of Washington, as they were laid and delineated in the plan of the city thereto attached, and also the several squares, parcels and lots of ground appropriated to the use of the United States, and particularly described, to Gustavus Scott, William Thornton and Alexander White, commissioners appointed under the act of Congress.

On July 23, 1798, President Adams, in an instrument alleging that the plan referred to in said request and instruction by President Washington as having been annexed thereto had been omitted, declared that he had caused said plan to be annexed to said writing, and requested the said Thomas Beall and John M. Gantt to convey the streets, squares, parcels and lots of ground, described in the act of the late President of the United States as public appropriations, to the said Scott, Thornton and White, and their successors in office as commissioners, to the use of the United States forever.

Lots and parcels of ground were sold to private purchasers, from time to time, under all three of these plans, and controversies have arisen as to the comparative authenticity of these plans. The particulars wherein those plans differ are stated and considered in the opinion of the court.

On February 27, 1801, Congress passed the act concerning the District of Columbia and its government, and providing "That the laws of the State of Maryland as they now exist shall be continued in force in that part of the said district which was ceded by that State."

By the act of August 2, 1882, c. 375, 22 Stat. 198, Congress made an appropriation for "improving the Potomac River in the vicinity of Washington with reference to the improvement of navigation, the establishment of harbor lines, and the raising of the flats, under the direction of the Secretary of War, and in accordance with the plan and report made in compliance with the River and Harbor Act approved March 3, 1881, and the reports of the Board of Engineers made in compliance with the resolution of the Senate of December 13, 1881."

This act made it the duty of the Attorney General to examine all claims of title to the premises to be improved under this appropriation, and to institute a suit or suits at law or in equity "against any and all claimants of title under any patent which, in his opinion, was by mistake or was improperly or illegally issued for any part of the marshes or flats within the limits of the proposed improvement."

By subsequent acts of Congress further appropriations were made for continuing the improvement, amounting to between two and three million of dollars, and in the prosecution of the work channels have been dredged, sea walls constructed, and a large area reclaimed from the river.

It appearing that claims to the lands embraced within the limits of the improvement, or to parts of them, were made by the Chesapeake and Ohio Canal Company, and by several other corporations and persons, besides those claiming under the patent referred to in the act of 1882, Congress passed the act approved August 5, 1886, c. 930, 24 Stat. 335, entitled "An

act to provide for protecting the interests of the United States in the Potomac River Flats, in the District of Columbia."

By the first section of this act it was made the duty of the Attorney General " to institute, as soon as may be, in the Supreme Court of the District of Columbia, a suit against all persons and corporations who may have or pretend to have any right, title, claim or interest in any part of the land or water in the District of Columbia within the limits of the city of Washington, or exterior to said limits and in front thereof toward the channel of the Potomac River, and composing any part of the land and water affected by the improvements of the Potomac River or its flats in charge of the Secretary of War, for the purpose of establishing and making clear the right of the United States thereto."

By the second section, it was provided that the suit " shall be in the nature of a bill in equity, and there shall be made parties defendant thereto all persons and corporations known to set up or assert any claim or right to or in the land or water in said first section mentioned, and against all other persons and corporations who may claim to have any such right, title or interest. On the filing of said bill process shall issue and be served, according to the ordinary course of said court, upon all persons and corporations within the jurisdictions of said court; and public notice shall be given, by advertisement in two newspapers published in the city of Washington for three weeks successively of the pendency of said suit, and citing all persons and corporations interested in the subject-matter of said suit, or in the land or water in this act mentioned, to appear, at a day named in such notice, in said court, to answer the said bill, and set forth and maintain any right, title, interest or claim that any person or corporation may have in the premises; and the court may order such further notice as it shall think fit to any party in interest."

The third section gives the court " full power and jurisdiction by its decree to determine every question of right, title, interest or claim arising in the premises, and to vacate, annul, set aside or confirm any claim of any character arising or set forth in the premises; and its decree shall be final and con-

clusive upon all persons and corporations parties to the suit, and who shall fail, after public notice as hereinbefore in this act provided, to appear in said court and litigate his, her or its claim, and they shall be deemed forever barred from setting up or maintaining any right, title, interest or claim in the premises."

As to all the defendants, except those claiming under a certain patent issued through the General Land Office to John L. Kidwell in 1869, the bill states that " the complainant is not sufficiently informed as to the nature and extent of said claims, or any of them, to set them out with particularity; and the complainant leaves them to present their claims in their answer hereto as they may be advised."

As to the claims under said patent, the bill avers the patent to be void upon several grounds, and the claims, therefore, unfounded, and prays that the patent may be cancelled and annulled.

The bill further states, that " the complainant disclaims in this suit seeking to establish its title to any of the wharves included in the area described in paragraph 3 of this bill, and claims title only to the land and water upon and in which said wharves are built, leaving the question of the ownership of the wharves proper, where that is a matter of dispute, to be decided in any other appropriate proceeding."

The limits of the "land and water" affected by the improvements are specifically set forth in the third paragraph of the bill of complaint. The beginning of said limits is at the southeast corner of square south of square 12, and they proceed thence along the east line of said square and the west line of Twenty-sixth street to the line of the Chesapeake and Ohio Canal bank; thence, by several courses and distances, "along the canal bank, parallel to and about ten feet southwest of a row of sycamore trees," and following the shore line of the river to the southwest line of Virginia avenue between Seventeenth and Eighteenth streets west; thence southeasterly along the southeast line of said avenue to the east line of Seventeenth street west, being the west line of Reservation 3 (known as the Monument Grounds); thence to the crest

of the bank forming the southwestern boundary of Reservation 3, and along said crest to the southwestern corner of square 233, at the intersection of Fifteenth street west and Water street; thence across Fourteenth street west and Maryland avenue to a point in the middle of E street south; thence to the nearest point in the shore line of the river; thence with said shore line to Greenleaf's Point at the southern extremity of the Arsenal Grounds; the line proceeds thence along the east side of the Washington channel of the Potomac River and across the mouth of the Eastern Branch in a southerly direction to the wharf at Giesboro Point; thence across the main or Virginia channel of the Potomac River in a westerly direction to the west side of that channel; thence along the west side of that channel in a northwesterly direction and following the meanders of the channel to a point opposite the wharf known as Easby's wharf; thence across the channel to the southwest corner of said wharf, and thence along the south side of said wharf to the southwest line of square south of square 12; and thence along said southwest line to the place of beginning at the southeast corner of said square.

The area of actual reclamation of land from the bed of the river within said limits under the above-mentioned legislation amounted to nearly seven hundred and fifty acres.

Claims and pretensions of various kinds to the land and water within said limits, or to portions of the same, are set up in the answers of the parties who were originally made defendants to the bill and of those who have appeared in response to the public notice of the pendency of the suit given in accordance with the terms of the act.

These claims, with respect to the nature of the several issues involved in them, admit of convenient division into classes, viz.:

I. The claim made by the heirs of James (M.) Marshall and those of his brother, Chief Justice John Marshall, to the ownership of the entire bed of the river from shore to shore (including therein the reclaimed land) under grants from the crown of England to Lord Culpeper and others, for what is known as the Northern Neck of Virginia, and the deed from Denny Martin Fairfax, as said Culpeper's successor in title, to said

James (M.) Marshall; and the claim made by the said heirs of James (M.) Marshall to such ownership under the patent to Lord Baltimore for the Province of Maryland, and the deed to them from Frederick Paul Harford as Lord Baltimore's successor in title.

II. The claims of ownership made to part of the reclaimed land by certain defendants, who assert title under a patent issued by the United States through the General Land Office to John L. Kidwell in the year 1869 for forty-seven and seventy-one one-hundredths ($47\frac{71}{100}$) acres and to one hundred and fifty (150) acres of alleged accretion thereto; and to another tract, the area of which is not stated, adjoining the Long Bridge and extending therefrom southwardly between the Washington and Georgetown channels, of which latter tract they claim to be the equitable owners under an application for a patent made by said Kidwell in 1871.

III. The claims made by the Chesapeake and Ohio Canal Company and its lessee, Henry H. Dodge, to riparian rights from Easby's Point to Seventeenth street west.

IV. The claims to riparian rights, right of access to the channel of the river, and to accretions, natural and artificial, made by the owners of lots in squares along the river west of Seventeenth street west, namely, squares 148, 129, 89, 63, 22, and square south of square 12.

V. The claim made by certain of the descendants of Robert Peter, an original proprietor of lands in the city of Washington, to certain land near the public reservation known as the Observatory Grounds.

VI. The claims to riparian privileges and wharfing rights made by owners of lots in squares beginning with square 233 and extending to the line of the Arsenal Grounds.

VII. The claims made by certain persons occupying wharves below the Long Bridge.

The main determination by the court "of rights drawn in question" in the suit was by a decree passed October 17, 1895. The decree adjudicated nearly all the points in controversy in favor of the United States.

Certain lots and parts of lots in squares 63, 89, 129 and

148, north of their boundaries on Water street and A street, which were subject to the ebb and flow of the tide, were included in the work of reclamation, and as to them the decree held the owners to be entitled to compensation for the taking and inclusion of the same in the improvements.

By the first paragraph of the decree, the claims under class 2, that is, those set forth in the answers of certain defendants founded upon a patent issued to John L. Kidwell in 1869, for a tract of forty-seven and seventy-one one-hundredths $(47\frac{71}{100})$ acres in the Potomac River, and alleged accretion thereto, and also to a tract adjoining the Long Bridge, founded upon an application for a patent therefor made by said Kidwell in 1871, are held and declared to be " invalid, void and of none effect ; " and the said patent is " vacated, annulled and set aside."

By the second paragraph, "the claims of each and all of the other parties defendants, set forth in their respective answers, to any rights, titles and interests, riparian or otherwise, in the said lands or water," are held and declared " to be invalid, void and of none effect," except as to the parties owning said lots and parts of lots in the squares last mentioned.

By the third paragraph, it is held and declared " that there does not exist (except as aforesaid) any right, title or interest in any person or corporation, being a party to this cause, to or in any part of the said land or water," and " that the right and title of the said United States (except as aforesaid) to all the land and water included within the limits of the said improvements of the Potomac River and its flats, as the said limits are described in the said bill of complaint," is absolute " as against all the defendants to this cause, and as against all persons whomsoever claiming any rights, titles or interests therein who have failed to appear and set forth and maintain their said rights, titles or interests as required by said act of Congress."

By the fourth paragraph, it is held that the defendants who are owners of the lots or parts of lots in squares 63, 89, 129 and 148, " which are included between the north line or

lines of the said improvements of the Potomac River and its flats, and the north line or lines of Water street and A street, are entitled to be indemnified for whatever impairment or injury may have been caused to their respective rights, titles or interests in said lots or parts of lots by the taking of the same by the United States; the value of such rights, titles, interests or claims to be ascertained by this court, exclusive of the value of any improvement of the said lots or parts of lots made by or under the authority of the said United States."

By the fifth and last paragraph of the decree, the taking of further testimony was authorized, on behalf of the owners and on behalf of the United States, as to the respective areas of the said lots and parts of lots, and of and concerning the true ownership and value of the said lots and parts of lots.

Such testimony as to ownership, areas and values having been taken and returned, the court upon consideration thereof, and on March 2, 1896, passed a further and supplementary decree, adjudging the values of the said lots and parts of lots so taken to be ten cents per square foot, and payment was directed to be made to sundry persons whom the court found to be the owners of certain of the parcels; the ownership of the remaining parcels not being, in the opinion of the court, sufficiently established, the taking of further testimony with respect thereto was ordered. The total amount of said values found by the court is $26,684.09.

The court having made a report of its action in the premises to Congress, agreeably to the requirements of the act of August 5, 1886, an appropriation was made for the payment of the sums so found to be due to the owners of the said lots and parts of lots in said squares; and with two exceptions, namely, Richard J. Beall and the trustees of the estate of William Easby, deceased, the several owners of the property applied, under said appropriation act, to the court for the payment to them of the respective sums found to be due to them, and the fund has been very largely disbursed under orders of the court passed on said applications.

From the main decree of October 17, 1895, appeals were taken as follows:

1. By all the defendants embraced in class one (1), namely, the heirs of James (M.) Marshall and the heirs of his brother, Chief Justice Marshall.

2. By all the defendants embraced in class two (2), claiming under. the Kidwell patent, etc., namely, Martin F. Morris, Henry Wells, Edward H. Wilson, Catherine A. Kidwell, Emma McCahill, John W. Kidwell, Francis L. Kidwell, Ida Hyde and George A. Hyde.

3. By one of the defendants embraced in class three (3), namely, the Chesapeake and Ohio Canal Company and its trustees.

4. By two of the defendants embraced in class four (4), namely, the trustees of the estate of William Easby, deceased, and Richard J. Beall.

5. By all of the defendants embraced in class five (5), namely, certain descendants of Robert Peter.

6. By certain of the defendants embraced in class six (6), namely : (*a*) Charles Chauncy Savage et al. ; (*b*) The Washington Steamboat Company, limited; (*c*) Avarilla Lambert et al. ; (*d*) William W. Rapley; (*e*) Mary A. S. Kimmell Gray ; (*f*) James F. Barber et al.; (*g*) William G. Johnson, assignee of the American Ice Company ; (*h*) Thomas W. Riley; (*i*) Edward M. Willis; (*j*) Annie E. Johnson, widow, sole executrix and devisee of E. Kurtz Johnson, deceased, et al. ; (*k*) Elizabeth K. Riley, in her own right and as trustee and executrix of William R. Riley, deceased ; (*l*) The Great Falls Ice Company ; (*m*) Daniel S. Evans ; (*n*) Margaret J. Stone; and (*o*) Charles B. Church et al.

7. By certain of the defendants embraced in class seven (7), namely, Annie E. Johnson, widow, sole executrix and devisee of E. Kurtz Johnson, deceased, et al.; Charles B. Church et al. ; Daniel S. Evans, and William W. Rapley.

The following reduced copies of the plans will assist in applying the reasoning of the opinion : ·

No. 1 is the city before the conveyances.

No. 2 is the Ellicott plan.

No. 3 is a portion of the Dermott map, sufficient to indicate the river front in part.

## No. 1.

Statement of the Case.

Statement of the Case.

No. 3.    Portion of the Dermott Map, 1797.

*Mr. A. Leo Knott* for the heirs of James Markham Marshall.

*Mr. John Howard* for the heirs of John Marshall. *Mr. James V. Brooke* was on his brief.

*Mr. George E. Hamilton* and *Mr. Nathaniel Wilson* for claimants under the Kidwell patent.

*Mr. Hugh L. Bond, Jr.*, and *Mr. John K. Cowen* for the Chesapeake & Ohio. Canal Company, and for Joseph Bryan, John K. Cowen and Hugh L. Bond, Jr., Trustees. *Mr. Charles F. T. Beale* was on their brief.

*Mr. Henry Randall Webb* for the Trustees of the estate of William Easby. *Mr. John Sidney Webb* was on his brief.

*Mr. J. Holdsworth Gordon* for William F. Dunlap and the heirs of George Peter. *Mr. Enoch Totten* and *Mr. Arthur Peter* were on his brief.

*Mr. John Selden* for the Washington Steamboat Company and the heirs of Moncure Robinson.

*Mr. William G. Johnson, Mr. Tallmadge A. Lambert* and *Mr. Calderon Carlisle* for Johnson, assignee of the American Ice Company and others claiming under Notley Young.

*Mr. Holmes Conrad* and *Mr. Hugh T. Taggart* for the United States.

*Mr. Enoch Totten* and *Mr. Edward A. Newman* filed a brief for W. W. Rapley.

*Mr. J. M. Wilson* filed a brief for Richard J. Beall.

*Mr. William F. Mattingly* filed a brief for Daniel S. Evans.

*Mr. T. A. Lambert* filed a brief for W. M. Easby-Smith.

MR. JUSTICE SHIRAS delivered the opinion of the court.

1. The first question for our determination arises out of the claims of the heirs of James M. Marshall and the heirs

of John Marshall to the ownership of the entire bed of the Potomac River, from shore to shore, including therein the reclaimed lands.

Their claims are based upon two distinct lines or sources of title, inconsistent with each other : One originating in the charter granted by Charles I, King of England, on June 20, 1632, to Cecilius Calvert, second Baron of Baltimore and first Lord Proprietary of the Province of Maryland; the other, in the charter granted by James II, King of England, on September 27, 1688, to Thomas, Lord Culpeper.

We do not think it necessary to enter at length or minutely into the history of the long dispute between Virginia and Maryland in respect to the boundary line. It is sufficient, for our present purpose, to say that the grant to Lord Baltimore, in unmistakable terms, included the Potomac River and the premises in question in this suit, and declared that thereafter the Province of Maryland and its freeholders and inhabitants should not be held or reputed a member or part of the land of Virginia, "from which we do separate both the said province and inhabitants thereof."

On September, 1688, King James II, by his royal patent of that date, granted to Thomas, Lord Culpeper, what was called the Northern Neck of Virginia, and described as follows :

"All that entire tract, territory or parcel of land situate, lying and being in Virginia in America, and bounded by and within the first heads or springs of the rivers of Tappahannock al* Rapahannock and Quiriough al* Patawonuck Rivers, the courses of said rivers from their said first heads or springs as they are commonly called and known by the inhabitants and descriptions of those parts and the Bay of Chesapeake, together with the said rivers themselves and all the islands within the outermost banks thereof, and the soil of all and singular the premises, and all lands, woods, underwoods, timber and trees, wayes, mountains, swamps, marshes, waters, rivers, ponds, pools, lakes, water courses, fishings, streams, havens, ports, harbours, bays, creeks, ferries, with all sorts of fish, as well whales, sturgeons and other royal fish. . . . To have,

hold and enjoy all the said entire tract, territory or portion of land, and every part and parcel thereof, . . . to the said Thomas, Lord Culpeper, his heirs and assigns forever."

Owing to the conflicting descriptions, as respected the Potomac River, contained in these royal grants, a controversy early arose between Virginia and Maryland. A compact was entered into in 1785 between the two States, whereby, through commissioners, a jurisdictional line, for the purpose of enforcing the criminal laws and regulating the rights of navigation in the Potomac River, was agreed upon.

Finally, the controversy as to the true boundary still continuing, in 1874 the legislatures of the two States agreed in the selection of arbitrators, by whose award, dated January 16, A.D. 1877, the jurisdictional line and boundary were declared to be the low-water mark on the Virginia shore. This award was accepted by the two States, and, by an act approved March 3, 1879, c. 196, 20 Stat. 481, Congress gave its consent to the agreement and award; but provided that nothing therein contained should be construed to impair or in any manner affect any right of jurisdiction of the United States in and over the islands and waters which formed the subject of the said agreement or award.

It was a mutual feature of the legislation by which this conclusion was reached that the landholders on either side of the line of boundary between the said States, as the same might be ascertained and determined by the said award, should in no manner be disturbed thereby in their title to and possession of their lands, as they should be at the date of said award, but should in any case hold and possess the same as if their said titles and possession had been derived under the laws of the State in which by the fixing of the said line by the terms of said award they should be ascertained to be. (Act of Virginia, February 10, 1876, chap. 48; act of Maryland, April 3, 1876, chap. 198.)

Whether the result of this arbitration and award is to be regarded as establishing what the true boundary always was, and that therefore the grant to Thomas, Lord Culpeper, never of right included the Potomac River, or as establishing

a compromise line, effective only from the date of the award, we need not determine. For, even if the latter be the correct view, we agree with the conclusion of the court below, that, upon all the evidence, the charter granted to Lord Baltimore, by Charles I, in 1632, of the territory known as the Province of Maryland, embraced the Potomac River and the soil under it, and the islands therein, to high-water mark on the southern or Virginia shore; that the territory and title thus granted to Lord Baltimore, his heirs and assigns, were never divested by any valid proceedings prior to the Revolution; nor was such grant affected by the subsequent grant to Lord Culpeper.

The record discloses no evidence that, at any time, any substantial claim was ever made by Lord Fairfax, heir at law of Lord Culpeper, or by his grantees, to property rights in the Potomac River or in the soil thereunder, nor does it appear that Virginia ever exercised the power to grant ownership in the islands or soil under the river to private persons. Her claim seems to have been that of political jurisdiction.

Without pursuing further this branch of the subject, and assuming that the heirs of John Marshall have become lawfully vested with the Fairfax title, we are of opinion that they have failed to show any right or title to the lands and premises involved in this litigation, and that the decree of the court below, so far as it affects them, is free from error.

There remains to consider the claim of the heirs of James M. Marshall as alleged successors to the title of Lord Baltimore to the river Potomac and the soil thereunder, as part and parcel of the grant to him by the patent of Charles I, in 1632.

We adopt, as sufficient for our purposes, the statement of that claim made in the printed brief filed on behalf of the heirs of James M. Marshall:

1st. That Charles I, in his charter of June, 1632, conveyed to the Lord Proprietary of Maryland, *inter alia*, full title to the lands under the navigable waters and rivers subject to tidal overflow, within the limits of that charter, with the right to grant such lands to others.

2d. That the King in said charter granted to the Proprietary of the Province of Maryland the whole bed and soil of the

Potomac River, from bank to bank, and from its source to its mouth, the *locus in quo* of the lands here in controversy.

3d. That the said Proprietary held such lands, as he held his other lands, in absolute ownership and propriety, but subject to the public servitudes in and of the waters over them, so long as those waters covered the lands.

4th. But that when the waters ceased to be or flow over them, these lands were relieved of those servitudes, and his right of seizin or possession attached and perfected his title, and of this his heirs or assigns could take the benefit and advantage, if holding title at that time.

5th. That by the action of the Government of the United States, in reclaiming these lands for public purposes, and converting them into firm and fast lands, and passing the act of August 5, 1886, and bringing suit against these appellants and others, the first opportunity was given to these appellants to make or assert their title.

6th. That title was legally derived to them by the devises and deeds set out in the record.

Briefly expressed, the appellants' contention is that the property in the soil under the river Potomac passed to Lord Baltimore and his grantees, and that it passed, not as one of the regalia of the Crown, or as a concomitant of government, but as an absolute proprietary interest, subject to every lawful public use, but not the less, on that account, a hereditament, and the subject of lawful ownership, and of the right of full and unqualified possession when that public use shall have ceased.

We need not enter into a discussion of this proposition, because the doctrine on which it is based has been heretofore adversely decided by this court in several leading and well-considered cases. *Martin* v. *Waddell*, 16 Pet. 367; *Den* v. *Jersey Company*, 15 How. 426; *Shively* v. *Bowlby*, 152 U. S. 1.

The conclusions reached were that the various charters granted by different monarchs of the Stuart dynasty for large tracts of territory on the Atlantic coast conveyed to the grantees both the territory described and the powers of government, including the property and the dominion of lands under

tide waters ; that by those charters the dominion and pro-
priety in the navigable waters, and in the soils under them,
passed as part of the prerogative rights annexed to the politi-
cal powers conferred on the patentee, and in his hands were
intended to be a trust for the common use of the new com-
munity about to be established, as a public trust for the
benefit of the whole community, to be freely used by all
for navigation and fishery, and not as private property, to
be parcelled out and sold for his own individual emolument ;
that, upon the American Revolution, all the rights of the
Crown and of Parliament vested in the several States, sub-
ject to the rights surrendered to the National Government by
the Constitution of the United States ; that when the Revo-
lution took place, the people of each State became themselves
sovereign, and in that character hold the absolute right to all
their navigable waters, and the soils under them, for their own
common use, subject only to the rights since surrendered by
the Constitution to the General Government.

If these principles are applicable to the present case, it
follows that, upon the Revolution, the State of Maryland
became possessed of the navigable waters of the State, in-
cluding the Potomac River, and of the soils thereunder, for
the common use and benefit of its inhabitants ; and that,
by the act of cession, that portion of the Potomac River,
with the subjacent soil which was appurtenant to and part
of the territory granted, became vested in the United States.

We do not understand the learned counsel for the appellees
to controvert the principles established by the cited cases as ap-
plicable to the royal grants and territories considered therein.
But their contention is that a different doctrine has prevailed
in the courts of the State of Maryland, to the effect that lands
beneath the tide waters of the Potomac were grantable in
fee to private persons, subject only to the public servitudes,
and that when, as in the present case, by the action of the
Government, these lands have ceased to be submerged, the
owner of the title, however long that title has been in abey-
ance, becomes entitled to possession and to compensation if
the land be taken for public purposes.

. The soundness of this contention depends upon two propositions: First, that the Federal decisions cited do not establish general principles applicable to each and all of the royal charters to the founders of the Atlantic colonies, but are restricted. in their scope to the particular grant in question in those cases; and, second, that the law of Maryland, if the sole rule of decision, is to the effect claimed.

In the argument in *Martin* v. *Waddell*, the decision of the Supreme Court of New Jersey, in the case of *Arnold* v. *Mundy*, 1 Halsted, 1, in which that court had laid down the rule as contended for by the appellants, was cited as conclusive, and as establishing a rule of property binding on the Federal courts.

In respect to this contention Mr. Chief Justice Taney said:

"The effect of this decision by the state court has been a good deal discussed at the bar. It is insisted by the plaintiffs in error that, as the matter in dispute is local in its character, and the controversy concerns only fixed property, within the limits of New Jersey, the decision of her tribunals ought to settle the construction of the charter; and that the courts of the United States are bound to follow it. It may, however, be doubted, whether this case falls within the rule, in relation to the judgments of state courts when expounding their own constitution and laws. The question here depends, not upon the meaning of instruments framed by the people of New Jersey, or by their authority, but upon charters granted by the British crown, under which certain rights are claimed by the State, on the one hand, and by private individuals on the other. And if this court had been of opinion that upon the face of these letters patent the question was clearly against the State, and that the proprietors had been deprived of their just rights by the erroneous judgment of the state court, it would perhaps be difficult to maintain that this decision of itself bound the conscience of this court. . . . Independently, however, of this decision of the Supreme Court of New Jersey, we are of opinion that the proprietors are not entitled to the rights in question."

The subject is barely adverted to in *Shively* v. *Bowlby*, where, referring to the case of *Martin* v. *Waddell*, it was

said by Mr. Justice Gray: "This court, following, though not resting wholly upon, the decision of the Supreme Court of New Jersey in *Arnold* v. *Mundy*, 1 Halsted, 1, gave judgment for the defendants." Whether, in the controversy between the United States, in the capacity of grantees of the State of Maryland, and the heirs of James M. Marshall, as successors to the property title of Lord Baltimore, involving a construction of the grant of Charles I, the final decision belongs to the Federal or to the state court, we do not find it necessary to decide. For, in our opinion, there is no conflict between the views announced by this court in the cases cited, and those that prevailed in Maryland, as they appear in the public conduct, and in cases decided prior to and about the time of the act of cession.

It does not appear that, in the administration of his affairs as land proprietor, Lord Baltimore, or his successors, ever made a sale, or executed a patent which, upon its face and in terms, granted the bed or shores of any tide water in the province, or ever claimed the right to do so.

The argument to the contrary, as respects the decisions of the courts of Maryland, depends on the case of *Browne* v. *Kennedy*, 5 H. & J. 195, decided in 1821, and following cases. The legal import of that case, and the effect to which it is entitled in the present case, we shall consider in a subsequent part of this opinion.

The case of *Fairfax's Devisee* v. *Hunter's Lessee*, 7 Cranch, 603, is authority for the propositions that Lord Fairfax's title to the waste and unappropriated lands, which he devised to Denny Fairfax, was that of an absolute property in the soil in controversy in that case, that the acts of ownership shown to have been exercised by him over the whole waste and unappropriated lands, vested in him a complete seizin and possession thereof; and that, even if there had been no acts of ownership proved, as there was no adverse possession, and the land was waste and unappropriated, the legal seizin must be considered as passing with the title. But neither Maryland nor any grantee of Maryland was a party to that suit. Nor, even as between the parties, was any actual question

made or evidence offered as to the boundary between Maryland and Virginia. The questions adjudicated were, what was the *nature*, not the extent of territory involved, of Lord Fairfax's title, and what was the character of the title which Denny Fairfax took by the will of Lord Fairfax, he being, at the time of Lord Fairfax's death in 1781, an alien enemy.

Therefore the questions now before us are not affected by that case. Nor do we think it necessary, in view of the conclusion we have reached on other grounds, to consider the legal effect and import of an alleged compromise between the State of Virginia and the devisees of Denny Fairfax and those claiming under them, and which is referred to in the act of December 10, 1796. Revised Code, c. 92.

However, even if it be conceded — which we do not do — that the river Potomac and the soil under it were, by virtue of the grant of Charles I the private property of Lord Baltimore, and that the same lawfully descended to and became vested in Henry Harford, the last Proprietary of Maryland, still, by the acts of confiscation passed by the general assembly of Maryland in 1780, (c. 45 and 49,) all the property and estate of the then Lord Proprietary of Maryland, within that State, were confiscated and seized to the use of the State, and, as public property belonging to the State at the time of the cession of 1791, passed into the ownership of the United States.

As against this proposition, it is argued on behalf of the Marshall heirs that the confiscation acts of Maryland were ineffectual in the present case, because the title to these lands under water is of such character that they could not be forfeited or confiscated, the owner thereof not having right of possession or right of entry thereon. If, as is elsewhere claimed by the appellants, the soil under the river was the subject of sale and devise, it is not easy to see why it may not be subjected to forfeiture and confiscation. Indeed, it was held in *Martin* v. *Waddell* that lands under navigable waters were subject to an action of ejectment. And in the case of *Lowndes* v. *Huntington*, 153 U. S. 1, an action of ejectment, asserting title to land submerged under the waters of Huntington Bay, was sustained.

It is further claimed, that these acts of Maryland were in derogation of the common law and of the express provisions and inhibitions of the constitution and bill of rights of that State adopted four years before the passage of these acts of confiscation; and that the effect of the sixth article of the treaty of 1783 and the ninth article of the treaty of 1794 and of the act of Maryland of 1787 making the treaty of 1783 the law of the State, operated to relieve these lands from forfeiture and restored them to Henry Harford, and that the power to pass acts of confiscation did not inhere as a war power in Maryland.

For an answer to the reasoning advanced by the learned counsel for the appellants in support of these contentions, it is sufficient to refer to the case of *Smith* v. *Maryland*, 6 Cranch, 286, where it was held, affirming the Court of Appeals of the State of Maryland, that by the confiscating acts of Maryland the equitable interests of British subjects were confiscated, without office or entry or other act done, and although such equitable interests were not discovered until long after the peace.

It is finally urged that, even conceding the validity of the confiscation acts, and that they were effectual to divest the title of Henry Harford and put it in the State of Maryland, and even though it was transferred by the act of cession to the United States, yet the latter took the property under a trust or equity created by the treaties with Great Britan, whereby they are in equity bound to restore it to the Harford heirs or to their assigns, or to make just compensation for subjecting it to public purposes. It is said that, when now the United States find themselves in control or possession of a part of the estate of a subject of Great Britain, they should do what they "earnestly recommended" should be done by the States, namely, make a restitution of the confiscated estates.

Whatever force, if any, there may be in such suggestions, it is quite evident that they are political in their nature, and appeal to Congress, and not to the courts. It cannot be maintained, with any show of plausibility, that Congress intended, by the act under which these proceedings are had, that the

Supreme Court of the District of Columbia, or that this court on appeal, should have the right to overturn, after the lapse of a century, rights originating in statutes of Maryland and of the United States, sustained as valid by their courts.

We affirm, therefore, the decree of the court below, in respect to the Marshall heirs, that, in the words of the act of 1886, they have no " right, title or interest in any part of the land or water composing any part of the Potomac River, or its flats, in charge of the Secretary of War."

2. The next claim for consideration is that founded upon a patent issued, on December 6, 1869, from the General Land Office to John L. Kidwell, for "a tract of vacant land containing fifty-seven acres and seventy-one one-hundredths of an acre, called 'Kidwell's Meadows,' and lying in the Potomac River, above the Long Bridge, according to the official certificate and plat of survey thereof bearing date the tenth and twelfth of October, 1867, made and returned by the surveyor of Washington County, pursuant to a special warrant of survey unto the said surveyor directed on the 26th day of June, 1867, by the Commissioner of the General Land Office aforesaid, in virtue of the authority of Congress, under a resolution 'directing the manner in which certain laws of the District of Columbia shall be executed,' approved on the 16th day of February, 1839."

The resolution of Congress referred to was in the following words : " That the acts of the State of Maryland for securing titles to vacant land which were continued in force by the act of Congress of the twenty-seventh of February, 1821, in that part of the District of Columbia which was ceded to the United States by that State, and which have been heretofore inoperative for want of proper officers or authority in the said District for their due execution, shall hereafter be executed, as regards lands in the county of Washington and without the limits of the city of Washington, by the Secretary of the Treasury, through the General Land Office, where applications shall be made for warrants, which warrants shall be directed to the surveyor for the county of Washington, who shall make return to the Commissioner of the General Land Office; and payment for said land, according to the said laws of Maryland, shall be

made to the Treasurer of the United States, whose certificate of such payment shall be presented to the Commissioner of the General Land Office, who shall thereupon issue, in the usual form of patents for lands by the United States, a patent for such land to the person entitled thereto; and the Secretary of the Treasury shall make such regulations as he may deem necessary, and shall designate the officers who shall carry the said acts into effect: Provided, that any land which may have been ceded to or acquired by the United States for public purposes shall not be affected by such acts." 5 Stat. 364.

The space claimed to be comprehended within the courses and distances of the survey, set forth in the patent, is now included within the lines of the raised land known as the reclaimed flats; and the claimants under the patent contend that this occupation by the United States is an appropriation of their property, for which they are entitled to compensation under the proceedings in this suit.

It is alleged in the bill that the patent to Kidwell was issued without authority of law, and was and is null and void, and several grounds are set forth for each allegation. The main contentions on behalf of the Government are that the land covered by the patent was, when it issued, within the limits of the city of Washington, and was therefore excepted from the operations of the resolution of 1839; that the land was, at the time of the cession, a part of the bed of the Potomac River and subject to tidal overflow, and was therefore reserved to the United States for such public uses as ordinarily pertain to the river front of a large city; that said land, as part of the bed of the Potomac River and subject to overflow by the tides, was not the subject of a patent under the resolution of 1839, and the General Land Office and its functionaries were without authority to grant a patent therefor; and that the patent was obtained by fraud, and was ineffectual by reason of certain specified irregularities.

By their answers the claimants under the patent denied these several allegations, and under the issues of law and of fact thus raised a large amount of evidence was taken.

In the opinion of the court below the questions involved

were elaborately considered; and they have been fully discussed before us in the oral and printed arguments of the respective counsel.

Our examination of the subject has brought us to conclusions which render it unnecessary for us to express an opinion on several of the questions that have been so fully treated.

In our consideration of the questions now before us we shall, of course, assume that the river Potomac with its subjacent soil was included in the grant to Lord Baltimore and became vested, by the methods hereinbefore considered, in the State of Maryland, and that, by the act of cession, that part of the river and its bed which is concerned in this litigation passed into the control and ownership of the United States.

Without questioning the power of Congress to have made a special sale or grant to Kidwell in 1869 of the lands embraced in this patent, in the condition that they then were, or even to have provided by a general law for the sale of such lands by the land office, we are of opinion that it was not the intention of Congress, by the general resolution of 1839, to subject lands lying beneath the waters of the Potomac and within the limits of the District of Columbia to sale by the methods therein provided.

The lands which Congress had in view in passing the resolution were stated to be the vacant lands, for securing title to which the laws of Maryland which were in force in 1801 had made provisions, but which laws had remained inoperative, after the cession, for the want of appropriate officers or authority in the District of Columbia for their execution.

The only acts of Maryland which have been brought to our attention as having been in force in 1801, under which a disposition of the lands of the State could be made, are the acts of November session, 1781, c. 20, and of November session, 1788, c. 44. The act of 1781, c. 20, is entitled "An act to appropriate certain lands to the use of the officers and soldiers of this State, and for the sale of vacant lands." The preamble recites that there are large tracts of land within the State "reserved by the late proprietors which may be applied to

the discharge of the engagement of lands made to the officers and soldiers of this State, and that the granting the other vacant lands in this State would promote population and create a fund towards defraying the public burthen." Sections 3 and 4 provide for a land office, and for issuing "common or special warrants of vacant cultivation, and for the surveying of any vacant lands, cultivated or uncultivated."

By the act of November session, 1788, c. 44, all other vacant lands in the State were made liable to be taken up in the usual manner by warrant.

It would seem evident that the lands whose disposition was contemplated by these acts were vacant lands which had been cultivated, or which were susceptible of cultivation.

By such terms of description it would not appear that the disposition of lands covered by tide water was contemplated, because such lands are incapable of ordinary and private occupation, cultivation and improvement, and their natural and primary uses are public in their nature, for highways of navigation and commerce.

In the case of *State* v. *Pacific Guano Co.*, 22 S. Car. 50, the Supreme Court of South Carolina, in discussing a somewhat similar question, said:

"The absolute rule, limiting land -owners bounded by such streams to high-water mark, unless altered by law or modified by custom, accords with the view that the beds of such channels below low-water mark are not held by the State simply as vacant lands, subject to grant to settlers in the usual way through the land office.

"There seems to be no doubt, however, that the State, as such trustee, has the power to dispose of these beds as she may think best for her citizens, but not being, as it seems to us, subject to grant in the usual form under the provisions of the statute regulating vacant lands, it would seem to follow that in order to give effect to an alienation which the State might undertake to make, it would be necessary to have a special act of the legislature expressing in terms and formally such intention."

In the case of *Allegheny City* v. *Reed*, 24 Penn. St. 39, 43,

it was held by the Supreme Court of Pennsylvania that the
provisions of the general acts in respect to patents for lands
did not relate to the foundation of an island whose soil had
been swept away by floods. "The title of the Common-
wealth to what remained was not gone, but was no longer
grantable under the acts of assembly for selling islands. The
foundation of the island belongs to the Commonwealth still,
but she holds it, as she does the bed of the river and all sand
bars, in trust for all her citizens as a public highway. The act
of 1806 was not a grant of the State's title, but only a mode
prescribed in which titles might thereafter be granted.   .   .   .
The jurisdiction is a special one, and if the subject-matter, to
which the act of 1806 relates, were gone — had ceased to be
— the board of property had no jurisdiction ; no more than
they would have over any other subject not intrusted to their
discretion."

In *Illinois Central Railroad* v. *Illinois*, 146 U. S. 387, it
was recognized as the settled law of this country that the
ownership of and dominion and sovereignty over lands cov-
ered by tide waters, or navigable lakes, within the limits of
the several States belong to the respective States within which
they are found, with the consequent right to use or dispose of
any portion thereof, when that can be done without substan-
tial impairment of the interest of the public in such waters,
and subject to the paramount right of Congress to control
their navigation so far as may be necessary for the regulation
of commerce.

In *Shively* v. *Bowlby*, 152 U. S. 1, the discussion was so
thorough as to leave no room for further debate. The con-
clusions there reached, so far as they are applicable to the
present case, were as follows :

"It is equally well settled that a grant from the sovereign
of land bounded by the sea or by any navigable tide water,
does not pass any title below high-water mark, unless either
the language of the grant, or long usage under it, clearly
indicates that such was the intention." 152 U. S. 13.

"We cannot doubt, therefore, that Congress has the power
to make grants of land below high-water mark of navigable

waters in any territory of the United States, whenever it becomes necessary to do so in order to perform international obligations or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several States, or to carry out other public purposes appropriate to the objects for which the United States holds the territory. But Congress has never undertaken by general laws to dispose of such lands." 152 U. S. 48.

"The Congress of the United States, in disposing of the public lands, has constantly acted upon the theory that those lands, whether in the interior, or on the coast, above high-water mark, may be taken up by actual occupants, in order to encourage the settlement of the country; but that the navigable waters and the soils under them, whether within or above the ebb and flow of the tide, shall be and remain public highways; and, being chiefly valuable for the public purposes of commerce, navigation and fishery, and for the improvements necessary to secure and promote those purposes, shall not be granted away during the period of territorial government." 152 U. S. 49.

"Upon the acquisition of a territory by the United States, whether by cession from one of the States, or by treaty with a foreign country, or by discovery and settlement, the same title and dominion passed to the United States, for the benefit of the whole people and in trust for the several States to be ultimately created out of the territory." 152 U. S. 57.

In *Mann* v. *Tacoma Land Co.*, 153 U. S. 273, it was again held that the general legislation of Congress in respect to public lands does not extend to tide lands; that the scrip issued by the United States authorities to be located on the unoccupied and unappropriated public lands could not be located on tide lands; and that the words "public lands" are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws.

As against these principles and these decisions, the claimants under the patent cite and rely on the case of *Browne* v. *Kennedy*, 5 H. & J. 195, to the alleged effect "that the bed

of any of the navigable waters of the State may be granted, and will pass if distinctly comprehended by the terms of any ordinary patent, issuing from the land office, subject only to the existing public uses of navigation, fishery, etc., which cannot be hindered or impaired by the patentee."

Our examination of this case has not satisfied us that the decision therein went as far as is now claimed. As we read it, the gist of the decision was that, by the common law and the law of Maryland, proprietors of land bounded by unnavigable rivers have a property in the soil covered by such rivers *ad filum mediam aquæ*, and that where one holding land on both sides of such a stream had made separate conveyances, bounding on the stream, and the stream had afterwards been diverted or ceased to exist, the two original grantees took each to the middle of the land where the stream had formerly existed, and that a subsequent grantee of the territory formerly occupied by the stream took no title. Such a decision would have no necessary application here.

But we are bound to concede that the Court of Appeals, in the subsequent case of *Wilson* v. *Inloes*, 11 G. & J. 351, has interpreted *Browne* v. *Kennedy* as establishing the principle that the State has the right to grant the soil covered by navigable water, subject to the public or common right of navigation and fishery, and inferentially that a title, originating in a patent issued under general law from the land office, attached to the land, and gave a right of possession when the waters ceased to exist.

The decision in *Browne* v. *Kennedy* was not made till a quarter of a century after the cession by Maryland to the United States, and seems to have been a departure from the law as previously understood and applied, both during the colonial times and under the State prior to the cession.

Thus in *Proprietary* v. *Jennings*, 1 H. & McH. 92, an information was filed by the attorney general of the Lord Proprietor, in 1733, to vacate a patent on the ground that it had been illegally obtained, and the case clearly indicates that land under tide water was not patentable. *Smith and Purviance* v. *State*, 2 H. & McH. 244, was the case of an

appeal from a decree of the chancellor, dated April 27, 1786, vacating and annulling, on the ground of fraud and misrepresentation, a patent granted to Nathaniel Smith, June 2, 1783, for a tract of land called Bond's Marsh. It was disclosed in the case that Smith was the owner of a tract of land called Bond's Marsh, which had been granted to one John Bond, September 16, 1766, for four acres; and that, on April 20, 1782, Smith, who had become the owner of the tract, petitioned for a warrant of resurvey, stating that he had discovered some vacant land contiguous thereto, and that he was desirous of adding the same to the tract already held by him. Thereupon the surveyor of the county was directed "to lay out and carefully survey, in the name of him, the said Smith, the said tract of land called Bond's Marsh, according to its ancient metes and bounds, adding any vacant lands contiguous thereto," etc. On May 8, 1782, the surveyor certified to the land office that he had resurveyed the said original tract called Bond's Marsh, and that it contained exactly four acres, and that there were seventeen and one half acres of vacant land added. Upon this Smith obtained from the State a grant on the said certificate for twenty-one and a half acres under the name of Bond's Marsh resurveyed, and, July 8, 1784, Smith conveyed for a consideration two undivided third parts of said tract to Samuel Purviance. The bill averred that " although the said Smith by his aforesaid petition did allege and set forth that he had discovered vacant land adjoining the said tract called Bond's Marsh, there was not any vacant land adjoining or contiguous to the same, but that the whole which by the said grant is granted to the said Smith as vacant land added to the original tract aforesaid, now is and at the time of obtaining the said warrant and grant was part of the waters of the northwest branch of Patapsco River." The bill also averred that Purviance was not an innocent purchaser, but knew that the pretended vacancy included in the patent "was not land, but part of the waters of the northwest branch of Patapsco River." The decree vacating the patent was affirmed.

In the foot notes to *Baltimore* v. *McKim*, 3 Bland, 468, the

cases of *Fowler* v. *Goodwin* and *Ritchie* v. *Sample* are referred to. In *Fowler* v. *Goodwin*, the chancellor, on May 19, 1809, refused to direct a patent to issue because a large part of the land lay in the waters of Bell's Cove. In *Ritchie* v. *Sample*, the certificate of survey showed that the tract applied for was a parcel of the Susquehanna River, comprehending a number of small islands, and the chancellor held, July 10, 1816, "that the land covered by the water cannot be called grantable land, though possibly islands may have been taken up together, between which the water sometimes flows."

Of course, the recent decisions of the courts of Maryland, giving to the statutes of that State a construction at variance with that which prevailed at the time of the cession, cannot control our decision as to the effect of those statutes on the territory within the limits of the District of Columbia since the legislative power has become vested in the United States. *Ould* v. *Washington Hospital*, 95 U. S. 303; *Russell* v. *Allen*, 107 U. S. 163, 171; *De Vaughn* v. *Hutchinson*, 165 U. S. 566.

At the utmost, such decisions can only be considered as affecting private rights and controversies between individuals. They cannot be given effect to control the policy of the United States in dealing with property held by it under public trusts.

This aspect of the question was considered by Mr. Justice Cox of the Supreme Court of the District of Columbia, in a case arising out of the legislation of Congress establishing the Rock Creek Park; and wherein the effect of a patent granted by the State of Maryland, in 1803, for a piece of land afterwards included in the park, was in question. It was said in the opinion:

"There is a still more important question, and that is whether the State of Maryland at that period could convey any interest, legal or equitable, in the property. In the act of 1791, ceding this property to the United States, there is this proviso: 'That the jurisdiction of the laws of this State over the persons and property of individuals residing within the limits of the cession aforesaid shall not cease or determine until Congress shall by law provide for the government thereof, under their jurisdiction in manner provided by the article of

the Constitution before recited.' Now this continues in force the jurisdiction of the laws of the State of Maryland over the persons and property of individuals residing therein. To make that applicable to the present case it would be necessary to have extended it to the property held by the State; but it seems to me that that extended no further than to say that the laws which affected private rights should continue in force until proper provision was made by Congress. See what the consequences would be if another construction had been given to it. The State of Maryland extended to the Virginia shore, and suppose that after this cession and before 1801 the State of Maryland had undertaken to cede to the State of Virginia the whole bed or bottom of the Potomac River, from its source to its mouth, including that part in the District of Columbia, doubtless Congress could have had something to say about it after the cession had been made. We are satisfied, therefore, that the proviso does not continue in operation the land laws of the State of Maryland, and consequently no title could be derived at the dates of this survey and patent or at the date when the warrant on which it was based was taken out. We are satisfied that the proviso does not continue in operation the land laws of the State of Maryland as to the public lands owned by the State within the said District, and that consequently no title to such lands could be obtained by patent from the State after the act of 1791."

This decision was adopted and the opinion approved by this court in the case of *Shoemaker* v. *United States*, 147 U. S. 282, 307.

If any doubt is left as to whether Congress intended by the resolution of 1839 to subject the river and its subjacent soil to the ordinary land laws as administered by the land office, that doubt must, as we think, be removed by a consideration of the express language of the proviso therein contained, withholding lands held by the United States for public purposes from the operation of the acts of Maryland. The language of the proviso is as follows: " *Provided, that any lands which may have been ceded to, or acquired by, the United States, for public purposes, shall not be affected by such acts.*"

Placed, as this proviso is, at the end of the enactment, the natural implication is that Congress did not intend to include the lands which the United States held for public purposes within the scope of the resolution, but added the proviso out of abundant caution. However this may be, the intention expressed is clear that, in the administration of the land laws by the Secretary of the Treasury through the general land office, the lands that had been ceded to or acquired by the United States for public purposes should not be affected.

What were the lands so held by the United States? Undoubtedly, the squares and lots selected by the President as sites for the President's House, the Capitol, and other public buildings, and which had been, in legal effect, dedicated to public use by the grantors, were not meant, because the resolution in terms provides that the lands to be affected were such as were within the county of Washington and *without the limits of the city of Washington.*

There may have been other land held by the United States for public purposes outside of the limits of the city of Washington, but surely the Potomac River and its bed, so far as they were embraced in the county of Washington, were included in the terms of the proviso. Indeed, it is not too much to say that they constituted the very land which Congress was solicitous to withhold from sale under proceedings in the land office.

It cannot, we think, be successfully claimed that even if, in 1839, the lands embraced within the Kidwell patent were exempted from the jurisdiction of the land office, yet they were brought within that jurisdiction by the fact that the waters had so far receded in 1869 as to permit some sort of possession and occupancy. Not having been within the meaning of the resolution of 1839, they would not be brought within it by a subsequent change of physical condition, but a further declaration by Congress of a desire to open them to private ownership would be necessary.

Besides, the facts of the case show that Congress is asserting title and dominion over these lands for public purposes. Whether Congress should exercise its power over these re-

served lands by dredging, and thus restoring navigation and fishery, or by reclaiming them from the waters for wharfing purposes, or to convert them into public parks, or by subjecting them to sale, could only be determined by Congress, and not by the functionaries of the land office.

If, then, there was an entire want of authority in the land office to grant these lands held for public purposes, a patent so inadvertently issued, under a mistaken notion of the law, would plainly be void, and afford no defence to those claiming under it as against the demands of the Government.

As was said by this court in *Smelting Co.* v. *Kemp*, 104 U. S. 636, 641:

"Of course, when we speak of the conclusive presumptions attending a patent for lands, we assume that it was issued in a case where the Department had jurisdiction to act and execute it; that is to say, in a case where the lands belonged to the United States, and provision had been made by law for their sale. If they never were public property, or had previously been disposed of, or if Congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them, and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. The action of the Department would in that event be like that of any other special tribunal not having jurisdiction of a case which it had assumed to decide. Matters of this kind, disclosing a want of jurisdiction, may be considered by a court of law. In such cases the objection to the patent reaches beyond the action of the special tribunal, and goes to the existence of a subject upon which it was competent to act."

Similar views were expressed in *Doolan* v. *Carr*, 125 U. S. 618, 624, where it was said:

"There is no question as to the principle that where the officers of the Government have issued a patent in due form of law, which on its face is sufficient to convey the title to the land described in it, such patent is to be treated as valid in actions at law as distinguished from suits in equity, subject,

however, at all times to the inquiry whether such officers had the lawful authority to make a conveyance of the title. But if those officers acted without authority, if the land which they purported to convey had never been within their control, or had been withdrawn from that control at the time they undertook to exercise such authority, then their act was void — void for want of power in them to act on the subject-matter of the patent — not merely voidable; in which latter case, if the circumstances justified such a decree, a direct proceeding, with proper averments and evidence, would be required to establish that it was voidable, and therefore should be avoided. . . . It is nevertheless a clear distinction, established by law, and it has often been asserted in this court, that even a patent from the Government of the United States, issued with all the forms of law, may be shown to be void by extrinsic evidence, if it be such evidence as by its nature is capable of showing a want of authority for its issue."

The further contention on the part of the United States, that the lands embraced within the Kidwell patent lie within the limits of the city of Washington, and that therefore they were, for that reason, not grantable by the land office, we have not found it necessary to determine, and we refrain from expressing any opinion upon it.

Nor do we need to enter at any length into the question of fraud attending the issue of the patent. We deem it not improper to say, however, that the allegations imputing fraud to the government officials concerned in the issuance of the patent, or to those who were active in procuring it, or in asserting rights under it, do not appear to us to have been sustained by the evidence.

We, therefore, conclude this branch of the case by affirming the decision of the court below, "that the proceedings of Kidwell, under the resolution of 1839, to obtain a patent for the 'Kidwell Meadows,' and the issue of that patent, are inoperative to confer upon the patentee or his assigns any title or interest in the property within its limits, adverse to the complete and paramount right therein of the United States."

It is urged on behalf of those claiming under the Kidwell

patent that a court of equity will not set aside the patent at the suit of the United States, unless on an offer by the latter to return the purchase money; that, in granting the relief, the court will impose such terms and qualifications as shall meet the just equities of the opposing party.

As the invalidity of the patent in the present case was not apparent on its face, but was proved by extrinsic evidence, and as the controversy respecting the title was not abandoned by the defendants, they were not, we think, entitled to a decree for a return of the purchase money, or for costs. *Piersoll* v. *Elliott*, 6 Pet. 95.

3. Before considering the remaining claims it will be necessary to dispose of the question of the river boundary of the city of Washington.

What place should be selected for the permanent seat of Government was, as shown by the histories of the times, a matter of long and bitter debate, occupying a large part of the second session of the second Congress. After the claims of Philadelphia and Baltimore had been adversely disposed of, the question was reduced to a choice between a site on the Susquehanna River in Pennsylvania and one on the Potomac River. And we learn from the recently published journal of William Maclay, Senator from Pennsylvania, 1780–91, and who was an earnest advocate for the former, that the allegation that a large expenditure would be required to render the Susquehanna navigable was used as a decisive argument in favor of the site on the Potomac. Maclay's Journal.

The result was the act of July 16, 1790, c. 28, 1 Stat. 130, whereby the President was authorized to appoint three commissioners to survey and, by proper metes and bounds, to define and limit, under his direction, a district of territory, to be located on the river Potomac. By the same act, the commissioners were empowered "to purchase or accept such quantity of land on the eastern side of the said river, within the said district," as the President might deem proper for the use of the United States, and *according to such plans as he might approve*, and were required, prior to the first Monday of December, 1800, to provide suitable buildings for the ac-

commodation of Congress and of the President and for the
public offices of the Government.

It has been the practice in this country, in laying out towns,
to have the plat surveyed, and a plan made in accordance with
the survey, designating the streets, public squares and open
spaces left for commons, wharves or any other public pur-
pose. Those streets, squares and open spaces are thus dedi-
cated to the public by the proprietors of the soil, whether
they be the State or private individuals. When a town is
situated on a navigable river, it is generally the custom to
leave an open space between the line of the lots next the
river and the river itself. This was done by William Penn
in 1682 in the original plan of the city of Philadelphia on the
Delaware River front, and he called it a top common; and in
1784 his descendants, the former proprietors, in their plan of
Pittsburgh, adopted a similar measure of leaving such an
open space, and they called it Water street. *Birmingham*
v. *Anderson*, 48 Penn. St. 258.

In 1789 the proprietors of the land on which the city of
Cincinnati is built pursued the same policy, and in their plan
the ground lying between Front street and the Ohio River
was set apart as a common for the use and benefit of the town
forever. *Cincinnati* v. *White*, 6 Pet. 431; *Barclay* v. *Howell's
Lessee*, 6 Pet. 498; *New Orleans* v. *United States*, 10 Pet. 662;
*Barney* v. *Keokuk*, 94 U. S. 324; *Rowan's Executors* v. *Port-
land*, 8 B. Monroe, 232.

Our examination of the evidence has led us to the conclu-
sion that it was the intention of the founders of the city of
Washington to locate it upon the bank or shore of the Po-
tomac River, and to bound it by a street or levee, so as to
secure to the inhabitants and those engaged in commerce free
access to the navigable water, and that such intention has
never been departed from.

While, as we have already seen, the United States became
vested with the control and ownership of the Potomac River
and its subjacent soil, within the limits of the District, by
virtue of the act of cession by the State of Maryland, it
must yet be conceded that, as to the land above high-water

mark, the title of the United States must be found in the transactions between the private proprietors and the United States, consisting of the mutual agreements entered into by the proprietors, their deeds of conveyance to the trustees, their concurrence in the action of the commissioners in laying out plats and giving certificates, and their recognition of the several plans of the city made under the direction of the President.

As we have already said, our inquiry is as to the intention of the parties to be affected, but that intention need not be expressed by any particular form or ceremony, but may be a matter of necessary implication and inference from the nature and circumstances of the case.

We cannot undertake to comment upon each and every step of the transactions, but shall briefly refer to those of the most significance.

And, first, in the agreement of March 13, 1791, signed by the principal proprietors, including Robert Peter, David Burns, Notley Young and Daniel Carroll, are the following recitals:

"We, the subscribers, in consideration of the great benefits we expect to derive from having the Federal City laid off upon our lands, do hereby agree and bind ourselves, our heirs, executors and administrators, to convey in trust to the President of the United States, or Commissioners, or such person or persons as he shall appoint, by good and sufficient deeds in fee simple, the whole of our respective lands which he may think proper to include within the lines of the Federal City, for the purposes and on the conditions following:

"The President shall have the sole power of directing the Federal City to be laid off in what manner he pleases. He may retain any number of squares he may think proper for public improvements, or other public uses, and the lots only which shall be laid off shall be a joint property between the trustees on behalf of the public and each present proprietor, and the same shall be fairly and equally divided between the public and the individuals, as soon as may be after the city shall be laid out.

"For the streets the proprietors shall receive no compensa-

tion, but for the squares or lands in any form which shall be taken for public buildings or any kind of public improvements or uses, the proprietors, whose lands shall be so taken, shall receive at the rate of twenty-five pounds per acre, to be paid by the public," etc.

And by an agreement of March 30, 1791, the proprietors of lots in Carrollsburgh, including Daniel Carroll and Notley Young, it was provided as follows:

" We, the subscribers holding or entitled to lots in Carrolls. burgh, agree with each other and with the President of the United States that the lots and land we hold or are entitled to in Carrollsburgh shall be subject to be laid out at the pleasure of the President as part of the Federal City, and that we will receive one half the quantity of our respective lots as near their present situation as may agree with the new plan, and where we may be entitled now to only one lot or otherwise not entitled on the new plan to one entire lot, or do not agree with the President, Commissioners or other person or persons acting on behalf of the public on an adjustment of our interest, we agree that there shall be a sale of the lots in which we may be interested respectively, and the produce thereof in money or securities shall be equally divided, one half as a donation for the use of the United States under the act of Congress, the other half to ourselves respectively. And we engage to make conveyances of our respective lots and lands aforesaid to trustees or otherwise whereby to relinquish our rights to the said lots and lands, as the President or such Commissioners or persons acting as aforesaid shall direct, to secure to the United States the donation intended by this agreement."

A similar agreement was entered into by the owners of the lots in the town of Hamburgh.

Following these agreements came the conveyances by the several proprietors to Beall and Gantt, trustees. Without quoting from them at length, and referring to those of David Burns and Notley Young, copied in full in the Statement of the Case, it is sufficient here to say that the proprietors, by said conveyances, completely divested themselves of all title to the tracts conveyed, and that the lands were granted to the

said trustees, " To have and to hold the hereby bargained and sold lands with their appurtenances to the said Thomas Beall and John Mackall Gantt, and the survivor of them, and the heirs of such survivor, forever, to and for the special trust following, and no other, that is to say, that all the said lands hereby bargained and sold, or such part thereof as may be thought necessary or proper, be laid out together with the lands for a Federal City, with such streets, squares, parcels and lots as the President of the United States for the time being shall approve; and that the said Thomas Beall and John Mackall Gantt, or the survivor of them, or the heirs of such survivor, shall convey to the Commissioners for the time being appointed by virtue of an act of Congress entitled 'An act for establishing the temporary and permanent seat of the Government of the United States,' and their successors, for the use of the United States forever, all the said streets, and such of the said squares, parcels and lots as the President shall deem proper for the use of the United States. And that as to the residue of the lots into which the said lands hereby bargained and sold shall have been laid out and divided, that a fair and equal division of them shall be made," etc.

In a suit between the heirs of David Burns and the city of Washington and the United States this court had occasion to pass upon the nature of these grants, and used the following language :

" It is not very material, in our opinion, to decide what was the technical character of the grants made to the Government; whether they are to be deemed mere donations or purchases. The grants were made for the foundation of a Federal City; and the public faith was necessarily pledged, when the grants were accepted, to found such a city. The very agreement to found a city was itself a most valuable consideration for these grants. It changed the nature and value of the property of the proprietors to an almost incalculable extent. The land was no longer to be devoted to agricultural purposes, but acquired the extraordinary value of city lots. In proportion to the success of the city would be the enhancement of this value; and it required scarcely any

aid from the imagination to foresee that this act of the Government would soon convert the narrow income of farmers into solid opulence. The proprietors so considered it. In this very agreement they state the motive of their proceedings in a plain and intelligible manner. It is not a mere gratuitous donation from motives of generosity or public spirit; but in consideration of the great benefits they expect to derive from having the Federal City laid off upon their lands. Neither considered it a case where all was benefit on one side and all sacrifice on the other. It was in no just sense a case of charity, and never was so treated in the negotiations of the parties. But, as has been already said, it is not in our view material whether it be considered as a donation or a purchase, for in each case it was for the foundation of a city." *Van Ness* v. *Washington*, 4 Pet. 232, 280.

In *Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.*, 109 U. S. 686, after an elaborate consideration of the agreements and conveyances, it was said:

"Undoubtedly Notley Young, prior to the founding of the city and the conveyance of his land for that purpose, was entitled to enjoy his riparian rights for his private uses and to the exclusion of all the world besides. It can hardly be possible that the establishment of the city upon the plan adopted, including the highway on the river bank, could have left the right of establishing public wharves, so essential to a great centre of population and wealth, a matter of altogether private ownership."

Thomas Johnson, Daniel Carroll and David Stuart were, on January 22, 1791, appointed by President Washington such Commissioners; and on March 30, 1791, by his proclamation of that date, the President finally established the boundary lines of the District; directed the Commissioners to proceed to have the said lines run, and, by proper metes and bounds, defined and limited; and declared the territory, so to be located, defined and limited, to be the district for the permanent seat of the Government of the United States.

With the lines of the District thus established, the next important question that presented itself was the location of the

Federal City, in which were to be erected the buildings for the accommodation of Congress, the President's House, and the public offices.

We are here met with a serious controversy as to the place and nature of the river boundary of the city. The record contains a large amount of evidence, consisting chiefly of maps and plans, of correspondence between the President and the Commissioners, the deeds of conveyance by the original proprietors, and the testimony of old residents, some of whom had acted as surveyors and engineers during the early history of the city.

We cannot complain of having been left unassisted to examine and analyze this mass of evidence, for we have had the aid of the painstaking opinion of the court below and of a number of able briefs on all sides of the controversy.

As a national city was to be founded, which was to be the permanent seat of the Government of the United States, where foreign nations would be expected to be represented, and as the site selected was on a navigable, tide-water river, inviting foreign and domestic commerce, we should naturally expect to find the city located in immediate proximity to the river, with public wharves and landings, and with a municipal ownership and control of the streets and avenues leading to and bounding on the stream.

As we have seen, the agreement of the proprietors provided that "the President shall have the sole power of directing the Federal City to be laid off in what manner he pleases."

In the exercise of that power the President, at different times, caused several maps or plans of the city to be prepared, the authenticity and effect of which constitute a large part of the controversy in the present case.

The earliest of these plans was that prepared in 1791, by Major L'Enfant, and was by him submitted to the President on August 19 of that year. On October 17, 1791, after advertisement, and under direction by the President, the Commissioners sold a few lots. On December 13, 1791, by a communication of that date, the President placed before Congress this L'Enfant plan. On this plan the squares were unnumbered and the streets unnamed.

Afterwards differences arose between L'Enfant and the Commissioners, which resulted in the removal of L'Enfant by the President early in March, 1792. Thereupon Andrew Ellicott was directed by the President to prepare this plan so that it might be engraved, but Major L'Enfant refused to permit Ellicott to use his original plan, and Ellicott proceeded to prepare a plan from materials in his possession and from such information as he had acquired while acting as surveyor under L'Enfant.

It may be well to mention, though out of chronological order, that in a letter of February, 1797, President Washington, in a letter to the Commissioners, referring to L'Enfant's plan and to certain alterations that had been made, stated that Mr. Davidson, a purchaser of lots, "is mistaken if he supposed that the transmission of Major L'Enfant's plan of the city to Congress was the completion thereof; so far from it, it would appear from the message which accompanied the same that it was given as a matter of information only to show what state the business was in; that the return of it was requested; that neither house of Congress passed any act consequent thereupon; that it remained as before under the control of the Executive."

Ellicott completed his plan and laid it before the President on February 20, 1792. This plan was engraved at Boston and at Philadelphia — the engraved plans differing in the circumstance that the latter did and the former did not exhibit the soundings on the river front and on the Eastern Branch.

On October 8, 1792, the Commissioners, who had been notified that "about 100 squares were prepared and ready for division," had a second public sale of lots — a copy of Ellicott's engraved plan being exhibited at the sale. Under the general authority conferred upon them by the President, on September 29, 1792, to make private sales at such prices and on such terms as they might think proper, the Commissioners, before November 6, 1792, had effected private sales of fifteen lots.

Between 1792 and 1797, this plan of Ellicott's, known as the "engraved plan," was circulated by the Commissioners in

the United States, and forwarded to European countries from the Office of State, as the plan of the city, and was referred to as such by the Commissioners in their negotiations for loans for the purpose of carrying on the public buildings.

On February 27, 1797, the Commissioners addressed a letter to the President, in which, among other things, they said:

"What Mr. Davidson alludes to in his memorial, when he says deviations have been made since the publication of the engraved plan, we know not; that plan required the doing of many acts to carry it into effect — such as the laying out and bounding a water street on the waters which surround the city, and laying out squares where vacant spaces unappropriated were left in several parts of the city. Acts of this kind have no doubt from time to time been done, and with the full consent of all interested."

It appears that the Ellicott plan was, in some respects, incomplete, as it did not show all the squares or correctly delineate the public reservations, and was made before the completion of the surveys.

The first appearance of the Dermott map, that we find in this record, was on June 15, 1795, when, as appears in the proceedings of the Commissioners of that date, "Dermott is directed to prepare a plat of the city with every public appropriation plainly and distinctly delineated, together with the appropriation now made by the board for the National University and Mint."

On March 2, 1797, by an instrument under his hand and seal, President Washington requested Thomas Beall and John M. Gantt, the trustees, to convey to the Commissioners all the streets in the city of Washington, as they are laid out and delineated in the plan of the city thereto annexed; and also the several squares, parcels and lots of ground therein described. Though in this communication President Washington mentioned a plan of the city as annexed thereto, yet it seems that a plan was not so actually annexed. And on June 21, 1798, the Commissioners wrote a letter to President Adams in the following terms:

"At the close of the late President's administration he exe-

cuted an act directing the trustees of the city of Washington to convey to the Commissioners the streets of said city and the grounds which were appropriated to public use. In the press of business the plan referred to was not annexed. We now send it by Mr. Nourse, with the original act and the draft of another act, which appears to us proper to be executed by the present President, in order to remove any objection to a compliance with the late President's request arising from the omission above mentioned. As these acts are the authentic documents of the title of the public to the lands appropriated, we shall write to Mr. Craik, or some other gentleman, to take charge of their return rather than trust them to the mail."

Accordingly, on July 23, 1798, President Adams, by an instrument reciting the act executed by his predecessor on March 2, 1797, and the non-annexation to that act of the plan of the city therein mentioned, makes known to Beall and Gantt, trustees, that he has caused the said plan to be annexed to the said act, and requests them to convey to the Commissioners for the use of the United States forever, according to the tenor of the act of Congress of July 16, 1790, "all the streets in the said city of Washington, as they are laid out and delineated in the plan of the said city hereto annexed, and all the squares, parcels and lots of ground described in the said act as public appropriations."

The following entry, as of the date of August 31, 1798, appears in the proceedings of the Commissioners : " Mr. William Craik delivered into the office the plan of the city of Washington, with the acts of the late and present Presidents."

Some dispute subsequently arose as to whether the plan which President Washington intended to have annexed to his act was the plan of Ellicott or that of Dermott. Thus, in an opinion delivered on December 16, 1820, by Attorney General Wirt to President Monroe, it was said that "if President Washington has, as Mr. Breckinridge states, previously ratified Ellicott's engraved plan, this must be considered as the plan he intended to annex, and it was not competent for President

Adams to give the instrument of writing a different direction by annexing to it a different plan."

But this opinion was evidently given in ignorance of the proceedings of the Commissioners on June 21, 1798, already referred to, and in which it appears that, in their letter to President Adams, they mention that the plan sent was " the last plan of the city, made by Mr. Dermott, and referred to in said instrument of writing" — the said instrument of writing being President Washington's act of March 2, 1797.

We also find in the record that, on January 7, 1799, Attorney General Lee, in an opinion given to President Adams, said :

"Already a plan of the city has been approved and ratified by the President of the United States, who has signed the plan itself, or an instrument referring to the plan, which I presume is a sufficient authentication. If this plan, under the President's signature, varies from the L'Enfant's or Ellicott's essays, they must yield to it, as they are to be considered only as preparatory to that plan which received ultimately the formal and solemn approbation of the President. It is not supposed that this is incomplete in any respect, except in relation to the rights appurtenant to the water lots, and to the street which is to be next to the water courses."

The record also contains a copy of a report of a committee of the House of Representatives, of April 8, 1802, in which it is said, referring to the Dermott plan :

"This plan has been signed by Mr. Adams, in conformity with which the trustees were directed by him to convey the public grounds to the United States, and is considered by the Commissioners the true plan of the city. The plan has never been engraved or published. . . . Your committee are of the opinion that suffering the engraved plan, which is no longer the true plan of the city, to continue to pass as such, may be productive of great deception to purchasers; and that measures ought to be taken for its suppression."

On July 14, 1804, President Jefferson, in a communication to Mr. Thomas Monroe, Superintendent of Public Buildings, said :

" The plan and declaration of 1797 were final so far as they

went, but even they left many things unfinished, some of which still remain to be declared."

What would seem to be decisive of the dispute is the fact that in the act or instrument signed by President Washington on March 2, 1797, is contained, by metes and bounds, a specification of the reservations, seventeen in number, and those metes and bounds do not coincide with the reservations indicated upon the Ellicott plan, but do accurately coincide with the reservations as indicated in the Dermott plan.

We, therefore, cannot doubt that the Dermott map was the one intended by President Washington to be annexed to his act of March 2, 1797.

But while we regard the Dermott map as sufficiently authenticated, we do not accept the contention that it is to be considered as the completed and final map of the city, and that it alone determines the questions before us.

On the contrary, we think it plain, upon the facts shown by this record, that the President, the Commissioners and the surveyors proceeded, step by step, in evolving a plan of the city. Under each of the plans mentioned lots were sold and private rights acquired. Changes were, from time to time, made to suit the demands of interested parties, and additions were made as the surveys were perfected. Even the last map approved by President Washington, as was said by President Jefferson in 1804, left many things unfinished, some of which still remained to be declared.

In short, we think that these several maps are to be taken together as representing the intentions of the founders of the city, and, so far as possible, are to be reconciled as parts of one scheme or plan.

Pursuing such a method of investigation, we perceive that, in the first map submitted to Congress by President Washington on December 13, 1791, as "the plan of the city," there is between the lots fronting on the Potomac and the river itself an open space, undoubtedly intended as a thoroughfare and for public purposes. It is true that this open space is not named as a street. But none of the other streets and avenues on this map are named. And we read in a letter of

the Commissioners to Major L'Enfant, dated September 9, 1791, as follows:

"We have agreed that the Federal District shall be called 'The Territory of Columbia,' and the Federal City 'The City of Washington;' the title of the map will therefore be 'A map of the City of Washington in the Territory of Columbia.' We have also agreed the streets be named alphabetically one way, and numerically the other; the former divided into north and south letters, the latter into east and west numbers from the capitol. Major Ellicott, with proper assistants, will immediately take and soon furnish you with soundings of the Eastern Branch to be inserted in the map."

This L'Enfant plan contains all the essential features of the city of Washington as they exist to-day.

Owing to the disputes between L'Enfant and the Commissioners, as already stated, the former withdrew, and Andrew Ellicott, who had been acting as an assistant to L'Enfant, proceeded with the work, with the result that about October, 1792, the engraved or Ellicott map was completed and in the hands of the Commissioners. This map shows the squares numbered, the avenues named, and the lettered and numbered streets all designated. It also shows on the front on the Potomac River and on the Eastern Branch, between the ends of the lots and the squares and the water, an open, continuous space or street, extending through the entire front of the city.

But it must be said of this map that it did not show all the squares or correctly place the public reservations, and, indeed, it was made before the completion of the surveys. As was said by the Commissioners in their letter of February, 1797, "that plan required the doing of many acts to carry it into effect, such as the laying out and bounding a water street on the waters which surround the city."

Then came, in March, 1797, the Dermott map, which indicated the location and extent of the public reservations or appropriations, and also certain new squares, not shown on the engraved plan, and which were laid out on the open spaces at the intersection of streets appearing on the engraved plan; and also exhibited the progress that had been made since

1792, in laying down the city upon the ground in accordance with the scheme of the previous plans. But, as was said by President Jefferson on July 14, 1804, in a passage previously quoted, "The plan and declaration of 1797 were final so far as they went ; but even they left many things unfinished, some of which still remain to be declared."

President Jefferson was probably led to form this opinion by his personal knowledge of the situation, which was intimate. And here may well be quoted a portion of a long communication addressed to him by Nicholas King, surveyor of the city of Washington, dated September 25, 1806, in which the writer, adverting to the several plans and to certain regulations published by the Commissioners on July 20, 1795, said :

" Perfecting this part of the plan, so as to leave nothing for conjecture, litigation or doubt, in the manner which shall most accord with the published plans, secure the health of the city, and afford the most convenience to the merchants, requires immediate attention. . . . The principle adopted in the engraved plan, if carried into effect and *finally established in the plan now laid out upon the ground*, when aided by proper regulations as to the materials and mode of constructing wharves for vessels to lay at and discharge their cargoes on, seems well calculated to preserve the purity of the air. The other streets will here terminate in a street or key, open to the water, and admitting a free current of air. It will form a general communication between the wharves and warehouses. of different merchants, and, by facilitating intercourse, render a greater service to them than they would derive from a permission to wharf as they pleased. The position of this Water Street being determined, it will ascertain the extent and situation of the building squares and streets on the made ground, from the bank of the river and bring the present as near to the published plan as now can be done. It will define the extent and privileges of water lots, and enable the owners to improve without fear of infringing on the rights of others. . . . Along the water side of the street, the free current or stream of the river should be permitted to flow and carry with it whatever may have been brought from the city along

the streets or sewers. The wharves permitted beyond this street to the channel may be stages or bridges with piers and sufficient waterways under them. And on the wharves so erected, it would seem proper to prohibit the erection of houses or anything obstructing a free circulation of air. . . . The surveying is now so far completed that it can be done with the utmost precision, and every foot of ground within the limits of the Federal City, with its appurtenant privileges, may be so defined as to prevent litigation or doubt on the subject. If it is not done at this time the evils will increase and every year add to our difficulties. Even now, from the various decisions or neglects, alterations or amendments which have heretofore taken place, some time an investigation may be necessary in the arrangement of a system which shall combine justice with convenience. If this decision is left to a future period and our courts of law, they can only have a partial view of the subject, and any general rule they may adopt may be attended with serious disadvantages."

Nicholas King himself prepared a plan or serial map of sixteen sheets in 1803. There is evidence tending to show that this was done in pursuance of an order of the Commissioners; and in reference to it the record contains the testimony, in the present case, of William Forsythe, who had been connected for many years with the office of surveyor of the city, in subordinate capacities and as the head of it, and who was in 1876 the surveyor of the District of Columbia. He says:

"I can only say that it is the best in point of execution of the early maps of the city; and that it has been acted upon ever since it has been prepared in connection with the affairs of the surveyor's office, and that the lines of wharfing indicated upon the map from Rock Creek to Easby's Point have been followed; in other words, that all the improvements, such as reclamation of land, and the wharves that have been built in that section of the city, were made and built in accordance with the plan of wharfing, etc., indicated on this map. . . . The map of 1803 has always, in my recollection going back forty years in connection with the surveying

department of the city, been considered and acted upon as an
official map, and from conversation with those who have pre-
ceded me in the surveyor's office, I know that it was always
considered by them as an authentic official map of the city.
It has in fact been the standard map."

While it is true that this map of 1803 was never officially
approved or authenticated by any President of the United
States, as were the earlier maps, and is not therefore of con-
clusive effect, it is, in our opinion, a legitimate and important
piece of evidence.

In connection with the later map of 1803, prepared by
King, ought also to be considered a series of plans drawn by
him and laid before the Commissioners on March 8, 1797, in
a communication, as follows:

"I send you herewith a series of plans exhibiting that part
of the city which lies in the vicinity of the water, and includes
what is called the water property, from the confluence of
Rock Creek with the Potomac to the public appropriation for
the Marine Hospital on the Eastern Branch. What appears
to me the most eligible course for Water street, with the
necessary alterations in the squares already laid out, or the
new ones which will be introduced thereby, are distinguishable
by the red lines which circumscribe them, while those already
established are designated by two black lines."

Without pausing to examine the King map and plans in
their particulars, to some of which we may have occasion to
recur at a subsequent stage of our investigation, it is enough
to here state that the existence of a water street in front of
the city, and comporting, in the main, with its course as laid
down on the engraved plan of the Ellicott plan, is distinc-
tively recognized.

The record also contains a map proposed by William Elli-
ott, surveyor of the city of Washington, in 1835, and adopted
in 1839 by the city councils and approved by President Van
Buren, entitled "Plan of part of the City of Washington,
exhibiting the water lots and Water street, and the wharves
and docks thereon, along the Potomac, from E to T streets
south." This map exhibits Water street as extending in front

of that part of the city embraced in the map, and it also shows that what are styled "water lots" front on the north side of Water street.

We have not overlooked the fact disclosed by the evidence in the record that, even during the presidency of General Washington, there were complaints made, from time to time, of alleged changes or departures from the L'Enfant and Ellicott plans, and that also efforts were made, sometimes successfully, to get changes allowed. And on November 10, 1798, a memorial was addressed to President Adams by some of the proprietors of lands within the city, complaining of changes made by the Dermott plan in some of the features of the previous plans, and calling attention to the incompleteness of that plan in omitting a delineation of Water street.

But these complaints appear to have been ineffectual. Nor are we disposed to understand them as meaning more than a call for a perfect delineation of Water street — not as asserting that the Dermott plan was an abandonment of such a street.

In connection with the various maps and plans must be read the regulations issued by the Commissioners while they were acting, and their contract and agreements with the proprietors and purchasers.

In July, 1795, certain wharfing regulations were published, containing, among other things, the following: "That all the proprietors of water lots are permitted to wharf and build as far out into the river Potomac and the Eastern Branch as they may think convenient and proper, not injuring or interrupting the channels or navigation of the said waters; leaving a space, wherever the general plan of the streets of the city requires it, of equal breadth with those streets; which, if made by an individual holding the adjacent property, shall be subject to his separate occupation and use, until the public shall reimburse the expense of making such street; and where no street or streets intersect said wharf, to leave a space of sixty feet for a street at the termination of every three hundred feet of made ground." This was certainly an assertion of the control by the public, then represented by the Commissioners, over the

fast land adjoining the shores and extending to the navigable channels.

Another fact of much weight is that, in the division of squares between the Commissioners and Notley Young, the plats of which were signed by the Commissioners and by Notley Young, in March, 1797, the southern boundary is given as Water street.

It is, doubtless, true, as argued in the brief filed for those who succeeded to Young's title, that such a division would not, of itself, have the effect of vesting title in fee to the land in the United States. Nor, perhaps, would such a transaction operate as a donation by Young to the city of the territory covered by the street, although it might be deemed a dedication thereof to public use as a street.

But the importance of the fact consists in the recognition by Young of the existence of Water street, as an existing or projected southern boundary of the squares.

Stress is laid, in the arguments for the appellants, on the use of the term " water lots," in the agreement of December 24, 1793, between the Commissioners for the Federal buildings, of the one part, and Robert Morris and James Greenleaf, of the other part, and also on the statement made, in that agreement, that Morris and Greenleaf were entitled to the lots in Notley Young's land, and, of course, to the privileges of wharfing annexed thereto.

It should, however, be observed that the term " water lots," as used in that agreement, and elsewhere in the proceedings of the Commissioners, does not necessarily mean that such lots were bounded by the Potomac River. The lots fronting on Water street were spoken of as " water lots " because next to that street and nearer to the river than the lots lying behind — a fact which gave them additional value. That this was the usage in speaking of " water lots " appears in Elliott's map made in 1835, and approved by President Van Buren in 1839, where the lots abutting on Water street on the south are termed " water lots."

As to the statement in the agreement that Morris and Greenleaf, as purchasers from the Commissioners of lots in

Notley Young's land, would be entitled to the privilege of wharfing annexed thereto, it must be remembered that that language was used in 1793, before the division of squares between Notley Young and the Commissioners was made.

It is true that in the return made by the surveyors, on June 15, 1793, of squares 472, 473, 505, 506, south of 506, and south of south 506, they bounded said lots by the Potomac River. But in a further and subsequent return, made on December 14, 1793, these squares are given, in each instance, a boundary by Water street. And on June 22, 1794, the Commissioners adopted the later survey, as shown by an entry on their minutes, as follows:

"The Commissioners direct that the surveys and returns made of the part of the city in Mr. Young's land, adjoining the Potomak, leaving Water street according to the design of the plan of the city, be acted on instead of the returns made by Major Ellicott in some instances bounded with and in others near the water."

And we learn, from the evidence in the record, that on July 12, 1794, by a letter of that date, Thomas Freeman, a surveyor in the employ of the Commissioners, informed them that "Water street on Potomak River is adjusted and bounded."

So that Morris and Nicholson, who succeeded to the interest of Greenleaf, took under their contract squares laid off in Notley Young's land with a boundary in every instance on Water street.

By various ordinances, from time to time passed, the city, from its organization in 1802, exercised jurisdiction over the portions of the Potomac River and the Eastern Branch adjoining the city and within its limits. So, too, Congress, by the act of May 15, 1820, c. 104, 3 Stat. 583, enacted that "the city should have power to preserve the navigation of the Potomac and Anacostia Rivers, adjoining the city, to erect, repair and regulate public wharves, and to deepen creeks, docks and basins; to regulate the manner of erecting and the rates of wharfage at private wharves; to regulate the anchorage, stationing and mooring of vessels."

Controversies arose, involving the meaning of the agree-

ments between the original proprietors and the United States
and the city of Washington, and as to the effect of subsequent
acts of Congress and ordinances of the city authorities, and
these questions found their way into the courts.

*Van Ness and Wife* v. *Washington,* 4 Pet. 232, grew out of
an act of Congress of May 7, 1822, authorizing the corporation
of Washington, in order to improve certain parts of the public
reservations and to drain the low grounds adjoining the river, to
lay off in building lots certain parts of the public reservations
and squares, and also a part of B street, as laid out and desig-
nated in the original plan of the city, which lots they might
sell at auction, and apply the proceeds to those objects, and
afterwards to enclosing, planting and improving other reser-
vations, the surplus, if any, to be paid into the Treasury of
the United States. The act also authorized the heirs or ven-
dees of the former proprietors of the land on which the city
was laid out, who might consider themselves injured by the
purposes of the act, to institute in the Circuit Court of the
District of Columbia a bill in equity against the United States,
setting forth the grounds of any claim they might consider
themselves entitled to make ; the court to hear and determine
upon the claim of the plaintiffs, and what portion, if any, of
the money arising from the sale of the lots they might be
entitled to, with a right of appeal to this court. The plain-
tiffs, Van Ness and wife, filed their bill against the United
States and the city of Washington, claiming title to the lots
which had been thus sold, under David Burns, the original
proprietor of that part of the city, on the ground that by the
agreement between the United States and the original pro-
prietors, upon the laying out of the city, those reservations
and streets were forever to remain for public use, and without
the consent of the proprietors could not be otherwise appro-
priated or sold for private use; that by such sale and appro-
priation for private use the right of the United States thereto
was determined, or that the original proprietors reacquired a
right to have the reservations laid out in building lots for
their joint and equal benefit with the United States, or that
they were in equity entitled to the whole or a moiety of the

proceeds of the sales of the lots. This court held that the United States possessed an unqualified fee in the streets and squares, and that no rights or claims existed in the former proprietors or their heirs.

This decision is criticised by the learned counsel of the appellants as founded on an erroneous assumption by the court, that Beall and Gantt, the trustees, had made a conveyance, on November 30, 1791, of all the premises contained in the previous agreements, including the squares or lots for public buildings and the land for the streets. And, indeed, it does appear, by the evidence in the present case, that although both President Washington and President Adams did formally request the trustees to convey to the Commissioners all the streets in the city of Washington, and also the several squares, parcels and lots of ground appropriated for public purposes, yet that the trustees, owing to disputes and objections on the part of several of the original proprietors, failed to ever actually execute such a deed of conveyance. Yet even if such an alleged state of facts had been made to appear to the court, namely, that no conveyance of the land in the streets had been actually made by the trustees, we think the conclusion reached by the court in that case could not have been different.

In the act of Maryland, ratifying the cession, and entitled "An act concerning the Territory of Columbia and the City of Washington," passed December 19, 1791, c. 45, was contained the following (§ 5):

"*And be it enacted*, That all the squares, lots, pieces and parcels of land within the said city, which have been or shall be appropriated for the use of the United States, *and also the streets*, shall remain and be for the use of the United States; and all the lots and parcels, which have been or shall be sold to raise money as a donation as aforesaid, shall remain and be to the purchasers, according to the terms and conditions of their respective purchase . . ."

In August, 1855, Attorney General Cushing rendered to the Secretary of the Interior an opinion upon the question of the authority of the Commissioner of Public Buildings, as

successor of the early Commissioners, to sell and convey lots in the city of Washington. Adverting to the act of the legislature of Maryland of December 19, 1791, and citing the section above quoted, he said :

" This provision seems to have been designed to have the legal effect to vest in the United States the fee of all the lots, conveyed for their use, and also to perfect the titles of purchasers to whom sales had been or should be made according to the terms of the act of Congress." 7 Opinions of Attys. Genl. 355.

And even if the act of Maryland did not avail, of itself, to convey unto the United States a legal statutory title, the facts show that the United States were entitled to a conveyance from the trustees, and a court of equity will consider that as having been done which ought to have been done.

In point of fact the trustees did, by their deed of November 30, 1796, on the request of President Washington, convey to the Commissioners in fee simple all that part of the land which had been laid off into squares, parcels or lots for buildings and remaining so laid off in the city of Washington, subject to the trusts remaining unexecuted.

In the case of *Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.*, 109 U. S. 672, it was held, following *Van Ness* v. *Washington*, that the fee of the streets was in the city, and further that the strip between the squares and lots and the Potomac River was such a street, and that there were no private riparian rights in Notley Young and those who succeeded to his title.

In the discussion of the evidence that led to such a conclusion Mr. Justice Matthews said :

"It has been observed that both squares No. 472 and No. 504 are bounded on the southwest by Water street. This street was designated on the adopted plan of the city as occupying the whole line of the river front, and separating the line of the squares from the river for the entire distance from Fourteenth street to the Arsenal grounds. It is alleged in the bill in respect to this street that there was traced on the map of the city ' but a single line denoting its general course

and direction; that the dimensions of said Water street, until the adoption, on the 22d of February, 1839, of the certain plan of one William Elliott, as hereinafter more particularly mentioned, were never defined by law; and that the said Water street was never, in fact, laid out and made in the said city until some time after the close of the recent civil war; that before the commencement of the said civil war one high bluff or cliff extended along the bank of said river in the city of Washington, from Sixth street west to Fourteenth street west; that to the edge thereof the said bluff or cliff, between the points aforesaid, was in the actual use and enjoyment of the owners of the land which it bounded towards the river; that public travel between the two streets last above mentioned, along the said river, could only be accomplished by passing over a sandy beach, and then only when the tide was low; and that what is now the path of Water street, between the two streets aforesaid, was and has.been made and fashioned by cutting down the said cliff or bluff and filling in the said stream adjacent thereto.'

"These allegations, in substance, are admitted in the answer to be true, with the qualification that the width of the street was left undefined because it constituted the whole space between the line of the squares and the river, whatever that might be determined to be from time to time; but that the Commissioners, on March 22, 1796, made an order directing it to be laid out eighty feet in width from square 1079 to square east of square 1025, and to 'run out' the squares next to the water and prepare them for division;' and that it was so designated on the maps of the city in 1803. If not, the inference is all the stronger that the whole space south of the line of the lots was intended to be the property and for the use of the public. *Barclay* v. *Howell's Lessees*, 6 Pet. 498. In *Rowan's Exrs.* v. *Portland*, 8 B. Monroe, 232, 239, that inference was declared to be the legal result of such a state of facts.

" It is quite certain that such a space was designated on the official map of the city as originally adopted, the division and sale of the squares and lots being made in reference to it.

What the legal effect of that fact is we shall hereafter inquire, and while we do not consider it to be qualified by the circumstance set forth as to the actual history of the street as made and used, they perhaps sufficiently account for the doubt and confusion in which the questions of right brought to issue in this litigation seem for so long a period to have been involved.

"The transaction between Notley Young and the public authorities, as evidenced by the documents and circumstances thus far set forth, was equivalent in its result to a conveyance by him to the United States in fee simple of all his land described, with its appurtenances, and a conveyance back to him by the United States of square No. 472, and to Greenleaf of square No. 504, bounded and described as above set forth, leaving in the United States an estate in fee simple, absolute for all purposes, in the strip of land designated as Water street, intervening between the line of the squares as laid out and the Potomac River."

It is earnestly urged in the present case that the court in that case did not have before it the Dermott map, and was not aware that said map was the one approved by President Washington on March 2, 1797. From this it is reasoned that, if the court had been informed that the Dermott map was the real and only official plan, and had seen that Water street was not laid out or designated upon it, a different conclusion as to the ownership of Water street would have resulted.

It is by no means clear that the Dermott plan was not before the court. If it was, as is now contended, the only plan which was approved by President Washington as the official map, it would seem very singular that the able and well-informed counsel who represented the respective parties in that case did not think fit to put it in evidence, and make it the subject of comment.

We are inclined to infer that the Dermott plan was the very one referred to in the bill and answer in that case. Thus, in the bill, in the portion above quoted, it was alleged, in respect to Water street, that there was traced on the map of the city " but a single line, denoting its general course and direction;" and in the answer it is stated that the width of

the street was left undefined, because it constituted the whole space between the line of the squares and the river.

An inspection of the Dermott plan discloses such a single line, extending along the entire river front on both the Potomac and the Eastern Branch, and outside of the line of the squares and lots.

But the Ellicott plan, as engraved in Philadelphia, discloses a well-defined space, of varying width, between the river and the line of the lots and squares, extending along the entire front of the city.

There are expressions used in the opinion of the court, in that case, that show that the attention and consideration of the court were not restricted to a single map. Thus, on page 679, after adverting to the order of the Commissioners on March 22, 1796, directing that Water street should be laid out eighty feet in width, the court adds " that it was so designated on the maps of the city in 1803 " — evidently referring to the King plan.

Even if so unlikely a fact did exist, namely, that in the case in 109 U. S. the Dermott map was not considered, we think that the conclusion of the court would not have been changed by its inspection. It was not understood to set aside or dispense with the important features of the previous maps. It, no doubt, having been made after most of the surveys had been returned, more accurately comported with the lots, squares and streets as laid out, than the previous plans. But, as we have seen, it was not itself complete. The contention that it omitted Water street, with the intention of thereby renouncing the city's claim to a street on the river, does not impress us as sustained by the evidence. The preceding plans exhibited a space for such a street, and the succeeding plans, both that of King in 1803, and that of Elliott, adopted by the city councils and approved by President Van Buren in 1839, recognize and, in part, define Water street. The Dermott plan itself exhibits the line of a space outside of the line of the squares and lots, and that portion of such space that lies on the Eastern Branch is marked on the Dermott plan as Water street.

The latest reference to the maps that we are pointed to in the reports of this court is in *Patch* v. *White*, 117 U. S. 210, 221,

where Mr. Justice Woods said: " The devise clearly and with-out uncertainty designates a lot on Ninth street, between I and K streets, well known on the map of the city of Washing-·ton, whose metes, bounds and area are definitely fixed, platted and recorded. The map referred to was approved by Presi-dent Washington in 1792 and recorded in 1794. Thousands of copies of it have been engraved and printed. All convey-ances of real estate in the city made since it was put on the record refer to it; it is one of the muniments of title to all the pub-lic and private real estate in the city of Washington, and it is probably better known than any document on record in the District of Columbia. The accuracy of the description of the lot devised is, therefore, matter of common knowledge, of which the court might even take judicial notice."

It is true that in that case there was no controversy respect-ing the authenticity of the city maps, and that the expressions quoted are found in a dissenting opinion. Still, such state-ments made in a closely contested case, where the parties were represented by leading counsel, residents of the city of Washington, may fairly be referred to as a contribution to the history of the city maps.

Without protracting the discussion, we think, considering the reasonable probability that a public street or thorough-fare would be interposed between the lots and squares and the navigable river; the language and history of the acts of Mary-land referred to; the agreements between the original proprie-tors; the deeds to the trustees; the subsequent transactions between the property holders and the Commissioners; the regulations affecting the use of wharves and docks, published by the Commissioners; the several acts of Congress conferring jurisdiction upon the city over the adjacent waters; the sev-eral city maps and plans, beginning with that of L'Enfant, sent by President Washington to Congress in 1791, and end-ing with that of Elliott, approved by President Van Buren in 1839; and the views expressed on the subject in previous deci-sions of this court, that the conclusion is warranted, that, from the first conception of the Federal City, the establishment of a public street, bounding the city on the south, and to be

known as Water street, was intended, and that such intention has never been departed from.

With this conclusion reached, it follows that the holders of lots and squares abutting on the line of Water street are not entitled to riparian rights; nor are they entitled to rights of private property in the waters or the reclaimed lands lying between Water street and the navigable channels of the river, unless they can show valid grants to the same from Congress, or from the city under authority from Congress, or such a long protracted and notorious possession and enjoyment of defined parcels of land as to justify a court, under the doctrine of prescription, in inferring grants.

4. With these results in view, we shall now proceed to examine the remaining claims.

The Chesapeake and Ohio Canal Company was incorporated in 1824 by concurrent acts of the legislatures of Virginia and Maryland. The object of the company was the construction of a navigable canal from the tide water of the Potomac to the Ohio River.

By an act approved March 3, 1825, c. 52, 4 Stat. 101, Congress enacted "that the act of the legislature of the State of Virginia, entitled 'An act incorporating the Chesapeake and Ohio Canal Company,' be, and the same is hereby, ratified and confirmed, so far as may be necessary for the purpose of enabling any company that may hereafter be formed, by the authority of said act of incorporation, to carry into effect the provisions thereof in the District of Columbia, within the exclusive jurisdiction of the United States, and no further."

That portion of the canal which lies within the boundaries of the city of Washington extends from Twenty-seventh street in a southeasterly direction to Seventeenth street, and appears to have been open for navigation in the latter part of 1835. This part of the canal was wholly constructed north of the street designed to run between the squares nearest to the river front and the river itself. The land occupied by the canal company within the city belonged in part to individual owners and in part to the United States.

Entering the city so long after the adoption of the several

maps and plans, the canal company must be deemed to have been aware of their contents, and to have been subjected thereto, except in particulars in which the company may have been released or exempted therefrom by the acts of Congress, or by the authorities of the city. Consequently the company cannot validly claim riparian rights as appurtenant to those lots or parts of lots which the company purchased from individual owners who held lots north of Water street. Having themselves, as we have seen, no riparian rights, such owners could not convey or impart them to the canal company.

But it is contended, on behalf of the canal company, that riparian rights attached at least to those portions of their land which they acquired by virtue of the legislation of Congress, and which were located on the margin of the Potomac River.

If it was, indeed, the persistent purpose of the founders of the city to erect and maintain a public street or thoroughfare along the river front, it would be surprising to find so reasonable a policy subverted by legislation on the part of Congress in favor of this canal company. To justify such a contention we should expect to be pointed to clear and unmistakable enactments to that effect. But the acts of Congress relied on are of a quite different character. Let us briefly examine them.

There was, in the first place, the act of March 3, 1825, heretofore quoted, wherein the act of Virginia incorporating the Chesapeake and Ohio Canal Company is ratified and confirmed so far as may be necessary for the purpose of enabling any company that might thereafter be formed under the authority of that act to carry into effect the provisions thereof in the District of Columbia within the exclusive jurisdiction of the United States, and no further. Then followed the act of May 23, 1828, c. 85, 4 Stat. 292, authorizing the connection of lateral canals, constructed under authority of Maryland and Virginia, with the main stem of the canal within the District. By the act of May 24, 1828, c. 86, 4 Stat. 293, Congress authorized a subscription by the United States for ten thousand shares of the capital stock of the

company, and made provision for the elevation and width of the section below the Little Falls, so as to provide a supply of water for lateral canals or the extension of the Chesapeake and Ohio Canal by the United States.

It may be conceded that it is clear from these enactments that Congress contemplated the location of the Chesapeake and Ohio Canal along the bank of the Potomac River within the District of Columbia; and it may be further conceded that Congress acquiesced in the route and terminus of the canal selected by the company. But it does not follow from such concessions, or from anything contained in the legislation referred to, that Congress was withdrawing from the city of Washington its rights in Water street, or was granting to the canal company a fee simple in the river margin with appurtenant riparian rights.

It is further urged, that by the act of March 3, 1837, c. 51, Congress adopted and enacted as a law of the United States the provision of the Virginia act of February 27, 1829, in the following terms: "That whenever it might be necessary to form heavy embankments, piers or moles, at the mouths of creeks or along the river shore, for basins or other purposes, and the president and directors may deem it expedient to give a greater strength to the same by widening them and constructing them of the most solid materials, the ground so formed for such useful purpose may by them, when so improved, be sold out or let for a term of years, as they may deem most expedient for the company, on such conditions as may direct the application of the proceeds thereof to useful purposes, and at the same time repay the necessary expense of the formation of such banks, piers or moles; provided, that this power shall in no case be exercised so as to injure the navigation of the canal;" that by the second section of the act of 1837, penalties were declared against any person who should maliciously injure the canal or its necessary embankments, tow paths, bridges or drains; and, by the third section, enacted that "all condemnations of lands for the use and purposes of said canal company, which have heretofore been made by the marshal of the District or any lawful deputy

marshal, shall be as valid as though the same had been situated in the State of Maryland, and had been condemned in pursuance of the laws of said State through the action and agency of a sheriff of any of the counties of said State."

As the canal had been constructed and opened for navigation within the limits of the city before the passage of this act of 1837, and as it is not claimed or shown that any embankments, piers or moles were constructed on the route of the canal, within the city, since the passage of the act, it thus appears that no rights were acquired by the company on the strength of the act, which are interfered with by the improvements projected by Congress.

It was, indeed, alleged in paragraph 16 of the company's answer that "the company did construct a gate house at the foot of Seventeenth street, and a pier, embankment or mole at the foot of Seventeenth street, and extending into the Potomac River; and that said gate house and the made land appurtenant thereto, and part or all of said pier, embankment or mole at the foot of Seventeenth street, as the same now exists, are the property of this defendant."

Without stating the particulars of the evidence on this part of the subject, it is sufficient to say that it clearly appears that the basin at the mouth of Tiber Creek, at the foot of Seventeenth street, was constructed by the corporation of the city of Washington, and that the pier or embankment, mentioned in the company's answer, did not extend into the Potomac River, but into this basin, and that the gate house referred to was erected under a permission granted by the city council by an act approved May 20, 1837, in the following terms:

"That permission be and is hereby granted to the Chesapeake and Ohio Canal Company to use and occupy so much of the northwest corner of the wharf erected at the southern termination of Seventeenth street west as they may deem necessary, for the purpose of erecting thereon a house for the keeper of the river lock at that place: *Provided*, The extent thereof shall not exceed sixty feet measured south and thirty feet measured east from the northwest corner of the said wharf."

There is nothing in this or in any other legislation on the part of the city council which can be construed as conferring on the company any rights of property in the land intervening, according to the plans of the city, between the canal and the river.

The fair meaning and effect of the legislation of Congress and of the city respecting the Chesapeake and Ohio Canal Company were to permit that company to construct and maintain its canal within the limits of the city, and to approve its selection of the route and terminus. The purpose of the construction of the basin at the foot of Seventeenth street was to provide a commodious harbor, in which were to meet and be exchanged the commerce of the Potomac River and of the Chesapeake and Ohio Canal. But we find, in such legislation, no intimation, much less any clear and distinct declaration, of an intention to set aside the existing plans of the city in respect to its river front.

We do not deem it necessary to enter upon a consideration of the exact nature of the company's title to the lands occupied by its canal within the limits of the city, nor to discuss the legal consequences of a failure by the company to occupy and use such lands for canal purposes. Different conclusions might be reached in respect to lands derived by purchase or condemnation and public lands granted for the public purpose of a navigable highway. But such questions are not before us.

It is sufficient now to hold that the Chesapeake and Ohio Canal Company does not, either as to lots procured from private owners, or as to lands occupied under the permission of Congress and of the city authorities, own or possess riparian rights along the line of its canal within the limits of the city.

Accordingly, the decree of the court below in respect to the claim of the Chesapeake and Ohio Canal Company is affirmed. It was, however, found by the court below that there is a small strip of land north of Water street and owned by the Chesapeake and Ohio Canal Company, which lies within the limits of the government improvement, the value of which was determined by the court below at the sum of $353,33,

As the United States have not appealed from this part of the decree, and as the Chesapeake and Ohio Canal Company has not excepted to the finding of the value, it follows that the canal company is entitled to that sum out of the appropriation by Congress as compensation for the occupation by the Government of such strip of land.

5. The next class of claimants consists of lot owners between Seventeenth street west and Twenty-seventh street west.

All these lots, with respect to which riparian rights are claimed, lie to the north of Water street, which intervenes between them and the channels of the river. Under the principles already established, no riparian rights belonged to these lots. But some portions of the lots are embraced within the limits of the government plan of reclamation, and for such portions the court below awarded compensation. All of these claimants, save two, have accepted and received the compensation.

Richard J. Beall and the heirs and trustees of William Easby have refused to accept the compensation so awarded them, and have appealed. Their asserted grounds of appeal are, first, their alleged rights to riparian and wharfage privileges on the Potomac River as appurtenant to their lots, and, second, the insufficiency of the compensation allowed by the court below.

An effort is made to distinguish the case of these lots from that of the lots east of Seventeenth street by referring to a book marked "Register of Squares," produced from among the records of the city, and wherein squares 63 and 89 are bounded on the north by Water street and on the south by the Potomac River, and square 129 is bounded on the north by B street and on the south by the Potomac River.

It was the opinion of the court below that there was a lack of evidence to prove that the registers of squares were contemporaneous and original books which it was the duty of the Commissioners to keep, that the entries were not in their handwriting, nor in that of any person whose handwriting is proved, and that they have not the quality of a public record.

We agree with that court in thinking that, in no point of

view, on the evidence adduced in this case, can effect be given to these registers of squares as contradicting or overriding the plans of the city adopted by the President, wherein, as we have seen, the squares in question were bounded by streets interposed between them and the channels of the river.

The second complaint on behalf of these appellants is of the insufficiency of the amount allowed them by way of compensation.

We have read the evidence on this subject contained in the record, and have been surprised by the discrepancy in the values put on these parcels of land by the respective witnesses — a discrepancy so wide that we find it impossible to reconcile the testimony, or to reasonably compromise between the extremes. In such circumstances we think our proper course is to adopt the conclusions of the learned judge who disposed of this matter in the court below. Acquainted, as he presumably was, with the locality of the lands and with the character and experience of the numerous witnesses, his judgment would be much safer than any we could independently form. The fact that the larger number of those concerned have acquiesced in the valuation and accepted the award is not without significance. The claim of Mr. Beall that he should be allowed interest or rental value for his property which was taken possession of by the United States in 1882, seems entitled to further consideration by the court below.

The amount awarded to the estate of William Easby was made payable in the decree of the court below to William Easby's heirs. The estate was represented in the appeal to this court by Rose L. Easby and Fanny B. Easby, styling themselves trustees of the estate of said William Easby, and by Wilhelmina M. Easby-Smith, who is described as one of the heirs at law and administratrix *de bonis non cum testamento annexo* of William Easby, deceased. These parties appear by the record to have taken a joint appeal, but they are represented by different counsel. It is now claimed by the counsel representing Rose L. Easby and Fanny B. Easby, alleged trustees of the estate, that the decree awarding payment to William Easby's heirs should be amended so as to make the

award payable to said alleged trustees. It is said that they were the only parties to the record, representing said estate, at the time the said award was made, and apprehensions are expressed that if the award is distributed to the different heirs of William Easby injustice will be done the alleged trustees, because it will enable said heirs to receive their proportionate shares directly from the Government without being compelled to share in the expenses of the suit. This controversy does not seem to have been dealt with in the court below, where it properly belongs, and to which, affirming the award in other respects, we shall remit the question.

6. The next claim is one made by the descendants of Robert Peter to parcels of land included in the government plan of reclamation, and situated near the Observatory grounds.

In June, 1791, Robert Peter executed and delivered a conveyance of his lands to Beall and Gantt in trust that the Federal City should be laid out upon them and other lands similarly conveyed by other proprietors.

Robert Peter was one of the signers of the agreement of March 13, 1791, hereinbefore mentioned, and the terms of his conveyance to Beall and Gantt were substantially similar to those used in the conveyances of David Burns and Notley Young. There therefore passed by this deed to the trustees his entire title to the main land and all his riparian rights appurtenant thereto.

It is now claimed that, under the terms of the agreement and of the conveyance, such streets, squares and lots should be laid out as the President might direct, and conveyances be made of them to the United States, and the residue of said lots should be divided between the United States and Robert Peter, and the lots so divided to him, together with any part of said land which should not have been laid out in the city, should be conveyed to Robert Peter in fee by the said trustees; and it is further claimed that certain parts of said land were never laid out as part of the city, nor conveyed either to the United States or Robert Peter, and that the equitable title to such parts, with the riparian rights appurtenant thereto, is in his heirs, for which they are now entitled to compensation. It is

not denied that, in pursuance of the agreement and conveyance, the city was laid out, and its streets, squares, lots and boundaries defined in the several maps or plans approved by the President and adopted by the city authorities. Nor has any evidence been adduced that by any act or declaration of the President, or of any one in authority under him, was any portion of the lands conveyed by Peter and the other proprietors to Beall and Gantt, trustees, ever excluded from the city. Nor is it denied that there was a division of lots between Peter and the Commissioners in pursuance of the agreement and conveyance.

But reliance is placed upon the correspondence between Peter and the Commissioners tending to show that lands with riparian privileges remained undivided.

In June, 1798, Nicholas King, in behalf of Mr. Peter, addressed a letter to the Commissioners, representing that it was "an object highly interesting to Mr. Peter to know the bounds, dimensions and privileges of those parts of the city generally called water property, and assigned to him on the division. . . . The square south of No. 12 has not yet been divided between said Peter and the Commissioners. . . . The square No. 22 as at present laid off and divided with the Commissioners does not extend to the channel by several hundred feet. If another square be introduced to the south of it, that square will be covered to a small depth with water, and the proprietors thereof will want earth to wharf and fill it up with. It will perhaps be best therefore to redivide square No. 22 and attach the low ground to it."

Replying on June 28, 1798, the Commissioners said:

"When the Commissioners have proceeded to divide a square with a city proprietor, whether water or other property, they have executed all the powers vested in them to act on the subject. It appertains to the several courts of the States and of the United States to determine upon the rights which such division may give; any decision by us on the subject would be extrajudicial and nugatory; of this, no doubt, Mr. Peter, if applied to, would have informed you. *With respect to square No. 22, we do not conceive that it is entitled to*

*any water privilege, as a street intervenes between it and the water;* but as there is some high ground between Water street and the water, we have no objection to laying out a new square between Water street and the channel, and divide such square, when laid out, so as to make it as beneficial to Mr. Peter and the public as circumstances will admit."

This suggestion of the Commissioners, to lay out and divide a square south of Water street, was never acted on. It is plain that the Commissioners would have had no right to disregard the action of the President in establishing Water street as the southern boundary of the city. It also appears from the letter of Mr. King that such a proposed square would have been under the waters of the Potomac, and therefore consisted of territory belonging to the United States as successor to the sovereignty of Maryland, and not to them as grantees of Mr. Peter.

In November, 1798, Mr. Peter, with other persons, as appears in the record, appealed to the President to have corrections made in the plan of the city, and used the following language:

" We know your excellency will attend to the necessity of defining what water privilege or right of wharfage is attached to the lots on the Eastern Branch, the Potomac River and Rock Creek, also all such streets as are to be left in wharfing from the shore to the channel of said waters, and the extent to which those wharves are to be carried; and what ground, so made and filled up, shall be considered as subject to occupancy by buildings."

This memorial was referred by the President to the Attorney General, Charles Lee, who, in an opinion dated January 7, 1799, advised against the application to make any departure from the plans of the city already approved by the President.

In May, 1800, Mr. Peter and the Commissioners agreed upon a division of square south of square No. 12, by which four of the lots were given to Peter, one of which faced on Water street, and two others facing on Water street were assigned to the United States ; and in a note attached to the map of square No. 22, signed in 1800 by Nicholas King, as

attorney for R. Peter, it is stated that the Commissioners conveyed to Robert Peter the lot No. 6 in square No. 22, in consideration of a balance due him by the public of square feet in the division of lots.

Since the year 1800 to the time of the institution of this suit no attempt to impeach this settlement, and no assertion of title to the land south of Water street, by the descendants, of Robert Peter, appear to have been made.

The decree of the court below in respect to this claim is affirmed.

7. The next class of appellants consists of those who claim rights of property on the river front between the Long Bridge and the Arsenal. They all derive title under Notley Young, and the parcels of land they claim are all situated south of Water street, and fall within the limits of the government improvement.

In so far as the arguments advanced in support of these claims are based on the alleged abandonment of Water street in the Dermott plan, and on the legal consequences supposed to follow from the fact that the trustees never formally conveyed the streets or public reservations, they are disposed of by the conclusions already reached.

But it is further contended that, even if we conclude that Water street was designed to be the southern boundary of the city, and that the title to said street passed to the United States, yet the facts disclose such equities between the United States, on the one hand, and the private claimants, on the other, as to justify a decree in favor of these appellants. Those equities are said to arise out of grants made by the United States and the city authorities, from time to time, in respect to wharves and water fronts, under which the appellants and their predecessors acted, and out of the long lapse of time during which they have been in undisturbed possession.

In considering the facts relied on by the appellants we must not lose sight of the conclusions already reached, namely, that Notley Young, by his agreement with the other proprietors and by his conveyance to the trustees, had parted with his

entire title to the lands described and to the riparian rights appurtenant thereto; that all the lots subsequently conveyed to Notley Young were subject to the plans of the city establishing Water street, and did not reinvest him with his original riparian rights.

Hence these appellants, claiming under Notley Young, can only rely, in their.contention now under consideration, on transactions that have taken place since the division between the Commissioners and Notley Young; and these we shall now briefly examine.

Our attention is first directed to the twelfth section of the Maryland act of December 19, 1791, Kilty's Laws Maryland, c. 45, in the following terms:

" That the Commissioners aforesaid, for the time being, or any two of them, shall, from time to time, until Congress shall exercise the jurisdiction and government within said territory, have power to license the building of wharves in the waters of the Potomac and the Eastern Branch, adjoining the said city, of the materials, in the manner and of the extent, they may judge durable, convenient and agreeing with general order; but no license shall be granted to one to build a wharf before the land of another, nor shall any wharf be built in the said waters without license as aforesaid; and if any wharf shall be built without such license or different therefrom, the same is hereby declared a common nuisance."

Here we may pause to observe that the only power given to the Commissioners was to grant *licenses*, from time to time, and *until* Congress should assume and exercise its jurisdiction within the territory, and it was declared that any wharf built in the waters of the Potomac, without such license or in disregard of its provisions, was declared to be a common nuisance.

The licenses contemplated therefore were temporary, and liable to be withdrawn by Congress on assuming jurisdiction. Such legislation certainly cannot be relied on as either conferring or recognizing rights to erect and maintain permanent wharves within the waters of the Potomac and the Eastern Branch.

On July 20, 1795, the Commissioners published the following regulations respecting wharves:

"The board of Commissioners, in virtue of the powers vested in them by the act of the Maryland legislature to license the building of wharves in the city of Washington, and to regulate the materials, the manner and the extent thereof, hereby make known the following regulations:

"That the proprietors of water lots are permitted to wharf and build as far out into the river Potomac and the Eastern Branch as they think convenient and proper, not injuring or interrupting the channels or navigation of the said waters, leaving a space, wherever the general plan of streets in the city requires it, of equal breadth with those streets, which if made by an individual holding the adjacent property shall be subject to his separate occupation and use, until the public shall reimburse the expense of making such street; and when no street or streets intersect said wharf, to leave a space of sixty feet for a street at the termination of every three hundred feet of ground. The buildings on said wharves to be subject to the general regulations for buildings in the city of Washington as declared by the President. Wharves to be built of such materials as the proprietors may elect."

It will be seen that, in publishing these regulations, the Commissioners claimed no authority in themselves, but professed only to act in virtue of the act of Maryland, and must therefore be understood as having intended to grant temporary licenses, subject to the will of Congress when it should take jurisdiction.

It appears in the record that Notley Young himself procured from the Commissioners a license to build a wharf on the Potomac River, and that the wharf appears as an existing structure upon the map of 1797. The board of Commissioners was abolished by an act of Congress approved May 1, 1802, 2 Stat. 175, by the second section whereof it was enacted:

"That the affairs of the city of Washington, which have heretofore been under the care and superintendence of the said Commissioners, shall hereafter be under the direction of

a superintendent to be appointed by and under the control of the President of the United States; and the said superintendent is hereby invested with all the powers, and shall hereafter perform all the duties, which the said Commissioners are now vested with, or are required to perform by or in virtue of any act of Congress, or any act of the general assembly of Maryland, or any deed or deeds of trust from the original proprietors of the lots of said city, or in other manner whatsoever."

This was followed by the act of May 3, 1802, entitled "An act to incorporate the inhabitants of the city of Washington, in the District of Columbia." 2 Stat. c. 53. In it was given to the corporation "full power and authority to regulate the stationing, anchorage and mooring of vessels," but no authority to license or regulate the building of wharves is given. Then came the act of February 24, 1804, 2 Stat. c. 14, wherein was given to the city councils power "to preserve the navigation of the Potomac and Anacostia Rivers adjoining the city; to erect, repair and regulate public wharves, and to deepen docks and basins."

By the act of May 15, 1820, 3 Stat. 583, c. 104, entitled "An act to incorporate the inhabitants of the city of Washington, and to repeal all acts heretofore passed for that purpose," the corporation was empowered "to preserve the navigation of the Potomac and Anacostia Rivers adjoining the city; to erect, repair and regulate public wharves; to regulate the manner of erecting and the rates of wharfage at private wharves; to regulate the stationing, anchorage and mooring of vessels."

On July 29, 1819, Burch's Dig. 126, the city council enacted:

"SEC. 1. That the owners of private wharves or canals and canal wharves be obliged to keep them so in repair as to prevent injury to the navigation.

"SEC. 2. That no wharf shall hereafter be built, within this corporation, without the plan being first submitted to the mayor, who, with a joint committee from the two boards of the city council, shall examine the same, and if it shall appear

to their satisfaction that no injury could result to the navigation from the erection of such wharf, then, and in that case, it shall be the duty of the mayor to issue a written permission for the accomplishment of the object, which permit shall express how near such wharf shall approach the channel."

By acts of councils approved January 8, 1831, c. 84, it was enacted:

"SEC. 1. That it shall not be lawful for any person or persons to build or erect any wharf or wharves within the limits of this corporation who shall not first submit the plan of such wharf or wharves to the mayor, who, with a joint committee from the two boards of the city council, shall examine the same; and if it shall appear to their satisfaction that no injury could result to the navigation from the erection of such wharf or wharves, then, in that case, it shall be the duty of the mayor to issue a written permission for the accomplishment of the object, which permit shall express how near such wharf or wharves shall approach the channel and at what angle they shall extend from the street on which they are erected."

The record discloses a continuous series of acts and joint resolutions of the city councils, on the subject of improving the navigation of the Potomac River, the erection and repair of sea walls on the river, granting special permission to named persons to build wharves in front of such walls. The last we shall notice is the act of March 23, 1863, entitled "An act authorizing the mayor to lease wharf sites on the Potomac River," etc. By this act the mayor was authorized to lease for any term of years, not exceeding ten, wharf sites in front of any sea wall theretofore built by the corporation, or in front of any sea wall that might thereafter be built in pursuance of any enactment for that purpose; and it was provided that at the expiration of ten years, or sooner, the said sites and all wharf improvements thereon should revert to the corporation, and that if the occupants should fail to keep said wharves in good repair and to comply with all the provisions of the act, the contract should cease, and the mayor should notify them to vacate the premises within ten days. And this was followed by similar acts in 1865, 1867, 1870 and 1871, all

asserting power by the corporation over the wharves on Water
street.

We think it impossible to reconcile the succession of acts of
Congress and of the city councils with the theory that the
wharves south of Water street were erected by individuals in
the exercise of private rights of property in defined parcels of
land to them belonging. The legislation clearly signifies that
during the entire history of the city Congress and the city
authorities have claimed and exercised jurisdiction for public
purposes over the territory occupied by these wharves; and
that jurisdiction seems to have been recognized and sub-
mitted to by the appellants and their predecessors in many
instances in which the evidence discloses the nature of the
transactions.

It is earnestly urged by the learned counsel of the appellants
that possession and enjoyment by successive occupants for so
long a period warrant the presumption of a grant, and authori-
ties are cited to show that such presumptive grant may arise
as well from the Crown or the State as from an individual.
As between individuals, this doctrine is well settled and valu-
able; and it may be that, in respect to the ordinary public lands
held by the Government for the purposes of sale, occupation
and settlement, there might exist a possession so long, adverse
and exclusive, as to justify a court of equity or a jury in pre-
suming a grant. But where, as in the present case, the lands
and waters concerned are owned by the Government in trust
for public purposes, and are withheld from sale by the Land
Department, it seems more than doubtful whether an adverse
possession, however long continued, would create a title.
However, under the facts disclosed in this record, it is unnec-
essary to determine such questions; for, as we have seen, at
no time have Congress and the city authorities renounced or
failed to exercise jurisdiction and control over the territory
occupied by these wharves and docks.

An effort is made to distinguish the claim of Edward M.
Willis, as alienee of A. I. Harvey, defendant, to land lying
between Thirteen-and-a-half street and Maryland avenue, and
fronting on the Potomac, by the circumstance that Water

street has never been actually constructed and opened as a thoroughfare in front of this land. But it is not perceived that the failure of the city heretofore to open Water street could create any title in Willis to the land and water lying south of the territory appropriated for that street. His occupancy, or that of his predecessors, of such land for wharfing or other purposes may be presumed to have been with the consent of the city authorities, but could not, under the facts shown in this record, avail to raise the presumption of a grant.

Referring to a similar claim this court said, in *Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.,* 109 U. S. 672, 692:

"Disputes undoubtedly arose, some quite early, not so much as to what rights belonged to ' water lots,' nor as to what properly constituted a.' water lot,' but, in regard to particular localities, whether that character attached to individual squares and lots. In part, at least, the uncertainty arose from the fact that the plan of the city, as exhibited on paper, did not accurately correspond at all points with the lines as surveyed and marked on the land. Complaints of that description, and of designed departures from the plan, seem to have been made. It is also true, we think, that mistakes arose, as perhaps in the very case of the lots on the north side of Water street, owing to the fact that the street existed only on paper, and for a long time remained an unexecuted project; property appearing to be riparian, because lying on the water's edge, which, when the street was actually made, had lost its river front. They were thought to be ' water lots,' because appearing to be so in fact but were not so in law, because they were bounded by the street, and not by the river." *Barclay* v. *Howell's Lessee,* 6 Pet. 498, 505; *Boston* v. *Lecraw,* 17 How. 426.

There are also defendants who claim the right to hold certain wharf properties on the Potomac between the Long Bridge and the Arsenal, under licenses in writing issued by the Chief of Engineers for the time being, authorizing the erection of wharves. The power to grant such licenses is attributed to the Chief of Engineers as the successor of the office of Commissioner of Public Buildings under the act of

March, 1867. It was the opinion of the court below that, under the legislation that preceded the act of 1867, jurisdiction with respect to private wharves had been conferred upon the authorities of the city, and that hence the Chief Engineer was without any lawful authority to issue such licenses. In so holding the court below followed the decision of the Supreme Court of the District in the case of *District of Columbia* v. *Johnson*, 3 Mackey, 120.

We see no reason to doubt the soundness of this conclusion, though, for the reasons already given, even if the power to grant such licenses had belonged to the Chief of Engineers, they would not have vested any rights in fee in the land and water south of Water street in these appellants.

The contention, on behalf of the Washington Steamboat Company, as successor to the title of the Potomac Ferry Company by a purchase on June 1, 1881, that the act of Congress of July 1, 1864, creating the latter company, operated as a release of the title of the Government to such land as that company might acquire for its proper purposes, we cannot accept. The legal purport of that enactment was, as we interpret it, to authorize the ferry company to purchase and hold such real estate as should be necessary to carry its chartered powers into effect, but was not intended as a grant of land on the part of Congress, or as a legislative admission of the title of private parties. The power to purchase land thereby conferred had room to operate on land north of Water street and on land situated in the State of Virginia.

While, however, our conclusion is that no riparian rights in the waters of the Potomac River belong to the owners of lots lying north of Water street, and that no presumption of grants in fee can arise, in these cases, from actual occupation of lands and water south of that street, we do not understand that it is the intention of Congress, in exercising its jurisdiction over the territory in question, and in directing the institution of these proceedings, to take for public use, without compensation, the private property of individuals situated within the lines of the government

improvement, even where such property may lie south of Water street. Those who, relying, some of them, on express and others on implied licenses from the city authorities, have erected and maintained expensive wharves and warehouses for the accommodation of the public, are not to be treated, as we read the will of Congress, as mere trespassers.

That such is not the intention of Congress we infer not merely from the fact that, by the act of 1886, the inquiry was submitted to a court of equity and not to a court of law, but from the express language of the act. Thus, by the first section, it is made "the duty of the Attorney General of the United States to institute, as soon as may be, in the Supreme Court of the District of Columbia, a suit against all persons and corporations who may have or pretend to have any right, title, claim or interest in any part of the land or water in the District of Columbia within the limits of the city of Washington, or exterior to said limits and in front thereof toward the channel of the Potomac River, and composing any part of the land or water affected by the improvements of the Potomac River or its flats in charge of the Secretary of War, for the purpose of establishing and making clear the right of the United States thereto." The second section provides "that the suit mentioned in the preceding section shall be in the nature of a bill in equity, and there shall be made parties defendant thereto all persons and corporations who may claim to have any such right, title or interest."

The third section provides that the cause "shall proceed with all practicable expedition to a final determination by the said court of all rights drawn in question therein; and that the said court shall have full power and jurisdiction by its decree to determine every question of right, title, interest or claim arising in the premises, and to vacate, annul, set aside or confirm any claim of any character arising or set forth in the premises."

The fourth section provides that if, on the final hearing of said cause, the said court "shall be of opinion that there exists any right, title or interest in the land or water in this act mentioned in any person or corporation adverse to the complete

and paramount right of the United States, the said court shall forthwith and in a summary way proceed to ascertain the value of any such right, title, interest or claim, exclusive of the value of any improvement to the property covered by such right, title or interest made by or under the authority of the United States, and report thereof shall be made to Congress."

It may be well here to mention that it is disclosed in the record that the wharves owned by the Potomac Steamboat Company opposite square 472, and other wharves on the Potomac, were rented by the Government during the civil war, and that rent was paid for them monthly by the Government during a period of several years. It is not to be supposed that the United States are now estopped by such conduct, but the fact is worthy of mention as going to show that the Government did not regard those who owned the wharves, and to whom the rent was paid, as trespassers, or that the structures were an obstruction to navigation and unlawfully there.

Such recognition by the Government of a right on the part of the wharf owners to receive rent, and the long period in which Congress has permitted private parties to expend money in the erection and repair of wharves and warehouses for the accommodation of the public, may be well supposed to have influenced Congress in providing for an equitable appraisement of the value of interests or claims thus arising.

In the twelfth section of the bill of complaint the United States " disclaim in this suit seeking to establish its title to any of the wharves included in the area described in paragraph 3 of this bill, and claim title only to the land and water upon and in which said wharves are built, leaving the question of the ownership of the wharves proper, where that is a matter of dispute, to be decided in any other appropriate proceeding."

Apparently acquiescing in this allegation or disclaimer, the appellants put in no evidence as to the value of their improvements, and sought no finding on that subject in the court below, but stood, both there and in this court, on their claims of absolute title.

An examination, however, of the language of the act of 1886, hereinbefore quoted, discloses that it was the plain purpose of

Congress that the court should make "a final determination of all rights drawn in question," and should "in a summary way proceed to ascertain the value of any such right, title, interest or claim."

We think it was not competent for the counsel of the respective parties to disregard this purpose of Congress and to withhold a part of the controversy from the action of the court.

It is not disclosed in this record whether it is the design of the Government, on taking possession of the wharves and buildings belonging to the appellants, to continue them in the use of the public or to supersede them by other improvements. Whatever may be the course pursued in that respect, it should not deprive the appellants of the right conferred upon them by the act of Congress to have the value of their respective rights, titles, interests or claims ascertained and awarded them.

As to the method to be pursued in valuing property of so peculiar a character, the cases of *The Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, and *Hetzel* v. *Baltimore & Ohio Railroad*, 169 U. S. 26, may be usefully referred to.

*While, therefore, we affirm the decree of the court below as to the claims of the Marshall heirs, and as to the Kidwell patent, and as to the several claims to riparian rights as appurtenant to lots bounded on the south by Water street, we remand the case to the court below for further proceedings in accordance with this opinion.*

MR. JUSTICE WHITE, with whom concurred MR. JUSTICE PECKHAM, dissenting.

The court holds that the owners of lots fronting on the Potomac River, who are impleaded in this record, have no riparian rights appurtenant or attached to such lots, and that they never possessed rights of that description.

This conclusion rests primarily upon a finding of fact, that is, that it was the intention of the founders of the city that a street should bind the city on the entire water front, which street should be the exclusive property of the public, thus

cutting off all the lot owners facing the river from connection therewith. Applying to this premise of fact the legal principle that where property is separated from the water by land belonging to some one else, no riparian rights attach to the land of the former, it is held that the lot owners before the court have no riparian privileges which the Government of the United States is in any way bound to respect.

Lest the precise theory may not be accurately conveyed the clear statement thereof contained in the opinion is quoted, viz. :

"Our examination of the evidence has led us to the conclusion that it was the intention of the founders of the city of Washington to locate it upon the bank or shore of the Potomac River, and to bound it by a street or levee, so as to secure to the inhabitants and those engaged in commerce free access to the navigable water, and that such intention has never been departed from."

Again, at the end of the review of the evidence following the above extract, the court states as follows :

"The conclusion is warranted that, from the first conception of the Federal City, the establishment of a public street, bounding the city on the south, and to be known as Water street, was intended, and that such intention has never been departed from.

"With this conclusion reached, it follows that the holders of lots and squares abutting on the line of Water street are not entitled to riparian rights ; nor are they entitled to rights of private property in the waters or the reclaimed lands lying between Water street and the navigable channels of the river."

From the legal proposition that where property is separated from a stream by land belonging to another person, such property is not abutting property, and hence not entitled to riparian rights, I do not dissent. I cannot, however, bring my mind to the conclusion that it was ever contemplated in the foundation of the city of Washington that there should be established a street on the water front so as to cut off the riparian rights of the lot holders. On the contrary, my ex-

amination of the record has forced me to the conclusion that from the legislation by which the city of Washington was founded, from the nature of the contracts made by the owners of the land upon which the city is situated, and from the subsequent statutory provisions relating to the foundation of the city, and their practical execution, it was understood and agreed that riparian rights should attach to the lots fronting on the river, and that any proposed street actually projected or which it was contemplated might ultimately be established was designed to be subordinate to the riparian rights of the lot holders, and was in nowise intended injuriously to impair or affect the same. It also, in my opinion, clearly appears that this result was understood by the lot owners, was contemplated by the founders, was approved by legislation, and was sanctioned by a long course of administrative dealing, ripening into possession in favor of the lot holders to such a degree that to now hold that they are not entitled to riparian rights would, as I understand the record, amount to a denial of obvious rights of property. Indeed, to disregard the riparian rights of the lot owners as shown by the record it seems to me will be equivalent to confiscation, and that in reason it cannot be done without imputing bad faith to the illustrious men who so nobly conceived and so admirably executed the foundation of the Federal City. Of course, I say this with the diffidence begotten from the fact that the court takes a different view of the record, which therefore admonishes me that, however firm may be my convictions on the subject, there is some reason which has escaped my apprehension.

Even if it be conceded that the record established that the intention of the founders was to bound the city towards the water by a street which would separate the land of the lot holders from the river, and that the fee of such street was to be in the public, such concession would not be conclusive in this case. For the record, as I read it, establishes such conclusive equities arising from the conduct of the Government in all its departments, in its dealings with the lot holders and the grantees of the Government and those holding under them,

as to conclusively estop the Government from now asserting any real or supposed technical rule of law so as to cut off rights of private property which the Government itself has solemnly avouched, upon the faith of which persons have dealt with it, and from which dealings the nation has reaped an abundant reward.

Before approaching the facts I eliminate propositions which seem irrelevant, and the consideration of which may serve to confuse the issue. Let it be at once conceded, *arguendo,* as found by the court, that whether riparian rights exist does not depend upon deciding whether one or the other of the particular maps or plans of the city is to be controlling. For in my view of the record, the riparian rights of the lot holders will be clearly shown to exist, whatever plan of the city may be considered. For the purposes then of this dissent, it is not at all questioned that the several plans of the city, referred to in the opinion of the court, are to be treated each as a progressive step in the evolution of the original conception of the city, and therefore are each entitled to be considered without causing one to abrogate the efficacy of the other, except where there is an essential conflict. It is also deemed unnecessary to refer to the events which led up to the selection of the sites of other cities, for instance Philadelphia, New Orleans, Pittsburgh and Cincinnati, decisions respecting which have been referred to, because in my judgment the existence of the riparian rights in the city of Washington depends upon the proceedings and legislation with reference to the city of Washington, and not to wholly dissimilar proceedings in relation to the foundation of other cities.

I come, then, to an examination of the record as to the foundation of the city of Washington. In doing so — in order to avoid repetition and subserve, as far as I can, clearness of statement — the subject is divided into three distinct epochs: First, that involving the conception of the city and the steps preparatory to its foundation, with the cessions by Maryland and Virginia of sovereignty over the land which was to form the Federal district, down to and including the 19th of December, 1791, when the general assembly of Maryland passed

an act ratifying the previous cession and conferring certain powers upon the Commissioners, etc.; second, the formative period of the city, in which the initial steps taken in the period just stated were in a large measure carried into execution, and this embraces the period from the Maryland act of 1791 down to and including the actual transfer and establishment of the seat of government in the city of Washington; and, third, the events subsequent to the last-stated period.

1. *Events connected with the conception of the city and the steps preparatory to its foundation down to and including the statute of Maryland of December* 19, 1791.

The cessions by Maryland and Virginia, in 1788 and 1789, of the territory intended for the seat of government of the United States need not be recapitulated, as they are fully stated in the opinion of the court. The acceptance by Congress, in 1790, of the cessions just mentioned is also stated fully in the opinion of the court. It is important, however, in considering this, to bear in mind a few salient facts: First, that whilst accepting the cessions, it was provided that the seat of the Federal Government should not be removed to the proposed capital until more than ten years thereafter, that is, the first Monday of December in the year 1800; second, that " until the time fixed for the removal thereto," and until Congress should by law otherwise provide, the operation of the laws of the State within the district should not be affected by the acceptance by Congress; third, whilst the act empowered the President to appoint three Commissioners, who should, under his direction, define and limit the district, and conferred upon the Commissioners authority to purchase or accept such quantity of land as the President might deem proper and to provide suitable buildings for the occupation of Congress and of the President and for the public offices of the Government, no appropriation was contained in the act for these essential purposes. On the contrary, the only means provided by the act was the authority conferred to accept grants of money or land for the purposes designated in the act.

The controversy which preceded the selection by Congress of the district ceded by Virginia and Maryland, in order to

establish therein the capital of the nation, is portrayed in the opinion of the court, and, indeed, if it were not, it is mirrored in the provisions of the act of acceptance already referred to. For, weighing those provisions, the conclusion cannot be escaped that an acceptance by Congress which left the territory ceded under the control of the ceding States for a period of ten years, and made no provision whatever, by appropriation of money, for the establishment of the city, affixed to the act of acceptance a provisional character depending upon the successful accomplishment by Washington of the plan for the foundation of the capital which he had so fervently advocated. In other words, that the accepting act devolved upon President Washington the arduous duty of bringing into being, within ten years, the establishment of the capital and of securing the means for constructing therein all the necessary buildings for the use of the Government, without the appropriation of one dollar of the public money. To the great responsibility thus imposed upon him, Washington at once addressed himself with that intelligence and foresight which characterized his every act. On January 17, 1791, he appointed as the Commissioners to execute the provisions of the act of Congress, Thomas Johnson, Daniel Carroll and David Stuart. The first two were owners of land within the limits of the proposed city. Mr. Johnson, after his designation as a Commissioner, was, in 1791, appointed an Associate Justice of this court, and although he qualified as such, he still continued to serve as Commissioner during and until after he had resigned his judicial office.

By the spring of 1791 the President had finally determined upon the precise situation of the proposed capital, locating it on the banks of the Potomac, within the ceded district, at the point where the city of Washington is now situated. The exact position of the land where the city was to be established is shown by the map annexed to the opinion of the court.

A casual examination of this map discloses that the proposed city began on the banks of the Potomac at Rock Creek, separating it at that point from Georgetown, following along

the course of the river to where the Eastern Branch emptied into the Potomac, and extending some distance along the banks of the Eastern Branch. It also shows that all the land fronting on the water within the designated limits was farming land, except at two points — the one where the town of Hamburgh (sometimes called Funkstown) was located, not far from Georgetown, and the other where the town of Carrollsburgh was situated, on the Eastern Branch. All the farming land fronting on the river and Eastern Branch was owned by Robert Peter, David Burns, Notley Young, Daniel Carroll, William Prout, Abraham Young, George Walker and William Young.

It is conceded that, at the time the city was located on the territory thus selected, the owners of all the farming land fronting on the water were entitled under the law of Maryland to riparian privileges as appurtenant to their ownership, and that the same right belonged to the owners of lots fronting on the water in the two towns of Hamburgh and Carrollsburgh. It is, moreover, indisputably established that at the time the selection was made some of the lot owners, by wharves or otherwise, were actually enjoying the riparian rights appurtenant to their property. Indeed, an inspection of the map already annexed makes it clear that the lots in Hamburgh and Carrollsburgh ran down to the water's edge, and in some instances extended into the water.

A few months after the appointment of the Commissioners, in March, 1791, in order to aid in the establishment of the city and to procure the funds wherewith to execute the duties imposed by the act of Congress, through the influence of President Washington most of the larger proprietors of the land embraced within the limits of the city executed an agreement, binding themselves to convey their lands, for the purposes of the Federal City, to such persons as the President might appoint, expressly, however, excepting from the operation of the agreement any lots which the subscribers might own in the towns of Hamburgh and Carrollsburgh. The main purposes of this contract were concisely expressed

by President Washington in a letter to Mr. Jefferson, then Secretary of State, of date March 31, 1791, enclosing the proclamation fixing the boundary lines of the Federal district. He said :

"The land is ceded to the public on condition that when the whole shall be surveyed and laid off as a city (which Major L'Enfant is now directed to do) the present proprietors shall retain every other lot — and for such part of the land as may be taken for public use, for squares, walks, etc., they shall be allowed at the rate of twenty-five pounds per acre — the public having the right to reserve such parts of the wood on the land as may be thought necessary to be preserved for ornament. The landholders to have the use and profits of all the grounds until the city is laid off into lots, and sale is made of those lots which, by this agreement, become public property — nothing is to be allowed for the ground which may be occupied as streets or alleys."

Subsequently, in order to carry out the agreement, the lot owners conveyed their lands to trustees. The draft of the conveyances, which were executed on June 28, 1791, there is every reason to believe was prepared by Commissioner Johnson.

Several of the conveyances are set out in full in the opinion of the court. Suffice it to say, that the land was conveyed to the trustees by described boundaries, with the appurtenances. Besides embodying the provisions contained in the previous agreement, the deeds also contained other provisions material to be noticed. Thus, in effect, the portion of the land conveyed which was to inure to the benefit of the public was divided into two classes: First, the public reservations, streets and alleys, not intended to be disposed of for purposes of profit but retained for the public use; second, the share of the public in the building lots (one half) intended as a donation. The land embraced in the first class was to be conveyed by the President to the Commissioners for the time being appointed under the act of Congress, 1790, "for the use of the United States forever." The lands included in the second class were stipulated to be sold and the proceeds applied as a

Dissenting Opinion: White, Peckham, JJ.

grant of money, etc., but the trustees were to retain the title and themselves execute deeds to purchasers of the public lots.

As already stated in the preliminary agreements and the conveyances to trustees executed by the larger proprietors, their lots situated in Carrollsburgh and Hamburgh were excepted. On February 21, 1791, a portion of the proprietors of lots in Hamburgh executed an agreement binding themselves to sell their lots in that town to the President of the United States or to such Commissioners as he might appoint. None of these lots would seem to have been situated on or near the river, and the agreement may be dismissed from view. On March 30, 1791, an agreement was executed by certain lot owners in Carrollsburgh, Commissioners Johnson and Carroll being among the number. It was stipulated that the lots of the subscribers should be subject to be laid out as part of the Federal City, each subscriber donated one half of his lots, and stipulated that his half should be assigned to him *in like situation as before ;* it being moreover provided that in the event of a disagreement between the owners and the President as to the allotments made to them, a sale should be made of the lots and the proceeds be equally divided. A copy of the agreement is set out in the margin.[1]

---

[1] We the Subscribers holding or entitled to Lots in Carrollsburgh agree with each other and with the President of the United States that the lots and land we hold or are entitled to in Carrollsburgh shall be subject to be laid out at the pleasure of the President as part of the Federal City and that we will receive one half the Quantity of our respective Lots as near their present Situation as may agree with the new plan and where we may be entitled now to only one Lot or otherwise not entitled on the new plan to one entire lot or do not agree with the President, Commissioners or other person or persons acting on the part of the public on an adjustment of our interest we agree that there shall be a sale of the Lots in which we may be interested respectively and the produce thereof in money or Securities shall be equally divided one half as a Donation for the Use of the United States under the Act of Congress, the other half to ourselves respectively. And we engage to make Conveyances of our respective Lots and lands af'd to Trustees or otherwise whereby to relinquish our rights to the said Lots & Lands as the President or such Commrs. or persons acting as af'd shall direct to secure to the United States the Donation intended by this Agreement.

The contracts just referred to embraced all the territory included within the proposed city, except certain lots in Carrollsburgh and Hamburgh, the owners of which had entered into no contract, and also certain lots in these towns owned by non-residents and others who were incapable from infancy, coverture or imbecility to consent to a sale or division of their lots.

I submit that the contracts in question clearly point out the difference between a city laid out as was the city of Washington and a city laid out as the result of a plat made by a proprietor in which lots are located on a street fronting on the river and intervening between the lots and the water. The President and the Commissioners, in dealing with the land embraced within the proposed Federal City, were not acting as owners in their own right, but were acting under the terms and according to the covenants contained in the contracts between the parties. What was to be given by the proprietors was plainly specified, and what was to be retained by them was also clearly stated. Riparian rights having been vested in the owners at the time the contract was made, it cannot, it seems to me, with fairness be said that the former proprietors were to receive as an 'equal division, one half of their lots, if in making that division the Government was to strip all the lots, as well those assigned to the public as those retained by the proprietors, of the riparian privileges originally appurtenant to the land. The intention of the contracting parties is plainly shown by the provisions for the transfer of the property in Carrollsburgh, where the owners stipulated that they should retain one half of the lots, *in like situation;* and where the plan to which reference has been made shows that many of the lots abutted on the bank of the water in the Eastern Branch.

But if there be doubt as to the agreements from which it could be implied that the lot owners intended to give not only one half of their lots but all the riparian rights appurtenant to the lots which they were to retain, the official conduct of the Commissioners, the action of President Washington and of all concerned, including the former proprietors, demon-

strates that the understanding of everybody concerned in the transaction was that the half of the lots which were to remain, to the lot owners, should preserve their riparian privileges, and that they should be continued to be exercised, even although it was proposed, on a plan of the city, that there should be a street on the entire river front.   And it seems to me it equally conclusively appears that it was plainly understood that the lots which were donated to the nation, and which were to be sold, for the purpose of raising money to erect the necessary buildings for the establishment of the government, should, so far as those lots fronted on the water, have attached to them the riparian rights which were originally appurtenant, and the fact that they had such original rights formed the basis upon which it was hoped that as to these lots a higher price would be obtained, because of the existence of the riparian rights which were intended to be conveyed, and as will be shown were actually conveyed along with the water lots which the Government sold.

It cannot be in reason successfully denied that the construction of the agreements between the parties contemporaneously made by all concerned, and followed by long years of official action and practical execution, furnishes the safest guide to interpret the contracts, if there be doubt or ambiguity in them.

In March, 1791, President Washington intrusted the preparation of a plan of the proposed city to Major L'Enfant.   On April 4, 1791, that officer requested Secretary of State Jefferson to furnish him with plans of leading cities and maps of the principal "seaports or dock yards and arsenals," and in a letter to President Washington, dated April 10, 1791, Mr. Jefferson alluded to the fact that he had sent by post to L'Enfant the plans of a number of Continental European cities.   Mr. Jefferson mentioned that he had himself procured these plans when he was visiting the named cities. The serious import of the plans thus sent and the significance resulting from them I shall hereafter comment upon.

Among the proprietors who joined in the agreement and had actually conveyed his land to the trustees was Robert

Peter. His property was situated abutting on Rock Creek, and on the river from the mouth of Rock Creek to the Hamburgh line. The record shows the following letter to the Commissioners from President Washington:

"PHILADELPHIA, *July* 24, 1791.

"I have received from Mr. Peter the enclosed letter proposing the erection of wharves at the new city between Rock Creek and Hamburgh. My answer to him is that the proposition is worthy of consideration, and that the transaction of whatever may concern the public at that place in future being now turned over to you, I have enclosed the letter to you to do therein whatever you may think best, referring him at the same time to you for an answer.

"The consequences of such wharves as are suggested by Mr. Peter will, no doubt, claim your first attention; next, if they are deemed a desirable undertaking, the means by which the work can be effected with certainty and dispatch; and lastly the true and equitable proportion which ought to be paid by Mr. Peter towards the erection of them."

The pertinent portions of the letter of Mr. Peter, which President Washington transmitted, are as follows:

"GEORGETOWN, *July* 20, 1791.

"SIR: Colonel L'Enfant, I understand, has expressed a wish that I should make propositions to join the public in the expense of erecting wharves to extend from the mouth of Rock Creek to the point above Hamburgh called Cedar Point, being about three thousand feet. . . . That the wood should be furnished by me on the same terms that it could be had from others, and that the whole expense should be divided between the public and me in proportion to the property held by each on the water. The streets I consider as belonging to the public and one half the lots, so that I suppose somewhere about one third of the expense would be mine, and about two thirds the public's."

On August 28, 1791, Mr. Jefferson wrote from Philadelphia to the Commissioners, acknowledging the receipt of a letter

from them to the President, and adding: "Major L'Enfant having also arrived here and laid the plan of the Federal City before the President, he (the President) was pleased to desire a conference of certain persons in his presence on these several subjects."

Further along in his letter Mr. Jefferson stated that Mr. Madison and himself "will be in George Town on the evening of the 7th or morning of the 8th of next month, in time to attend any meeting of the Commissioners on that day."

In accordance with this suggestion, on September 8, 1791, the records show a meeting of the Commissioners, and it is recited that "the Hon. Thomas Jefferson, Secretary of State, and the Hon. James Madison attended the Commissioners in conference."

It is further recited: "The following queries were presented by the Secretary of State to the Commissioners, and the answers thereto, with the resolutions following, were given and adopted: . . . Whether ought the building of a bridge over the Eastern Branch to be attempted, canal set about, and Mr. Peter's proposition with respect to wharves gone into now or postponed until our funds are better ascertained and become productive?"

In the margin is this notation: "Must wait for money."

The foregoing letter of Mr. Peter to President Washington clearly conveyed that his (Peter's) construction of the deed of conveyance which he made to the trustees was that the lots to be assigned to him along the river should preserve their riparian rights, since he proposed as such owner to exercise his riparian rights by building wharves under a joint agreement with the Commissioners, by which the work should be done between the Commissioners and himself as joint proprietors, he of his lots and they of their share of the building lots, and as owners of the intersecting streets and reservations. That such also was the view of President Washington necessarily follows from the fact that he transmitted Peter's letter to the Commissioners with what amounted to an express approval of Peter's construction of the contract, cautioning the Commissioners only to be circumspect as to the consequences

of constructing the wharves and the proper equitable proportion of the cost of construction between the respective parties; that is, Peter on the one hand in the exercise of his riparian rights in front of his lots, and the public on the other in the exercise of its riparian rights in front of its own lots and the public land. It is worthy of note that the letter of Peter states that he wrote the President under the inspiration and at the suggestion of Major L'Enfant. If it be true that L'Enfant, who was then engaged in making the plan under Washington's orders, had conceived the project of cutting off all the riparian rights of the lots fronting on the river by a proposed street, how can it be conceived, in consonance with honesty or fair dealing, that he would suggest to Peter the making of a proposition absolutely inconsistent with the very plan which he was then supposed to be carrying out? How can it be thought that if President Washington entertained the idea, that the engineer employed by him had such an intention, could he consistently have favorably indorsed the proposition which would destroy the very plan which it now is decided was then adopted and in process of actual execution? The scrupulous honor, the marvellous accuracy of detail and precision of execution as to everything which he supervised or undertook, which were the most remarkable characteristics of President Washington, exclude the possibility of any other construction being placed upon his acts with reference to Peter's letter than that which I have thus given. But the reasoning is yet more conclusive. Mr. Jefferson's letter shows that before the meeting of the Commissioners was held where Peter's letter was acted upon, the plan of Major L'Enfant had been laid before the President and by him transmitted to Mr. Jefferson. With this plan in his possession, do the proceedings at the meeting of the Commissioners at which Mr. Jefferson and Mr. Madison were present in conference with the Commissioners disclose the slightest repudiation by them or the Commissioners of the construction put by Peter upon the contract? Emphatically no, for the sole reason ascribed for not entering into an arrangement with Peter is the minute entry, "Must wait for money."

At the time this meeting of the Commissioners with Mr. Jefferson and Mr. Madison was held advertisement had been made of an intended sale of some lots at public auction in the following October: In a letter of Andrew Ellicott, a surveyor who had been assisting L'Enfant, which letter was addressed to the Commissioners under date of September 9, 1791, he offered suggestions with reference to the contemplated sale of lots, remarking that three things appeared necessary to be attended to:

"*First,* those situations which will be considerably increased in value when the public improvements are made; *secondly,* those situations which have an immediate value from other considerations; and, *thirdly,* those situations whose real value must depend upon the increase and population of the city."

With respect to the second of these considerations he further stated as follows:

"*Secondly,* it is not probable that the Public Improvements will considerably affect either the value of the Lots from Geo. Town to Funks Town; or generally on the Eastern Branch; the proximity of the *first* to a trading town and good navigation, and the *second* lying on one of the best Harbours in the Country, must have an immediate value, and are therefore the most proper plans to confine the first sales to."

On the same day, also, L'Enfant was instructed by the Commissioners that the Federal district should be called "the Territory of Columbia," and that the Federal City should be named the City of Washington; and that the title of the map should be "A Map of the City of Washington in the Territory of Columbia."

How can it be that Ellicott, the surveyor engaged with Major L'Enfant in laying off the plan of the city, would have suggested that the lots fronting on the water would obtain the best price because of an advantageous situation, if it had been supposed that those lots should be, by the effect of the plan of the city, stripped of their riparian rights, especially when the Peter's letter is borne in mind and the construction of the contracts which arise therefrom is taken into consideration.

On October 17, 1791, a first partial division of squares or parts of squares was made with one or more of the former proprietors; and on the same day and on the two days following a small number of lots were sold. At this sale plats of that portion of the city in which the lots offered for sale were situated were shown to those in attendance. As none of these appear to have been near the water, no further attention need be given to them.

On October 25, 1791, in his third annual address, President Washington informed Congress that "a city has been laid out agreeably to a plan which will be laid before Congress," and the plan prepared by L'Enfant was transmitted to Congress on December 13, 1791.

It is obvious from a glance at this plan, as contained in the record, that it projected an open space along the water front, and showed at various localities separate wharves extending beyond the open way. That L'Enfant never contemplated, however, that the effect of this was to cut off the riparian rights of the lot holders, and cause the water privileges to be merely appurtenant to the street, is shown by his suggestion to Peter and the cotemporaneous circumstances which have been already adverted to, and will be moreover shown hereafter. A vivid light on this subject is derived from an additional occurrence which took place at the meeting of the Commissioners with Mr. Jefferson and Mr. Madison.

At that meeting it is recited that a letter was written by the Commissioners to the general assembly of Maryland, in which occurs this passage:

"That it will conduce much to convenience and use, as well as beauty and order, that wharfing should be under proper regulations from the beginning. . . . Your memorialists therefore presume to submit to your honors whether it will not be proper to . . . enable the Commissioners or some other corporation, till Congress assumes the government, to license the building of wharves of the materials, in the manner and of the extent they may judge desirable and convenient, and agreeing with general order."

The request embodied in the memorial thus submitted

implied that in the judgment of those by whom it was drawn that riparian rights, embracing the privilege of wharfage, were attached to the lots fronting on the river, and authority was deemed necessary to regulate the exercise and enjoyment of such existing rights. There is not a word in the memorial which can lead to the supposition that the Commissioners desired power to *originate* rights of wharfage, for the memorial asks for authority to license the building of wharves "of the materials, in the manner and of the extent they may judge desirable and convenient, *and agreeing with general order.*" Indeed, if all the riparian rights, as to the lots facing on the river, had been destroyed by the effect of the drawing of the L'Enfant plan, then the requested authority was wholly unnecessary, for in that case all the riparian rights would have been appurtenant to a street which belonged to the public, and no one would have had the right to enjoy them without the consent of the Commissioners, and consequently they would have had the power in giving their assent to such enjoyment, to affix any condition they deemed proper, without legislative authority for that purpose. The mere fact that the right of a riparian owner to erect wharves is subject to license and regulation in nowise implies the non-existence of riparian rights and rights of wharfage, for all ownership of that character is held subject to control, as to the mode of its enjoyment, by the legislative authority. I do not stop to make any copious citation of authority on this subject, but content myself with referring to the opinion of Chief Justice Shaw, where the whole matter is admirably considered, in *Commonwealth* v. *Alger*, 7 Cushing, 53.

The argument, then, that because the riparian right was subject to license and regulation, it could not have preëxisted, amounts to saying that no riparian right can ever exist. This follows from an analysis of the contention, which may be thus stated: Riparian rights exist as rights of property and are ever subject to lawful legislative regulation. If, however, they are regulated, the necessary result of the regulation is to take away the right. I do not here further consider this question, because, as will hereafter be shown by a statement

of the Commissioners, which was in effect approved by President Washington, it was expressly declared that the sole object and purpose of the desired regulations was to compel the owners in the enjoyment of their existing riparian rights as to wharfage to conform to some general plan of public convenience.

On December 19, 1791, the general assembly of Maryland passed an act complying with the above request and conferring authority to license the building of wharves, as well as excavations and the erection of buildings within the limits of the city. The fact that in the same act in which was given the power to license and regulate wharves there was also conveyed the authority to license excavations and the erection of buildings, shows that it was considered that the act did not originate a right, but merely controlled its exercise. For, can it be said that because a lot holder was obliged to obtain a license before erecting a building on his lot, that therefore his ownership of his building was destroyed, and that he held it at the will of the Commissioners? If it cannot be so said in reason as to buildings, how can it be thus declared as to the wharves, which were placed by the act in exactly the same category? The act of the Maryland legislature in which the foregoing provisions were contained embraced besides other subjects. It subjected to division lands in Hamburgh and Carrollsburgh, not yet conveyed, for the purposes of the Federal City, and provided legal means to accomplish the division of such lands belonging to persons who, on account of mental or other incapacity, had not hitherto conveyed their rights. The act contained a provision as to building liens, provided for the existence of party or common walls between contiguous owners, for a record book, etc. Annexed in the margin [1]

---

[1] Extracts from act of general assembly of Maryland, dated December 19, 1791, c. 45:

After reciting the proclamation of President Washington, of date March 20, 1791, declaring the bounds of the territory, since called the Territory of Columbia, it was further recited in the first section as follows:

"And whereas, Notley Young, Daniel Carroll of Duddington, and many others, proprietors of the greater part of the land hereinafter mentioned to have been laid out in a city, came into an agreement, and have conveyed

are extracts from the act, and, without stopping to analyze its text, it seems to me that it evinces the clear intention of the legislature that the lot owners should receive in all and every

their lands in trust to Thomas Beall, son of George, and John Mackall Gantt, whereby they have subjected their·lands to be laid out as a city, given up part to the United States, and subjected other parts to be sold to raise money as a donation to ·be employed according to the act of Congress for establishing the temporary and permanent seat of the government of the United States, under and upon the terms and conditions contained in each of the said deeds; and many of the proprietors of lots in Carrollsburgh and Hamburgh have also come into an agreement, subjecting their lots to be laid out anew, giving up one half of the quantity thereof to be sold, and the money thence arising to be applied as a donation as aforesaid, and they to be reinstated in one half of the quantity of their lots in the new location, or otherwise compensated in land in a different situation within the city, by agreement between the Commissioners and them, and, in case of disagreement, that ·then a just and full compensation shall be made in money; yet some of the proprietors of lots in Carrollsburgh and Hamburgh, as well as some of the proprietors of other lands, have not, from imbecility and other causes, come into any agreement concerning their lands within the limits hereinafter mentioned, but a very great proportion of the landholders having agreed on the same terms, the President of the United States directed a city to be laid out. . . ..

"SEC. 3. *And be it enacted,* That all the lands belonging to minors, persons absent out of the State, married women, or persons *non compos mentis,* or lands the property of this State, within the .limits of Carrollsburgh and Hamburgh, shall be and are hereby subjected to the terms and conditions hereinbefore recited, as to the lots where the proprietors thereof have agreed concerning the same; and all the other lands, belonging as aforesaid, within the limits of the said city of Washington, shall be, and are hereby subjected to the same terms and conditions as the said Notley Young, Daniel Carroll of Duddington, and others, have, by their said agreements and deeds, subjected their lands to, and where no conveyances have been made, the legal estate and trust are hereby invested in the said Thomas Beall, son of George, and John Mackall Gantt, in the same manner as if each proprietor had been competent to make, and had made, a legal conveyance of his or her land, according to the form of those already mentioned, with proper acknowledgments of the execution thereof, and where necessary, of release of dower."

The section then authorized the Commissioners, after due notice by advertisement, to allot to the owners one half of the lots owned by infants, married women, insane persons or owners absent out of the city.    It was then further provided:

"And, as to the other lands within the said city, the Commissioners aforesaid, or any two of them, shall make such allotment and assignment

respect an equal division of their property upon the allotments authorized to be made by the Commissioners, and that thereby it rebuts the assumption that by the effect of allotments or the plan of the city, the lots fronting on the river were stripped of their riparian rights, and that all such riparian rights were vested in the public as the owners of a projected street bounding on the river. In passing, attention is directed to the fact that some of the very lots in controversy in this cause, and as to which riparian rights are now denied, were allotted by the Commissioners upon a division of water lots owned by persons incapable of acting for themselves, under the proceedings provided for in the Maryland statute, which clearly, as to such persons, negates the conception that their

---

within the lands belonging to the same persons, in alternate lots, determining by lot or ballot whether the party shall begin with the lowest number: *Provided*, That in the cases of coverture and infancy, if the husband, guardian or next friend will agree with the Commissioners, or any two of them, then an effectual division may be made by consent; and, in case of contrary claims, if the claimants will not jointly agree, the Commissioners may proceed as if the proprietor was absent; and all persons to whom allotments and assignments of lands shall be made by the Commissioners, or any two of them, on consent and agreement, or pursuant to this act without consent, shall hold the same in their former estate and interest, and in lieu of their former quantity, and subject in every respect to all such limitations, conditions and incumbrances as their former estate and interest, and in lieu of their former quantity, and subject in every respect to all such limitations, conditions and incumbrances as their former estates and interests were subject to, and as if the same had been actually reconveyed pursuant to the said deed in trust."

" SEC. 12. *And be it enacted*, That the Commissioners aforesaid for the time being, or any two of them, shall from time to time, until Congress shall exercise the jurisdiction and government within the said territory, have power to license the building of wharves in the waters of Potowmac and the Eastern Branch, adjoining the said city, of the materials, in the manner and of the extent they may judge durable, convenient and agreeing with general order; but no license shall be granted to one to build a wharf before the land of another, nor shall any wharf be built in the said waters without license as aforesaid; and if any wharf shall be built without such license or different therefrom, the same is hereby declared a common nuisance; . . . they may also, from time to time, make regulations for landing and laying materials for building the said city, for disposing and laying earth which may be dug out of the wells, cellars and foundations, and for ascertaining the thickness of the walls of houses."

riparian rights had been or could be destroyed by the involuntary surrender of their property under the operation of the statute.

I am thus brought to a consideration of the second epoch.

2. *The formative period of the city in which the initial steps in the previous period were in a large measure carried into execution, which extends to the actual establishment of the seat of government in Washington.*

The L'Enfant plan was not engraved and put into general circulation, owing to the withdrawal of that gentleman from the employment of the city, in consequence of differences with the Commissioners, and his retention of the plan which he had prepared. In consequence, Andrew Ellicott was employed, about the middle of February, 1792, to prepare another plan of the city for engraving. A proof sheet of a plan by him made, which had been engraved at Boston, but which omitted to indicate the soundings of the Eastern Branch and the Potomac River, was received by the Secretary of State early in the following July. Proof from a plate of the same plan engraved in Philadelphia, which indicated the soundings, was, however, received by the Commissioners about the middle of November, 1792. Copies of both of the above plans were largely distributed throughout this country and abroad. The Ellicott plan, in its general features, was similar to that of L'Enfant, being practically based thereon. It indicated an open space along the water front, and wharves projecting from the further side thereof. A reduced copy of this plan is a part of the opinion of the court.

Incidentally it may be stated that a project of the Secretary of State for obtaining a loan upon the public property to meet the expenditures connected with the establishment of the new city was transmitted to the Commissioners on March 13, 1792, but action thereon was suspended owing to a financial crisis which occurred soon afterwards.

On September 29, 1792, President Washington transmitted to the Commissioners an order authorizing a public sale of lots on the 8th day of October, 1792, and conferring authority upon the Commissioners to dispose thereafter of lots by pri-

vate sale. The second public sale of lots was held on October 8, 1792, and the plan of the city engraved at Boston was exhibited. During 1792 some squares were divided with the proprietors, among others Nos. 4, 8, 160, 728 and 729.

Nothing else of material importance, requisite to be noticed, transpired in 1792.

On March 12, 1793, Major Ellicott, who had been in charge of the surveying department, left the service of the Commissioners. Two days afterwards Dermott, who had prepared a plan of that part of the city which is covered by Hamburgh, and who had laid down the lines of Hamburgh in different ink, was requested to do the like with respect to Carrollsburgh, so that each might be ready for division with the proprietors in April.

On April 9, 1793, a number of lot owners in Hamburgh and Carrollsburgh joined in a formal conveyance of lots owned by them, to the trustees named in the deeds of the proprietors of the farming tracts, for the purposes of the Federal City. This was after, it will be remembered, both the L'Enfant and Ellicott plans had been prepared, and the latter extensively circulated. It was stipulated in this deed that on the allotment and division to be made by the Commissioners, "one half the quantity of the said lots, pieces and parcels hereby bargained and sold shall be assigned and conveyed as near the old situation as may be to them, the said Thomas Johns, James M. Lingan, William Deakins, Jun., Uriah Forrest and Benjamin Stoddard, respectively, in fee simple, so that each respective former proprietor shall have made up to him one half of his former quantity and in as good a situation."

If the L'Enfant and Ellicott plans had destroyed all riparian rights, as it is now held, it is obvious that the provisions of this conveyance could not be carried out if the water lot owners were to receive half of their lands in the same or as good a situation.

On April 9, 1793, regulations were promulgated by the Commissioners relative to the subject of surveys by the surveying department, prescribing forms of returns to be made, etc., adding: "The work is from time to time to be added

on the large plat, which, on being finished, is to be considered as a record."

On April 10, 1793, James R. Dermott was appointed to lay off squares into lots, and regulations were prescribed with respect to the performance of his duties. He was to take minutes of the squares from the certificates of surveys returned to the office of the clerk of the Commissioners, and, from this, plat the squares by a scale of forty feet in an inch and divide the squares into lots, and in one corner of the paper containing the plat of the squares he was to write down the substance of the certificate from which it was made, giving the boundaries. Mr. Dermott, in answers to questions propounded by the Commissioners on February 28, 1799, enumerates thirty squares that were surveyed in the summer of 1792, having been in a manner bounded and a small ditch cut around them, but the dimensions were not noted on any document. He said that Mr. Ellicott's return of their survey and measurement was after the 10th of April, 1793, on which date Ellicott returned to the service of the city.

On June 17, 1793, Andrew Ellicott forwarded to the clerk of the Commissioners three sheets of different parts of Washington, with the returns of the bounds and dimensions of the several squares represented on the sheets. Sheet 2 contained the part which was formerly Hamburgh — the interferences between the new and old locations being delineated in different colors — Hamburgh, as formerly, being represented in red. Sheet No. 3 contained the town called Carrollsburgh drawn in yellow, so that the interferences, as in the case of Hamburgh, might be rendered conspicuous.

The map of Hamburgh showing interferences is contained in the record. No city squares are shown nearer to the water than Nos. 62 and 88. They abut on the south line of what was named Water street in Hamburgh, which street was the northerly boundary of the lower range of water lots. Squares 63 and 89 were subsequently made to embrace the water lots, those squares being bounded on the north by the south line of the old Water street, while in the return and plat of survey they are bounded on the south by the Potomac River.

A partial division was made with some of the lot owners of Hamburgh and Carrollsburgh in 1793. Concerning this, Dermott, in a report to the Commissioners made on February 28, 1799, answering the question as to whether he knew of any instance when the right of wharfage in the city had been so claimed or exercised *as to raise a dispute*, or was likely to do so, said:

"The Commissioners in 1793, when dividing Carrollsburgh and Hamburgh, *had the subject of wharfage under considera-tion.* There were only two places where any difficulty could arise, against which every precaution was taken. The one place was square south of 744. In compensating for what was termed *water property* of Carrollsburgh, which lay on that ground, there were some lots laid out on that square to satisfy claimants. Upon an investigation of the business it was found that that square must bind on Canal street to the east, and not the channel, and that it could have *no privilege* south, there-fore the new locations of water property made in it were with-drawn (except one) and placed in square 705, in a much more advantageous situation than could be expected from the origi-nal location; to this the original proprietors acquiesced."

Three things are evident to me from this statement: First, that the Commissioners had considered wharfing and found no difficulty in recognizing it in every case but the instances mentioned, a condition of things impossible to conceive of if no wharfing rights existed and they had all been vested in the public; second, that the privilege in the water or water lots was treated by Dermott and the Commissioners as sy-nonymous with the right of wharfing, in other words, with riparian rights; and, third, that as by the peculiar location of one of the squares which was entitled originally to the water privilege, such privilege was by the new plan impaired, a new water lot was given to the owner to enable him to have the full enjoyment of his water and wharfage privilege. But that to give the owner another allotment to secure him an existing right is utterly incompatible with the conception that the right did not exist, seems to me too clear for anything but statement.

Dermott also communicated the following as alterations made after the Ellicott plan had been published, having respect to the exercise of wharfing privileges:

"In running a water street on the southeast of Carrollsburgh *on the bank and establishing the right of wharfing to be governed by the parallel (or east and west streets to the channel).* This latter part is not considered as a difference, but an establishment of right, to regulate *the privilege by at all times.* This was done in order to accommodate the original proprietors of lots in that town already established by law. Without this there was no mode known at the time to do it. Similar regulations had taken place through the rest of the city, of which the returns of the surveyors in the office can testify. The whole of this met the approbation of the Commissioners under the regulations of the 10th of April, 1793."

This explains the presence on the Dermott map at this locality of a number of new squares, *in the water*, with the river side of the squares open towards the channel. As Dermott declares, they were designed to mark the direction for wharfing, and the evidence establishes that lots thus situated *in the water* were regarded as appurtenant to the water squares, or squares bounded towards the water by an apparent street, and of which squares an equal division was to be made.

May I again pause to accentuate the fact that every statement thus made by Dermott to the Commissioners of the changes in the Ellicott plan are absolutely inconsistent with the assumed non-existence of wharfing rights and, indeed, as I understand them, are irreconcilable with honesty on the part of Dermott or the Commissioners if the riparian rights had been obliterated. Remember that the lot owners had a right to have the share of the lots coming to them in "a like or as good situation" as before, and if not satisfied with the share given to them, had the power to cause the sale of the whole. To satisfy them and induce them to accept the allotment, here is the final declaration that in considering the question of wharfage the lot holders were assured that their rights would extend across the proposed street by *parallel east and west lines* to the channel. Can it be believed that all the hon-

orable men concerned in the division of the lands, would
have given such assurances to the proprietors to cause them
to accept the allotment, if they knew or believed that the
rights of the lot holders were cut off by the proposed street,
and that there could be no extension of the east and west
lines across the street to the channel? Mark, moreover, the
express declaration of Mr. Dermott, upon whom the duty had
been cast of platting the surveys of the division, that " similar
regulations had taken place through the rest of the city. . . .
The whole of this met the approbation of the Commissioners
under the regulations of the 10th of April, 1793." This, then,
is the situation. An official concerned with duties respecting
divisions with lot owners solemnly declares that throughout
the whole city the lot holders had been assured that the ri-
parian privileges attached to their water lots, which right of
wharfage would extend by east and west lines across the pro-
posed street to the channel, and that this declaration was ap-
proved by the Commissioners; but yet it is now decided that
at the time all this was done there were no riparian rights to
extend across the proposed street by east and west lines to the
channel, because they had all been cut off by the street in
question.

Dermott replied to the question : " Were any difficulties
ever suggested as to the direction of the wharves or rights of
purchasers until the time of Nicholas King?" as follows:

" None that I know of after the first arrangements had
taken place, in 1793, respecting Carrollsburgh, Hamburgh
and other parts of the city. Sometimes purchasers of water
property could not at the first view understand their *privileges*,
but when explained to them were generally satisfied ; and I
know of no one closing a bargain until fully convinced *of their
rights of wharfage.*"

Evidently the " first arrangements " referred to were those
made on the initial division or sale of water property. " Privi-
leges " and " rights of wharfage " are here also used as synony-
mous in meaning.

The Government having succeeded in selling, at an enhanced
price, lots fronting on the river only after convincing the pur-

chasers of their rights to wharfage, it seems to me that, after all these years, it cannot in equity be allowed to hold on to the result of the sales and deny the right of wharfage, by giving positive assurance as to the existence of which the sales were alone made possible.

Mr. Dermott also alluded to the fact that variations had been made in the published plan of Ellicott "in order to compensate original proprietors of lots in Carrollsburgh with lots on the plan of the city upon the principles established by law, *and as near the original situation* as could be."

In December, 1793, Ellicott addressed another letter to the Commissioners, from which it is clearly inferable that the advantages attached to the lots having riparian rights were deemed to give to those lots a higher value than those not possessing such rights.

Dermott, in enumerating the sales of "public water squares, in lots on navigable waters," which were sold before a date stated, mentioned, among other property : "The public water property from squares Nos. 2 to 10, inclusive." The above squares were on land which formerly belonged to Mr. Peter, and was part of the land in front of which the negotiations were had in 1791, already referred to, for the erection of wharves in conjunction with the city. They were all bounded on the Ellicott map on the water side by a *street.* Square No. 3, appearing as a small triangular piece of ground and as abutting directly on the river street, was separated by a street on the west from square No. 8. Though appearing on the plan, square No. 3 had not been platted or officially admitted as a square. On December 22, 1793, John Templeman offered to buy one half—presumably the public half—of square 8, (which square had been divided October 8, 1792,) and one half of the square back of it, "provided that the slip of ground which lays between the water and street is given in, . . . and oblige myself to *build a good wharf* and brick store immediately." The proceedings of the Commissioners in January, 1794, recite the sale to Templeman of nine lots in square No. 8, and the delivery to him of a certificate with the following indorsement thereon: "It is the intention of

this sale that the ground across the street next the water, with the privilege of wharfing beyond the street in front, and of the breadth of the lots, pass with them *agreeably to the general idea in similar instances.*"

It will be observed that the conveyance, in the body of the certificate, was of lots in square 8, the indorsement evidently being designed to indicate what was to be regarded as appurtenant to *those* lots.

It seems hardly necessary to suggest that riparian rights, that is, rights of wharfage, could not possibly have been certified as existing in the land sold to Templeman, "*agreeably to the general idea in similar instances,*" if all such rights had been already cut off by the effect of the L'Enfant and the Ellicott maps, for it must be borne in mind that the property certified, in effect, as *appurtenant* to the lots in square 8 and sold to Templeman was delineated on the map as being bounded on the water side by a proposed street.

Let me for a moment consider the consequences of the above transaction. When it took place it is not denied by any one that the Commissioners were sedulously engaged in an effort to dispose of the public lots for the purpose of obtaining the money to carry out the great object of establishing the city. The property sold to Templeman was unquestionably separated from the water by a street on the proposed plans which had been distributed and were known; but more than this, partially in front of it, on the further side of the street, lay a small strip of land, also bounded on the plan on the river side by an apparent street, and that such square was marked on the plan as a numbered square, though not actually platted. Templeman desired to buy the platted square, but he was unwilling to do so lest it might be claimed that the small piece of unplatted land on the opposite side of the street might cut him off from the river, and thereby deprive him of his riparian rights. That he needed the riparian rights and intended to use them results from the fact that his proposition contained a guarantee to erect a wharf. It is patent from such proposition that it entered into the mind of no one to conceive of the fact that a street laid down on the plan as in

front of the square would cut off riparian rights. Now, what did the Commissioners do? They accepted the proposition and sold square 8, expressly declaring that riparian rights should exist in front of the square, across the street, "agreeably to the general idea in similar instances." Put side by side the decision now made and the declaration of the Commissioners. There were no riparian rights across the street, because they had all been destroyed and taken away from the owners and given to the public by the L'Enfant and Ellicott plans. So, now, it is held. Riparian rights exist across the street, including wharfage, in all similar cases; that is, in all cases where the property substantially abuts upon the river, but is bounded by a proposed and projected street, is the declaration which the Commissioners made in the execution of the great trust reposed in them.

When the effect of this declaration is considered in connection with the previous acts of the Commissioners and the contracts and negotiations of the proprietors, and when the flood of light which it throws upon subsequent dealings is given due weight my mind refuses to reach the conclusion that riparian rights did not attach to the water lots. Can it be doubted that this formal and official declaration of the Commissioners became the guide and the understanding for the sales thereafter made by the Commissioners, and which they were then contemplating and endeavoring to consummate? Will it be said that the members of the commission and all those associated in the work would have allowed a declaration so delusive and deceptive to have been made and entered on the minutes of the commission, if it had in the remotest degree been conceived that riparian rights did not exist?

The sale to Templeman, as stated, was not consummated until January, 1794. No sales in the city took place deserving attention until the 23d of December, 1793, when a contract was made with Robert Morris and James Greenleaf for the sale of 6000 lots, (to be selected,) averaging 5265 square feet, at the rate of thirty pounds per lot, payable in seven annual instalments, without interest, commencing the 1st of

May, 1794, and with condition of building twenty brick houses annually, two stories high; covering 1200 square feet each; and with further condition that they should not sell any lots previous to the 1st of January, 1796, but on condition of erecting on every third lot one such house within four years from the time of sale. It was expressly stipulated that 4500 of the lots should be to the southwest of Massachusetts avenue, and that of those lots "the said Robert Morris and James Greenleaf shall have the *part of the city in Notley Young's land.*" Certain squares were next specifically excepted from the operation of the agreement, as also "the lots lying in Carrollsburgh, and . . . the water lots, including the water lots on the Eastern Branch, and also one half of the lots lying in Hamburgh, the lots in that part of the city and belonging to it, *other than water lots*, being to be divided by alternate choice between the said Commissioners and the said Robert Morris and James Greenleaf." Immediately thereafter was contained this proviso: "Provided, however, and it is hereby agreed by and between the parties to these presents, that the said Robert Morris and James Greenleaf are entitled to the lots in Notley Young's land, *and of course to the privilege of wharfing annexed thereto.*"

The word "lots" in the proviso manifestly meant "water" lots, as there had been previously an express agreement that Morris and Greenleaf should "have the part of the city in Notley Young's land." As stated, the proviso followed a stipulation excepting "water lots" generally from the operation of the agreement. Evidently, therefore, the proviso was inserted out of abundant caution, to leave no room for controversy as to the right of Morris and Greenleaf to the "*water*" lots in Notley Young's land; and therefore clearly imported that the lots in Notley Young's land fronting on the river, and which had been bounded at that time by both the L'Enfant and the Ellicott plan and by the return of surveys by Water street, were notwithstanding water lots, and entitled to wharfage as a matter of course.

My mind fails to see that there were no riparian rights or rights of wharfage attached to the lots bounded by the pro-

posed Water street, in view of the express terms of the above contract. How could it have been declared that "of course" the water privilege and consequent right of wharfage went with the water lots, when it had been long determined, as the court now holds, that there were no water lots and no wharfing privileges to be sold? True, it has heretofore been suggested that this provision in the Morris and Greenleaf contract may have referred to lots in Notley Young's land which might be water lots other than those on the Potomac River, as, for instance, lots in Carrollsburgh or on the Eastern Branch. But *all* lots in Carrollsburgh and the water lots on the Eastern Branch were excluded from being selected by Morris and Greenleaf by the express terms of the contract, and besides there were no lots in the land conveyed by Notley Young which could be considered as water lots, other than those fronting on the Potomac River and on that portion of the Eastern Branch which the Government had already taken as a public reservation for an arsenal. The fact is then, that at the very time when it is now decided that all riparian rights had been wiped out and that no wharfing privilege existed as appurtenant to water lots, in order to accomplish the successful foundation of the city an enormous number of lots were sold under the express guarantee of the existence of water lots and under the unambiguous stipulation that such lots should, *of course,* enjoy the wharfing privilege. That this sale to Morris and Greenleaf was submitted to President Washington before its consummation no one can doubt, in view of the deep interest he took in the foundation of the city and of the manifest influence which the making of the sale was to have on the accomplishment of his wishes. Can it be said of Washington that he would have allowed a stipulation of that character to go into the contract if he believed that there were no water lots and no wharfing privileges because under his direction they had all ceased to exist? If this were a controversy between individuals, and it were shown that a conveyance had been made with statements in it as to the existence of water lots and rights of wharfage, would a court of equity be found to allow the person who had reaped the benefit of

his assurance by selling the property, to alter his position and assert as against the purchaser the non-existence of the very rights which he had declared, " of course," existed, in order to consummate the conveyance? If a court of equity would not allow an individual to take such a position, my conception is that a nation should not be allowed here to avail itself of an attitude so contrary to good faith and so violative of the elementary principles of justice and equity, and, especially, where the statute on which this controversy is based imposes upon the court the duty of administering the rights of the parties according to the principles of equity.

It is true that some time after the Morris and Greenleaf contract was made a certificate was issued by the Commissioners, giving more formal evidence of the title to the land, and describing the lots by reference merely to the numbers in the squares, without repeating the assurance that the lots were water lots, and that, " of course," the rights of wharfage attached as stated in the previous contract. But neither did the certificate reiterate or reëxpress the obligations assumed by the purchasers to erect buildings, and so on. Can the certificate be treated as changing the covenants of the contract as against Morris and Greenleaf so far as the water lots and wharfing privilege are concerned, because it was silent on this subject, and yet be not held to have discharged them from the burdens of the contract, as to which also the certificate was silent? Can it be imputed to the Commissioners that after the contract was made, and they had duly reaped the benefits arising from it, that, of their own accord, by the mere fact of the issue of the certificate, they could discharge themselves from the burdens of the contract and hold on to the benefits? Can a court of equity recognize such a principle or enforce it? If not, how in consonance with equity can such a principle be applied here? But the record in my judgment entirely relieves the mind of the possibility of imputing any such inequitable conduct to the Commissioners, for it shows beyond dispute that after the consummation of the allotments to Morris and Greenleaf and to Notley Young, both these parties or their grantees applied to the Commis-

sioners for license to erect wharves in front of their "water lots," and that licenses were issued as a matter of course. It should also be remembered that the expression "water lots" and "the wharfing privileges," which were, of course, attached "thereto," used in the contract with Morris and Greenleaf, affirmatively shows what was the signification of the words "water lots" as previously made use of by the Commissioners in dealing with other persons. As there were no lots in Notley Young's land embraced within the terms of the contract which were not separated from the river by the proposed street on the L'Enfant or Ellicott plan, it follows conclusively that the words "water lots" could only have referred to the lots fronting on the river and facing on the projected street, which were deemed water lots because of their situation, and which were of course entitled in consequence to the privilege of wharfage. It cannot be gainsaid that at the time the contract with Morris and Greenleaf was made the L'Enfant plan was known and the Ellicott reproduction of it had been engraved and was extensively circulated. Dealing with this ascertained and defined situation the covenants in the contract with Morris and Greenleaf were, in reason, it seems, susceptible alone of the construction which I have placed upon them. The importance with which the Morris and Greenleaf contract was regarded at that time and the influence which it was believed it would exert upon the successful accomplishment of the foundation of the city is amply shown by a report of the Commissioners made to President Washington, enclosing, on December 23, 1793, a copy of the Morris and Greenleaf contract. The Commissioners said:

"A consideration of the uncertainty of settled times and an unembarrassed commerce weighed much with us as well as Mr. Morris' capital, influence and activity. The statement of funds enclosed may enable the prosecution of the work even in a war, in which event we should (be?) *without this contract* have been almost still."

This summary of the events of the year 1793 is concluded with a reference to the Maryland act of December 28, 1793, passed as supplementary to the statute of December 19, 1791.

Dissenting Opinion: White, Peckham, JJ.

By the first section it would seem to have been designed to vest in the Commissioners the legal title to the lands which had been conveyed to the trustees, while the third section provided for division and allotment by the Commissioners of the lots within the limits of Carrollsburgh not yet divided. In the margin [1] the sections referred to are inserted.

As further evidence that the Commissioners regarded the special value of "water lots" to consist in the wharfing privilege, and that a water lot was not divested of riparian rights because the lots were bounded towards the water, (either on the plat of survey or on the plan of the city,) by a street, attention is called to the minutes of the Commissioners in March, 1794, with respect to squares 771 and 802, which, on both the Ellicott and Dermott maps, were separated from the water by Georgia avenue. Return of survey of square 802 was dated September 3, 1793, and bounded the square on all sides by streets.

---

[1] SEC. 1. *Be it enacted by the General Assembly of Maryland,* That the certificates granted, or which may be granted, by the said commissioners, or any two of them, to purchasers of lots in the said city, with acknowledgment of the payment of the whole purchase money, and interest, if any shall have arisen thereon, and recorded agreeably to the directions of the act concerning the territory of Columbia and the city of Washington, shall be sufficient and effectual to vest the legal estate in the purchasers, their heirs and assigns, according to the import of such certificates, without any deed or formal conveyance.

\* \* \* \* \* \* \*

SEC. 3. *And be it enacted,* That the commissioners aforesaid, or any two of them, may appoint a certain day for the allotment and assignment of one half of the quantity of each lot of ground in Carrollsburgh and Hamburgh, not before that time divided or assigned, pursuant to the said act concerning the territory of Columbia and the city of Washington, and on notice thereof in the Annapolis, some one of the Baltimore, the Eastern and Georgetown newspapers, for at least three weeks, the same commissioners may proceed to the allotment and assignment of ground within the said city, on the day appointed for that purpose, and therein proceed, at convenient times, till the whole be finished, as if the proprietors of such lots actually resided out of the State; provided, that if the proprietor of any such lot shall object, in person, or by writing delivered to the commissioners, against their so proceeding as to his lot, before they shall have made an assignment of ground for the same, then they shall forbear as to such lot, and may proceed according to the before-mentioned act.

The minutes read as follows (6 : 162) :

" A copy of the following proposition was delivered Mr. Robert Walsh, of Baltimore : Mr. Carroll will sell only half of his half of the water lots, in square 771 & 802; he will divide so that the purchaser may have his part adjoining.

" The Commissioners have for the public a right in one half of these water lots. They are willing to dispose of that part.

" Mr. Greenleaf by his contract has a right to choose the public part in squares 770, 771, & 801, 802, except the water lots.

" The Commissioners have advised Mr. Greenleaf that they were in treaty for the public water lots in squares 771 and 802, and some adjoining lots, and expected that Mr. Greenleaf would have waived his right of choice in the back lots; he has not done so, but, desired in case the contract for the water lots was not finished that they might be reserved as a part of twelve. The Commissioners had promised to reserve for him to accom'odate his friends, under terms of speedy improvement. So circumstanced, the Commissioners can positively agree for the public interest in the water lots only, which they offer at the rate of 200 pounds each, and the public interest in the rest of the lots in the four squares, at 100 pounds each, to take place in case Mr. Greenleaf does not fix his choice on them.

" But the Commissioners, conceiving there is room *on three fourths of the water line* FOR WHARFAGE SUFFICIENT TO GRATIFY BOTH, and that the views of all would be promoted by the neighborhood and efforts of both interests, would wish rather that on Mr. Greenleaf coming here, from 10 to 15th of next month, the two interests might be adjusted. The Commissioners would have a pleasure in contributing all in their power, and assure themselves there would be no difficulty if all were met together."

These squares, because they were " water lots in the Eastern Branch," could not have been selected by Greenleaf under the large contract already referred to, and therefore the purchase of these lots was a separate transaction. The fact that the

respective parties referred to in the communication were contending for the acquisition of the water lots separated from the river by Georgia avenue, because they wanted the water privileges, clearly shows that it was deemed that such privilege was appurtenant; and that the Commissioners thought that on three fourths of the water line there was wharfage room sufficient to gratify both, makes it plain that it did not occur to the mind of anybody that the contemplated street would cut off the water lots from the possession of riparian rights or destroy the wharfing privilege.

As already stated, a division of the water lots in Hamburgh was not made until June, 1794. Without stopping to analyze these divisions, suffice it to say that in my opinion they affirm the fact that it was not intended to cut off the water privileges of the owners whose water lots were divided. It is clear from the proceedings as to the allotments in squares 63 and 89 (which embraced most of the former water lots) that some of these divisions in Hamburgh, as already mentioned, were made as against owners incapable of representing themselves, and that allotments were made by the Commissioners by virtue of the authority conferred by the Maryland act, which commanded, as I have already shown, that the allotments should be in *a like situation* and that the division should be *equal.* The acts of the Commissioners in the division of the squares referred to manifest, as understood by me, an effort and purpose to comply, not only with the terms of the contracts for the division of Hamburgh, but with the commands of the statute, and show the preservation of whatever rights were appurtenant to the water lots before the division took place. It may be worthy of note that one of the lots in square 63 which was so divided and fell to the public was sold contemporaneously with the transaction as a water lot by the front foot.

I have already referred to the fact that Dermott in 1799 enumerated the public water property previously sold, as part of "the public water property from squares Nos. 2 to 10, inclusive," formerly land of Robert Peter, and part of the water lots in front of which L'Enfant in 1791 had proposed that

Peter and the city should jointly erect wharves. On November 7, 1794, the Commissioners wrote to General W. Stewart in part as follows:

" . . . With respect to the water lots, the squares are also not yet divided, and the Commissioners can only sell you the part of the said two squares" (referring to squares 2 and 10) "which shall belong to the public on making divisions. Such we have no objections to sell you at 16 dollars the foot in front."

And on November 11 following the Commissioners again wrote General Stewart:

" . . . No. 2 contains at the termination of the wharf 317 feet. This is to be paid for by the number of feet in front, but it includes square No. 7," (a small square on the east,) "15,444 square feet, not taken into any other calculation. No. 10 contains in front, at high-water mark, 176 feet. At the termination of the wharf 246. Medium, on account of the vicinity of the channel.

"N. B. — It must be remembered that only one half of these squares belong to the public."

This shows that at the time of these negotiations wharves existed in front of the squares, and that though the squares were bounded *on the plan*, towards the water, *by a street*, yet that the squares lay partly in the water, and that the negotiations were conducted on that basis and with reference to the wharfing privileges. No other inference is possible in view of the fact that an actual charge was made for land beyond the street and out to the end of the wharf.

A sale was made to General Stewart on December 18, 1794.

At what was formerly Carrollsburgh, as already stated, a variation was made from the Ellicott map by running a water street on the southeast *on the bank*, and establishing the right of wharfage to be governed by the parallel (or east and west streets) to the channel. Dermott, in his report to the Commissioners, represented that "the public water squares, or lots on navigable water what fell to the public *after satisfying original proprietors of lots in Carrollsburgh* from square 611 round to square 705, both inclusive," except four lots in squares

610 and 613, were sold by a date named. The main portion of the water lots in front of Carrollsburgh would seem to have been allotted to former water lot owners. The evidence in this record, however, as to sales of public water lots in this locality, clearly exhibits the fact that *apparent* squares shown on the Dermott map as lying wholly or almost entirely *in the water*, outside of the line of the assumed street, were sold, simply as a part of the water lots on the other side of the projected street; that is to say, the conveyances were of those lots by the front foot, in some instances adding " with the water privileges *east of the same*," showing clearly that what lay east of the street was considered as simply a part of the property fronting on the street, and as necessarily following it in order not to impair its value. Instances of this kind are shown by the record in connection with squares 667 and east of 667, squares 665 and 666, and squares 662 and 709. And in the case of square s. s. 667, lying to the south of the street, which consisted of considerable fast land, a sale was made of a lot in that square with the privilege east of the same, being an unnumbered square lying in the water.

It is worthy to be mentioned, although out of the order of its date, that lots in one of the very squares above referred to (No. 667) were conveyed to General Washington himself, together with the appurtenant lots *lying in the water* beyond the street, and that General Washington, in his will, (1 Spark's Writings, 582, 585,) referred to the lots fronting towards the river on the street as water lots, and made no mention of the lots *in the water*.

Illustrations like unto those above made abound in the record, showing that lots which were separated from the river by a street delineated upon the plan of the city, and also by the return of actual survey, were yet sold by the Commissioners for an increased price as water lots, which imported, as has been shown and will hereafter further appear, that riparian privileges were attached to the lots. The record also cites instances where application was made to the Commissioners by the owner of a water lot for a license to wharf in front of his lot, and such license issued. I do not stop to refer

in detail to all such cases, because those already enumerated adequately show the conception of the situation entertained by all the parties at the time and on the faith of which they dealt. No single instance to the contrary has been found, nor has a case been pointed to where the Commissioners sold or offered to sell a water privilege or riparian right of any kind, including the right of wharfage, as appurtenant. *to a public street.* The importance of this fact cannot be overestimated. The history of the times leaves no doubt of the solicitude of President Washington and of the Commissioners, whose hopes were enlisted in the permanent establishment of the capital, to avail of every resource to obtain the means wherewith to erect the public buildings, so that the capital might be ready for occupancy at the time designated in the act of Congress. If it be true that the riparian rights were cut off by the intention to make a street along the river, then all such rights along the whole river front belonged to the United States and were at the disposal of the Commissioners for sale. Seeking, as they were doing, to make use of every resource by which funds could be procured, can it be doubted that if they had deemed this to be the case, there would not have been mention of the fact on the plans which were put in circulation, and that there would have been effort made to sell these available rights in order to obtain the much-desired pecuniary aid? It is certain that the minds of the Commissioners were addressed to the importance and value of the water lots and of wharfage, because of the many contracts referring to this subject from the very beginning. The only inference to my mind permissible from this is, that as the Commissioners were seeking to obtain the highest possible price for the water lots, because they enjoyed riparian and wharfing privileges, the thought never entered their mind of destroying the sale of the water lots by stripping them of that attribute which gave peculiar value to them.

Let me come now to a circumstance which seems to throw such copious light on the situation that it is even more conclusive than the facts to which reference has heretofore been made.

In September, 1794, Messrs. Johnson and Stuart were succeeded as Commissioners by Messrs. Scott and Thornton. In May, 1795, Commissioner Stuart was succeeded by Commissioner White. The views of the new Commissioners on the subject of wharfage were expressed by them in a communication to the President dated July 24, 1795, the communication being one transmitting for the President's approval regulations formulated by the Commissioners as the result of their consideration of "the subject of regulating the building of wharves." In the communication it was expressly declared that the regulations had been prepared "with respect to the *private property on the water.*" Referring to the Maryland act of December 17, 1791, which conferred the power to regulate wharfing, the Commissioners said:

"Had the legislature of Maryland been silent on the subject, the holders of water property in the city would have had a right to carry their wharves to any extent they pleased under the single restriction of not injuring navigation. The law of the State is therefore restrictive of that general right naturally flowing from the free use of property, and ought not to be construed beyond what sound policy and the necessity of the case may require."

Adverting to the importance of so drafting the regulations as not to impose restrictions calculated to discourage those intending to purchase water lots with their appurtenant privileges, the Commissioners said:

" Our funds depend in some measure on sales, and sales on public confidence and opinion. Any measure greatly counteracting the hopes and wishes of those interested would certainly be injurious, and ought not to be adopted without an evident necessity."

Does not the declaration that the rules were adopted with respect to private property on the water rebut the contention now advanced that there was no such property on the water, because all riparian rights and rights of wharfage were exclusively the property of the public?

Are these statements of the Commissioners not a complete answer to the contention that the Maryland act was intended

to *originate* rights of wharfing, and not merely to regulate the exercise of existing rights? At the outset attention was called to the fact that the Maryland law was passed at the request of the Commissioners, preferred at a meeting where Mr. Jefferson and Mr. Madison were present, and that the very terms of the request implied that the Commissioners desired power to *regulate* the riparian rights which they thought were then existing. Now, with all the intervening transactions, comes the letter to the President, showing beyond peradventure the construction and interpretation affixed to the Maryland act by those to whom it was addressed. Could Washington, could Jefferson, have remained silent if the letter of the Commissioners was an incorrect statement of the understood law on the subject? The declaration of what the rights of the water lot owners were as to wharfage is as full and complete it seems to me as human language could make it.

The draft of the proposed regulations adopted by the Commissioners and which was submitted by them to the President is not in the record, although the communication to the President indicates its character. Correspondence, however, on the subject ensued between the President represented by the Secretary of State and the Commissioners. It is to be inferred that the draft of the regulations sent to the President contained a provision forbidding water lot owners, in the construction of their wharves, from erecting on the wharves any buildings whatever, the intent appearing to be that the warehouses would be built on the water lot to which the wharfing privilege was attached. This would indicate that the Commissioners intended by their regulations to so arrange that any projected street would not cut off the water rights and right of wharfage, but would serve merely as a building line.

Complaint on this subject was made by a Mr. Barry, and such complaint was thus referred to in a letter of Commissioners Scott and Thornton to Secretary of State Randolph on May 26, 1795:

"Mr. Barry had purchased on the Eastern Branch, under

an idea of immediately building, and carrying on trade, but refuses to build, on being informed of the restrictions to which every one must be subject in support of a Water street, which we presume it was the intention of the executive to keep open to the wharves, as is the case in Bordeaux and some other cities in Europe. The inconvenience pointed out by Mr. Barry is that in unlading vessels it would be necessary to go through three operations: 1st, taking out the load; 2d, conveying it across the wharves *and Water street* to the warehouses; 3dly, by taking it up into the warehouses. Whereas, if the stores or warehouses were to stand on the water edge of the wharves, the unlading into the warehouses would only be one operation, and it would save five per centum, and the same in loading."

Observe that there is not an intimation in this communication that the Commissioners or anybody else had the faintest conception that the right to wharf did not exist in favor of the owner of the water lot because of a proposed street, but there was simply a question as to whether the regulations should restrict the water lot owner from building warehouses on his wharves. The wharfing regulations, as adopted, are annexed in the margin.[1] As approved, they contained no

---

[1] Building Regulation No. 4.

(Proceedings of Commissioners, p. 408.)

CITY OF WASHINGTON, *July 20th*, 1795.

The Board of Commissioners in virtue of the powers vested in them by the act of the Maryland legislature to license the building of wharves in the city of Washington, and to regulate the materials, the manner and the extent thereof, hereby make known to those interested the following regulations:

That all the proprietors of water lots are permitted to wharf and build as far out into the river Potomac and the Eastern Branch as they think convenient and proper, not injuring or interrupting the channels of navigation of the said waters, leaving a space wherever the general plan of the street in the city requires it, of equal breadth with those streets; which if made by an individual holding the adjacent property, shall be subject to his separate occupation and use until the public shall reimburse the expense of making such street, and where no street or streets intersect said wharf to leave a space of sixty feet for a street at the termination of every three hundred feet of made ground; the buildings on said wharves or made ground to be subject to the general regulations for buildings in the city of Washington,

restriction on the right of water lot owners to erect warehouses on their wharves, thereby clearly implying that the complaint of Barry was treated by President Washington as well founded, and that the regulations were corrected in that respect before final approval. Comment at much length upon the regulations is unnecessary, but their perusal refutes the idea that a street marked upon the plan of the city as running in front of water lots operated to deprive such water lots of riparian privileges. The regulations warrant the inference that the right of wharfage was intended to attach to such lots *at the boundary of the lot on the water side,* and that the water street was designed to be superimposed upon the water privileges. The requirement was that when the proprietor of the water lot wharfed out *in front of his lot,* he should leave a space for the street, which, *upon the plan of the city,* appeared as bounding the lot on the water, and if in so wharfing it became necessary to fill up and make the street, he was to have the exclusive right of occupancy until reimbursed "the expense of making such street."

It will also be observed that in the regulations the right is recognized, without qualification or reservation of any kind, of ALL proprietors of water lots to wharf into the river and the Eastern Branch.

While President Washington had under consideration the proposed wharfing regulations, Commissioners Scott and Thornton addressed a letter to Commissioner White on August 12, 1795. A sentence in this communication illustrates the important nature of the riparian privileges and refutes the thought that any one then supposed that such a right was received as a favor and was a mere temporary license, revocable at the pleasure of the Commissioners or of Congress. The letter discussed the advisability of not requiring a space of sixty feet to be left between the termination of the wharves and the channel, and in the course of the comments it was

---

as declared by the President, wharves to be built of such material as the proprietors may elect.

By order of the Commissioners:

(Signed)    T. JOHNSON, Jr., *Sec'y.*

said : " Mr. Hoban, agent for Mr. Barry, says the intended wharf in his case, which he estimates to cost *upwards of twenty thousand dollars*, will terminate in four feet water." The regulations, as finally approved, were sent to the Commissioners on September 18, 1795, by President Washington,with the following communication :

" MOUNT VERNON, 18 *September*, 1795.

" GENTLEMEN : The copy of the letter which you wrote to the Secretary of State on the 21 ult., enclosing regulations relative to the wharves and buildings in the Federal City, came to my hand yesterday.

" If the proprietors of water lots will be satisfied with the rules therein established for the extension of wharves and buildings thereon, the regulations will meet my entire approbation, and of their ideas on this head you have no doubt made some inquiries and decided accordingly. . . ."

Can this letter be reconciled with the theory that proprietors of water lots had no riparian privileges and no right to extend their wharves because of a proposed street? Does not the letter declare the existence of such rights in unequivocal terms, and also clearly point out that the words " water lots " meant property fronting on the river, to which riparian rights and consequently rights of wharfage attached, despite the presence of the proposed street?

Mark the declaration of President Washington that he considers the regulations as relating to the *extension* of wharves and buildings thereon, clearly implying the right to extend out the wharves from in front of the water lots, and also showing that he had in his mind the change which had been made in the regulations in consequence of the complaint of Mr. Barry, allowing buildings to be erected by the owners of water lots on the wharves which they were entitled to construct. In addition to these considerations, however, there is one of much greater import which arises from the letter of Washington, that is, the great importance which he attached to doing nothing to impair the riparian rights of the owners of water lots, for he expressly says:

"If the proprietors of water lots will be satisfied with the rules therein established for the extension of wharves and buildings thereon, the regulations will meet my entire approbation."

If the rights of the owners of water lots were not deemed by him a matter of grave importance, why should one so scrupulously careful as Washington always was have declared, in a public document, that the satisfaction of the lot owners with the regulations constituted one of the moving causes for affixing his approval to them? Can it be said that Washington would have subordinated the execution of a public duty to the approval of private individuals who had no special rights in the matter?

It seems to me that this declaration on his part obviously implied that, as by the results of the contracts made with the former proprietors, under his influence and at his suggestion, they had given up their property upon the condition of an equal division, he was unwilling that anything should be done to deprive them of a part of their equal rights, and therefore he would not approve any regulation which he considered had such an effect. In other words, from reasons of public honor and public faith, he deemed it his duty to protect the rights of the owners of water lots. This obligation of public honor and public faith thus, it seems to me, expressly declared by Washington, rests, in my judgment, upon the nation to-day and should be regarded. As I see the facts, it ill becomes the nation now, when the rights have been sanctified by years of possession, to treat them as if they had never existed, and thus disregard the obligations of the public trust which Washington sought so sedulously to fulfil.

Mr. Barry, whose proposal to build a wharf has been above set forth, and at whose complaint the regulations were presumably amended so as to allow the building of a warehouse on the wharves, it would seem after the adoption of the regulations feared another difficulty. Certain lots situated in square No. 771, which had been sold by the Commissioners to Greenleaf under the express statement that they were entitled to the wharfing privilege, had been conveyed to Barry

as the assignee of Greenleaf. The regulations, as I have observed, provided that the wharf owner should where the plan of the city exhibited a street and at every three hundred feet leave a space for a street. Barry, conceiving the idea that a projected street (Georgia avenue) which would run across his wharf, would under his complaint previously made impair the utility of his wharf, entered into negotiations with the Commissioners on the subject. The majority of the Commissioners addressed him the following letter:

"CITY OF WASHINGTON, 5th Oct., 1795.

"SIR: We have had your favor of the 3d inst., too late on that day to be taken up, as the board were about rising.

"It will always give us the greatest pleasure to render every possible aid to those who are improving in the city, especially on so large a scale as you have adopted. We think with you that an imaginary continuation of Georgia avenue through a considerable depth of tide water, *thereby cutting off the water privilege of square 771 to wharf to the channel*, too absurd to form a part of the plan of the city of Washington. That it never was a part of the plan that such streets should be continued through the water, and that your purchase in square 771 gives a perfect right to wharf to any extent in front or south of the property purchased by you not injurious to the navigation and to erect buildings thereon agreeably to the regulations published."

In other words, the Commissioners agreed to relieve him from the effect of the wharfing regulations. Because, in the letter of the Commissioners, the words are used "thereby cutting off the water privilege of square 771 to wharf to the channel," it has been argued that the Commissioners must have thought that the existence of a street in front of a water lot, between it and the water, would technically operate to deprive the lot of its riparian privileges. But this overlooks the entire subject-matter to which the letter of the Commissioners related. They were dealing with the operation which a projected street would have, as complained of by Barry, on a wharf *when built*, and not with the riparian right to wharf

to the channel, which was conceded. Indeed, this becomes perfectly clear when it is considered that the square referred to had been the subject not long before of express representations by the Commissioners to various would-be purchasers that it possessed wharfing privileges. This letter of the Commissioners also contains a statement which shows their estimate of the theory that a merely projected street in front of a water lot should cut off riparian privileges, since they declare that such an effect to be given to an imaginary street was, to use their language, "too absurd" to be considered.

The period following the approval of the wharfing regulations by General Washington affords other illustrations of the sale of water lots and the granting of licenses to lot owners to wharf across the street in front of their property — in other words, to enjoy their riparian rights — which I do not deem it essential to enumerate in detail, as they are simply cumulative of the examples which I have already given.

There is an interval of about fifteen months during this time where the records of the Commissioners no longer exist, and therefore approach is at once made to the Dermott map, which was transmitted by the Commissioners to the President on March 2, 1797. The court has inserted a reduced reproduction simply of that portion of this map on which is delineated the water front from the Long Bridge up the Eastern Branch, and this will answer the purpose of elucidating what I have to say in connection with the map.

On June 15, 1795, Dermott had been "directed to prepare a plat of the city with every public appropriation plainly and distinctly delineated." In consequence of departures made from the Ellicott map, resulting from changes in the public reservations or corrections of mistakes which were developed as existing by subsequent surveys, as well as from the creation of new squares and the obliteration of some old ones, it resulted that the Ellicott plan no longer accurately portrayed the exact situation of the city, and the Dermott map, when completed, exhibited the result of all such changes.

It was strenuously claimed in argument that this map was the final and conclusive plan of the city, and that an inspection

of it disclosed that the proposed water street marked on the plans of L'Enfant and Ellicott was omitted. The court finds that this map was only one step in the evolution of the city, and that whilst it is true that it did not mark Water street along the whole front of the city, it nevertheless delineated a line binding the front, which the court considers indicates that a Water street was either then projected or contemplated in the future to exist in accordance with the face of the L'Enfant and Ellicott maps. Whilst to my mind the line in question is but a demarcation of the tide line, this is immaterial; for it is conceded *arguendo* that the plan is what it is now decided to be.

One thing, however, is plainly noticeable on the Dermott map, viz., that whilst the line which it is now held indicates the fixed purpose to there locate a street is patent, Water street is not named upon the map at that locality, and such a street is only named in a short space from square 1079 to square east of square 1025. How the Water street came to be delineated and named at this particular locality by Dermott is shown by an order made by the Commissioners on March 22, 1796, directing the surveyor to "run Water street to eighty feet wide from square 1079 to square east of square 1025, and run out the squares next to the water and prepare them for division." In other words, at the one place on Dermott's map where a Water street is specifically stated to exist, it is shown that it was the result of a precise order to that effect given by the Commissioners. That the Commissioners could not have considered that this order cut off riparian rights from the water lots within the area in question is shown by the evidence in the record, which establishes that the lots there abutting on Water street were sold by the Commissioners as water lots, subsequent to the order referred to and with water privileges attached. (Square 1067, August 15, 1798, 1079 and 1080, November 9, 1796, and October 24, 1798; east of 1025, December 5, 1798.)

On the Dermott map was noted, as already mentioned, the changes and corrections which had taken place in the intervening time to which I have referred.

The Dermott map also makes clear this fact that, as by the

result of the surveys, in most instances, the measurement of the squares — certainly in front of Notley Young's land — carried them down to, or substantially to, the water line along the river bank, that the projected Water street, taking the line as delineating such street, was proposed to be established, in great part at least, in the water.

It seems to me, after what has been said, nothing further is required to show that, granting that the line on the Dermott map was intended to indicate a proposed street, it was not thereby the intention to abolish the distinctive characteristics of water lots and the riparian privileges which were appurtenant to them. Dermott himself was familiar with all the previous transactions, having been in the service of the city from early in 1792. He had made changes as reported in the situation of particular pieces of property in order to preserve the riparian rights and give them fruition. He stated to the Commissioners in 1799 (long after it is alleged his plan was approved by Washington) that riparian rights had been the basis of purchases, and that assurances and explanations as to their existence had caused purchases to be made which otherwise would not have taken place. He had supervised the division in Carrollsburgh, which preserved the riparian rights. In other words, he had dealt with the whole matter, as an officer of the city, upon the assured assumption of the existence of the riparian rights attached to water lots. In no instance, except in a few cases of an exceptional character, had he questioned such rights. And when, in 1799, he gave a summary of the prior dealings of the Commissioners in relation to water property — as to which, as stated, he was personally familiar — he observed, after stating that in some special instances squares touching or binding upon the water were not given the privilege of wharfing, in which case they were sold and divided *as upland lots,* he said as a sure criterion that a lot was a " water lot " and, as a corollary, was entitled to " water privileges; " that " where squares were entitled to water privileges, in the sales *these were sold by the front foot,* or the privilege generally mentioned to the purchasers."

Under these circumstances to suppose that the line drawn, on Dermott's plan, along the river, whether it indicated a projected street or the line of tide water, was intended to cut off the riparian rights, would attribute to him a conduct so inconsistent, not to use harsher words, as to be beyond explanation. And when the approval by President Washington of the Dermott plan is weighed, it strikes me as an express sanction by him of the existence of the riparian rights and wharfing privileges, as attached to water lots, especially in view of all the transactions to which reference has been made, and particularly in view of his language in approving the wharfing regulations, in which he said: "If the proprietors of water lots will be satisfied with the rules therein established for the extension of wharves and buildings thereon, the regulations will meet my entire approbation."

During this period occurred the controversy between Nicholas King and the Commissioners, which led to a communication on June 25, 1798, which it is claimed contains language importing generally that the Commissioners denied that wharfing privileges attached to a lot when separated from the water by a street. But this inference, in view of all the circumstances, is unwarranted. Mr. King left the employ of the city in September, 1797, and thereafter looked after the interests of some of the original proprietors. As representing Robert Peter he wrote to the Commissioners on June 27, 1798, urging in substance that the wharfing regulations should be made more definite and complete. He enumerated a number of water squares owned by Mr. Peter as entitled to riparian privileges, and without expressly declaring that square 22 was a water square, suggested that the dimensions of that square as then platted should be enlarged rather than that a new square should be formed from the low ground on the south, thus implying that the square *as enlarged* would be bounded on the water side by a street. In answering this communication the Commissioners said in reference to square 22:

"With respect to square No. 22, we do not conceive that it is entitled to any water privileges as a street intervenes between it and the water; but, as there is some high ground

between the Water street and the water, we have no objection to laying out a new square between Water street and the channel, and divide such square, when laid out, so as to make it as beneficial to Mr. Peter and the public as circumstances will admit."

That the Commissioners did not intend to assert that a merely projected street appearing on a plan of the city would take a square adjacent to the water out of the category of water property is evident from the fact that they did not dispute Mr. King's assertion that the other squares enumerated in his letter which were bounded, on the plan of the city, on all sides by streets, were possessed of riparian privileges. The Commissioners evidently assumed that there was fast land of the entire dimensions of a street south of square 22, and also other fast land between that street and the water, and that the particular locality justified treating square 22 as upland property, and called for the creation of a new square to the south. It is to be remarked also that the Commissioners were dealing, not with would-be purchasers, but with the representative of the former proprietor, with whom it was competent to agree that in view of circumstances, such as stated, a square might be laid partly in the water below a street, which square should be the "water square" to which the riparian privileges should attach. As these very Commissioners, about this very time, sold lots as possessed of riparian privileges where a street was contemplated towards the water and where some fast land existed, (as in the case of squares 1067, 1079, 1080 and east of 1025, to which we have already referred as facing that portion of Water street expressly named on the Dermott map,) it is evident that the statement in question was not meant as a general declaration in the broad sense which might be ascribed to it if the circumstances under which it was made were not considered.

The examination of the events which transpired in the second period is concluded with mentioning that the Commissioners, at various times, made reports to the President, by whom they were transmitted to Congress. In each of these reports they gave a statement of the public property in the

city of Washington, distinguishing between "upland" and "water" property, describing the latter by the number of feet frontage on the water, and stating the average price which had been realized on the sales of water lots in the past by the front foot. This latter was a criterion which Dermott had previously declared to the Commissioners was one of the conclusive tests for determining whether a lot was entitled to be classed as a water lot, possessed of riparian rights and wharfing privileges. In none of these reports was the claim made that the public possessed all riparian rights as appurtenant to an existing or proposed street. Certainly such a claim would have been advanced — especially as the reports in question were made with a view to legislation authorizing the borrowing of money on the security of all the public property. The same remarks also apply to the forwarding of a copy of the plan of the city, in the same period, to a firm in Amsterdam, through whom the representatives of the city were endeavoring to negotiate a loan. The public property was marked upon that plan, but no intimation was given of the existence of riparian rights distinct from the squares appearing upon the plan. Can it be considered that, when all the public property was being tendered as a security for money proposed to be borrowed, so valuable a right as the entire wharfing privileges and riparian rights of the city, if believed to be concentrated in its hands as appurtenant to a proposed street, would not even have been referred to or tendered in order to aid in the consummation of the desired loan?

The facts which I have reviewed are not the only ones establishing the universal admission and acceptance of the existence of riparian rights as attached to water lots during the period examined. Many others tending in the same direction are found in the record, and are not referred to because they are merely cumulative. Among one of the facts not fully reviewed is the presumption which it seems to me arises from the book described as the register of squares. The importance and sustaining power of the results of this book are substantially conceded by the court, but it is held that the

book ought not to be treated as controlling. Grant this to be so, yet the power of the implications resulting from the book, when considered in connection with the other proof to which I have adverted, seems unquestionable. The book, however, is not reviewed at length, since it simplifies examination to refer only to such matters of proof as are unquestioned in the record and are undenied in the opinion of the court; and all the facts which I have above stated come under this category.

By these means, which have been merely outlined, the difficulties which beset the establishment of the city were overcome, and the seat of government at the time provided for in the act of Congress was transferred to its present location.

Before passing to the third period of time it seems to me well for a moment to analyze the situation as resulting from the events which have been narrated. One or two considerations arise by necessary implication from them. Either that all parties concerned in the foundation of the city contemplated that a space should separate the building line from the wharves, so as to have free communication along the river front, without impairing the rights of the owners of the water lots, or that they contemplated a street, the fee of which would be in the public along the whole river front; and, ignorant of the legal consequence of such a street, proceeded to dispose of the greater part of the water lots upon the express understanding that riparian rights would attach across the street just as if the street had not been contemplated, and that upon this understanding everybody contracted and the rights of every one were adjusted and finally settled. For the purpose of this dissent it becomes wholly immaterial to determine which of these propositions is true, because if either be so — as one or the other must be — then the riparian rights, in my opinion, should be adjudged to exist. It seems to me, however, that the first hypothesis is the one naturally to be assumed. It must be borne in mind that L'Enfant, the engineer selected by President Washington to draw the plan of the city, was a Frenchman. It is in evidence that he requested Mr. Jefferson to send him plans of European cities,

and that his request was complied with.   Thus Mr. Jefferson wrote: "I accordingly send him by this post plans of Frankfort-on-the-Main, Carlsruhe, Amsterdam, Strasburg, Paris, Orleans, Bordeaux, Lyons, Montpelier, Marseilles, Turin and Milan, on large and accurate scales, which I procured while in those towns respectively."   The fair presumption is that L'Enfant's request of Mr. Jefferson was the result of a previous communication to him by Mr. Jefferson that he possessed the desired information, for it is impossible to conceive, with all this information in his possession, that Mr. Jefferson, who must have come in contact with L'Enfant, would not have stated to him the fact.   It is also fairly to be assumed that, as Mr. Jefferson had procured in person when abroad the plans of all these foreign cities, he was looking forward to them as means of information and guidance to be used for the future Federal City; otherwise he would not have undertaken such a labor.   That Mr. Jefferson was familiar with the plans is of course manifest; for, with his phenomenal faculty of reaching out for sources of information on all subjects and storing his mind therewith for future use, it is impossible to conceive that he had not vividly before him the method by which the cities in question were laid out.   Now, it is especially to be remembered that every one of the cities mentioned by Mr. Jefferson, the plans of which he had forwarded, were on the continent of Europe, that is, were situated in countries governed by the general principles of the civil law.   By that law, whilst lot owners fronting on a navigable river have the enjoyment of riparian rights, this right vested in them is subject to what the civilians denominate a legal servitude, that is, an easement, by which they are compelled to leave around the entire river front an open space or way in order to afford convenient access to the water by the public.   Whilst this open way may be used by everybody, it does not cut off the riparian rights, but is simply superimposed upon those rights, the lot owner having the enjoyment of the rights, but being obliged to furnish the open space which the public may use.   (Civil Code of Louisiana, Art. 665; *Dubose* v. *Levee Commissioners*, 11 La. Ann. 165; Code Napoleon, Art. 650,

and note to the article in question in the Annotated Code by Fuzier-Herman (Paris, 1885), p. 880.)

Is it not natural to presume, in view of the country from which L'Enfant came, in the light of the plans which Mr. Jefferson sent him and of the knowledge which Mr. Jefferson had acquired of these plans, and by the personal investigation which he had made in procuring them, that the L'Enfant plan but exhibited the principle of legal servitude as embodied in the civil law? When one looks at the L'Enfant plan and bears in mind the civil law rule, it strikes me that the plan but illustrates and carries out that rule.

Strength is added to this view by considering the Maryland law of 1791 conferring authority upon the Commissioners to regulate wharfage and giving other directions as to the city. That law was passed at the request of the Commissioners, preferred at a meeting held when Mr. Jefferson and Mr. Madison were present. It may properly be assumed that the draft of so important a law was, before its passage, submitted to President Washington and his advisers. Now, the Maryland statute contains two provisions, then and now existing in substantially all civil law countries, but at that time not usual in countries controlled by the common law; that is, a provision for a builder's lien, and one directing that houses or buildings should be erected in accordance with the rule of party walls. Was this then new departure discovered by a member of the Maryland legislature, or was it not rather suggested because it prevailed in the continental cities, the mind of Jefferson being then directed to the rule in those cities, as it was upon the plans prevailing in them that the proposed capital was to be laid out? This view is greatly fortified by the wharfing regulations, which were formulated by the Commissioners and approved by the President. It will be seen that they provided that when a wharf was to be extended by the proprietor of a water lot a space should be left for a street wherever the general plan of the city required it, and at intervals of three hundred feet a space of sixty feet should be left for new streets. There is an analogy between the regulations in question and section 38 of the French ordinance of

1669 on the same subject. (Code Civil, by Fuzier-Herman (Paris, 1885), p. 880, note 1 to article 650, where the text of the French ordinance is stated in full.)

But we are not left to mere resemblance on this subject, for there exists the express declaration of the Commissioners to the effect that they considered that the continental rule governed in the plan of the city as to the wharves, which declaration was in effect approved by Washington himself. After the proposed wharfing regulations had been submitted to the President and while they were under consideration, the complaint of Mr. Barry was made, to which reference has been made, and the letter was written by the Commissioners to the Secretary of State regarding such complaint and explaining the nature thereof. Now, in that letter, in giving their reasons why, by the regulations which they finally submitted, the Commissioners had restricted the erection of buildings on the wharves, they referred to the open space, and added " which we presume it was the intention of the executive to keep open to the wharves as is the case in Bordeaux and some other cities of Europe." This must have been derived from an antecedent knowledge of the purposes of the plan. It must have been approved by Washington, for it is impossible to believe that with this important explanation made to the Secretary of State for submission to the President, when he was considering whether he would approve the regulations, he should not have corrected such a misapprehension if it was such. Besides, the general conditions involved in the foundation of the Federal City persuasively indicate why Washington and Jefferson and Madison should have established the city upon the continental plans, with which not only Jefferson but L'Enfant was familiar. The contracts with the proprietors required an equal division, those with the lot owners in Carrollsburgh and Hamburgh an allotment of one half the quantity of their former land in a like or as good a situation. As the laying off of a street so as to take away the riparian privileges of former water lot owners would be incompatible with an equal division or one in like situation, there was a serious difficulty in so doing. On the other hand, not to

keep an open way for public access might well have been conceived as injurious to the public interests. The theory of an easement furnished a ready solution for this otherwise insuperable difficulty. It afforded an apt means of protecting all the rights of the water lot owners by preserving their riparian rights and wharfing privileges, and at the same time it afforded full protection to the rights of the public by keeping an open space on the water front, subject, it is true, to the exercise of riparian rights, but in no way interfering with public utility. Another consideration bears this view out. That it was hoped that the means for establishing the city to be derived from the sale of lots would be readily aided by the purchase of lots by residents of France and Holland is shown by the record, for among the first uses made of the engraved plan was to send copies thereof to the continent in the hope of stimulating there a desire to purchase, and the record shows that a member of the Amsterdam firm, heretofore referred to, actually purchased lots in the city with reference to the plan. Now, the sagacious men who were Washington's advisers must have seen at once that the plan preserving the riparian rights, and giving access at the same time to the river front, in accordance with the system which, it may be assumed, existed in the countries where it was hoped that money would be obtained, was much more likely to accomplish the desired result than the adoption of a contrary plan.

But the strongest argument in support of this theory of the purpose of Washington and the object contemplated by the plan, is that if it be adopted all the facts in the record are explained and rendered harmonious, one with the other. The plans over which controversy has arisen all then coincide. The reason why so much of Water street was laid in the water becomes apparent. The contracts for the sale of water lots with riparian rights attached, the reports of the surveyors and the action of the Commissioners, all blend into a harmonious and perfect whole, working from an original conception to a successful consummation of a well-understood result. The contrary view produces discord and disarrangement, and leads

to the supposition either that the plan of a street, cutting off riparian rights, was devised in ignorance of its legal result — and, of course, I have not the audacity to make such suggestion as to Washington and Jefferson and Madison, and Mr. Justice Johnson of this court, and all the other wise men who lent their aid to the establishment of the city — or that the plan of the street, in that sense, having been devised it was at once departed from because it was discovered that it was not only in conflict with the rights of the lot owners, but also would destroy the sale of the water lots, hence all the contracts and dealings and declarations to which I have referred ensued. But if the theory that the plan of establishing an easement was adopted be not true, and it be conceded that it was the intention to lay out a street, in the fullest sense of that word, which would cut off the riparian rights, such conclusion, in my judgment, would not at all change the result in this case; for in that event, I submit, that the contracts and dealings and representations and admissions, upon which the lot owners dealt and upon which everybody acted in changing their respective positions, brings into play the principle of estoppel and compels, in accordance with the elementary principles of equity, that the riparian rights and rights of wharfage which were bought and paid for, and which were solemnly declared to exist in every conceivable form, should now be respected.

It would thus seem from the events of the two periods that the riparian rights of the water lot owners were conclusively established, and that it is unnecessary for me, in considering the last and final period, to do anything more than to state that nothing therein occurred by which the water lot owners abandoned or were legally deprived of their rights. But, from abundant precaution, let me, in a condensed form, refer to the events of the third period, simply to show that the riparian rights of water lot owners continued to be recognized down to so recent a period as the year 1863, and were not thereafter interfered with in such manner as to give even color to the contention that the rights were transferred to the Government.

3. *Events subsequent to March 2, 1797.*

The legislation by Congress and the municipality of Wash-

ington with respect to wharfing practically constitutes the only facts necessary to be considered in any review of this period. That legislation, I submit, until a comparatively recent date, in nowise imported a denial of private ownership of wharfing rights as attached to water lots, but, on the contrary, establishes their existence.

I first premise as to the existence of *public* wharves.

On one of the water lots of Hamburgh there existed in June, 1794, what was termed the "City Wharf." On the plat of survey of square 89 this wharf appeared, on lot 10, as "Commissioners' Wharf." Lot 10 was retained for the public. On January 26, 1801, the proceedings of the Commissioners recite that a "representation," which was set out, had that day been sent to the President. In it the public property of the city was enumerated, and in the course of such enumeration the statement was made that "Four wharves have been built at the expense of $3221.88, *which remain in a useful state.*" As I have heretofore shown, a number of private wharves had been built prior to 1800, three of which appear on the Dermott map, but in the representation no claim is advanced, that such wharves were *public* property.

The act of Congress of May 1, 1802, c. 41, 2 Stat. 175, abolished the Commissioners and vested their powers in a superintendent. The act of May 3, 1802, 2 Stat. 195, incorporated the inhabitants of the city. In 1802, as we have seen, there were at least four, and perhaps five, wharves, which were owned *by the public.* While authority was given to the corporation of Washington, by the act of May 3, 1802, to "regulate the stationing, anchorage and mooring of vessels," no authority to license or regulate the building of wharves was given. Presumably as to *private* wharves, the regulations of 1795 were deemed to be in force.

I pause here to interrupt the chronological review of the legislation as to wharfing, to call attention to a report, bearing date September 25, 1803, made by Nicholas King, as surveyor of the city, to President Jefferson on the subject of a water street and wharves, simply because this communication is referred to in the opinion of the court. It is submitted

that on the face of the communication, instead of tending to show that there was question as to the existence of the wharfing rights, it, on the contrary, expressly asserts their existence and relates only to their definition and regulation. Indeed, the main purpose of the communication seems to have been a complaint that the wharfing regulations as originally proposed should have been approved by President Washington without striking out the clause which forbade the wharf owners from building on their wharves. And all this becomes very clear when it is considered that Surveyor King, by whom the letter was written, was the same person who in previous years had avowedly asserted the existence of riparian rights in favor of a former proprietor, Robert Peter, and made claim in relation thereto.

The act of February 24, 1804, c. 14, 2 Stat. 254, gave the city councils power to "preserve the navigation of the Potomac and Anacostia Rivers adjoining the city; to erect, repair and regulate public wharves, and to deepen docks and basins." While, under the authority conferred "to preserve navigation," private wharves could have been regulated, manifestly no such power could have been exercised under an authority to "*erect* and REPAIR and regulate *public* wharves."

That private wharves were not regarded as public wharves is clearly evidenced in the ordinance of July 29, 1819, (Burch's Dig. 126,) passed under the authority granted by the act of 1804 "to preserve the navigation of the Potomac." The act reads as follows:

"SEC. 1. That the owners of private wharves or canals, and canal wharves, be obliged to keep them so in repair as to prevent injury to the navigation. . . .

"SEC. 2. That no wharf shall hereafter be built, within this corporation, without the plan being first submitted to the mayor, who, with a joint committee from the two boards of the city council, shall examine the same, and if it shall appear to their satisfaction that no injury could result to the navigation from the erection of such wharf, then, and in that case, it shall be the duty of the mayor to issue a written permission for the accomplishment of the object, which per-

mit shall express how near such wharf shall approach the channel."

How and where, may I ask, did the private wharves originate if no such wharves existed?

That the authority conferred with respect to public wharves was not supposed to vest power over *all* wharves is also indicated in the act of May 15, 1820, c. 104, 3 Stat. 583, which expressly distinguished the two classes. The corporation was empowered "to preserve the navigation of the Potomac and Anacostia Rivers adjoining the city; to erect, repair and regulate public wharves; to regulate the manner of erecting and the rates of wharfage at private wharves; to regulate the stationing, anchorage and mooring of vessels."

The distinctive character of *private* wharves was still further recognized in the act of the city councils of May 22, 1821, (Rothwell's Laws, D. C. 275,) by section 1 of which the mayor was authorized and requested "to appoint three intelligent and respectable citizens, *not being wharf owners*, as Commissioners to examine and report to the two boards a suitable plan to be adopted for the manner of erecting wharves *upon the shores* of the Anacostia and Potomac Rivers."

And, by section 2, the mayor was solicited to wait upon the President, and to request his appointment of such persons as he might deem proper, to coöperate with those commissioners.

Again, by resolution of the councils, approved September 3, 1827, it was enacted "that a committee of two members from each board be appointed to act, in conjunction with the mayor, in regulating the mode of erecting wharves," conformably to section 2 of the act of councils approved July 29, 1819.

Similar recognition of private ownership of wharves is contained in the resolution of the councils of March 19, 1823, which established "*as fish docks*," amongst other sites, "the steamboat wharf on the Potomac, near the bridge over the Potomac, and at Cana's wharf."

That the preservation of navigation was the controlling object in the regulation of private wharves is very distinctly evidenced in the act of councils, approved January 8, 1831, Corp. Laws 1830–1, p. 34, which, in section 6, repealed the act

of councils of July 19, 1819, and in the first section enacted as follows:

"SEC. 1. That it shall not be lawful for any person or persons to build or erect any wharf or wharves within the limits of this corporation, who shall not first submit the plan of such wharf or wharves to the mayor, who, with a joint committee of the two boards of the city council shall examine the same; and if it shall appear to their satisfaction that no injury could result to the navigation from the erection of such wharf or wharves, then, in that case, it shall be the duty of the mayor to issue a written permission for the accomplishment of the object, which permit shall express how near such wharf or wharves shall approach the channel, and at what angle they shall extend from the street on which they are erected."

Four years after the enactment last referred to a slight controversy was precipitated as to the existence of rights of wharfage as attached to water lots on the Potomac River between the Long Bridge and the Arsenal grounds. On April 13, 1835, a resolution to the effect that the city had never attempted, and, without injury to the general interests, could not admit, the existence of "water rights" of individuals, between the Long Bridge and the Eastern Branch, was indefinitely postponed. A Mr. Force, then a member of the lower board of the city council, protested against the action thus taken. We have seen how unfounded was the assumption contained in this proposed resolution. In 1839, however, Mr. Force, as mayor of the city, approved a plan of William Elliott for the establishment of Water street and for the regulation of wharfing thereon. I shall, as briefly as possible, outline the history of the plan:

As surveyor of the city of Washington in 1833, William Elliott (the subject of "water privileges" then being before the councils of the city) suggested to William A. Bradley, mayor of the city, "that system" which was deemed by the former "best for securing those privileges in the most equitable manner amongst those who own property facing on Water street, as well as securing the public rights." It was proposed by Elliott, in his plan No. 2, that Water street, besides being

conformed to certain particular outlines, be rendered everywhere not less than one hundred feet in width, between the Long Bridge and the then Arsenal grounds, and that the construction of wharves and docks — of wharves, by individuals owning lots on the north side of Water street, and of wharves or docks, by the public, opposite public appropriations, or the ends of streets terminating at the north line of Water street — between that bridge and those grounds, be governed by the principle that the Water street front of any such lot, appropriation or end of street should furnish it a channel front, only in the proportion existing between the total frontage of Water street, estimated at 5280 feet, and the chord, estimated at 5050 feet, measuring the total channel front — between the Long Bridge and the then Arsenal grounds. The plan was described on its face as of that part of the city " exhibiting the water lots and Water street and the wharves and docks thereon, along the Potomac, from E to T street south." It assigned, in the ratio proposed by Elliott, to every square on the north side of Water street a wharfing site from the south side of that street to the " edge of the channel" of the Potomac, and to public appropriations and the ends of streets terminating at Water street, sites for docks or other like uses. It represented Water street as of varying width, and reduced, on its southern limits, to a curve lying parallel to that describing the edge of the channel; and the squares, on the north side of Water street, to which wharfing sites are assigned, are designated as " water lots " on the face of the plan. A more complete recognition of the preëxisting riparian rights of the water lot owners than is shown on and established by this plan my mind cannot conceive.

On February 22, 1839, the city councils adopted the following resolutions:

" *Resolution* in relation to the manner in which wharves shall be laid out and constructed on the Potomac River:

" *Resolved*, That the plan No. 2, prepared by the late William Elliott, in eighteen hundred and thirty-five, while surveyor of the city of Washington, regulating the manner in which wharves on the Potomac, from the bridge to T street

south, and the plan of Water street, shall be laid out, be, and the same is, adopted as the plan to be hereafter followed in laying out the wharves and the street on the said river: *Provided*, The approbation of the President of the United States be obtained thereto.

"*Resolved, also*, That the wharves hereafter to be constructed between the points specified in the said plan shall be so built as to allow the water to pass freely under them; that is to say, they shall be erected on piers or piles from a wall running the whole distance on the water line of Water street." Sheahan's Laws, D. C. 178 (ann. 1857).

These resolutions were approved by the mayor of the city, Mr. Peter Force.

Before their passage and on February 15, 1839, Secretary of the Treasury Woodbury, afterwards a Justice of this court, had referred plan No. 2 of William Elliott to William Noland, Commissioner of Public Buildings, and (intermediately) the successor in office of the Commissioners, for the opinion of that Commissioner upon the judiciousness of the improvement contemplated in the plan.

On February 21, 1839, the day following the passage of the ordinance, Mr. Noland, acknowledging the receipt of the plan and returning it to the Secretary, reports, "that after due deliberation," he believes "*the improvement proposed would be judicious and proper.*"

On February 23, 1839, the day following the passage of the resolutions, the plan, *approved by the President*, was transmitted by Mr. Woodbury to Mayor Force.

When it is considered that up to the time when the Elliott plan received the approval of President Van Buren, Water street, though contemplated, had not been further laid down than by the establishment of the upper boundary or building line, this action manifestly possesses great significance. The fact that action with respect to Water street was incomplete was expressly stated by Attorney General Lee in his opinion to President Adams on January 7, 1799, when he said, referring to the Dermott map:

"It is not supposed that this is incomplete in any respect,

except in relation to the rights appurtenant to the water lots and to the street that is to be next to the water courses. . . . The laying off of Water street, whether done in part or in whole, will stand in need of the sanction of the President."

As in the President of the United States therefore was vested the authority to complete the plan of the city in any particular in which it was defective, the approval of President Van Buren may properly be referred to the exercise of that power, and as entitled to be regarded as a distinct declaration that Water street was not to have the operation now asserted of divesting the water lots fronting towards the river on Water street of riparian rights. From Washington, then, to Van Buren, in every form in which it could be done, the riparian rights of the lot holders have been continuously and solemnly sanctioned. I cannot now by any act of mine destroy them on the theory that they have never existed.

On May 26, 1840, a permit was issued by Mayor Force, by virtue of the act of June 8, 1831, to William Easby to wharf in front of some of the water squares which originally formed part of the land of Robert Peter, situate on the Potomac River near Rock Creek. I set out in the margin[1] the document re-

---

[1] MAYOR'S OFFICE,

WASHINGTON, *May* 26, 1840.

William Easby of the city of Washington having made application for permission to erect a wharf in front of square No. 12, and extend a wharf in front of square south of square No. 12, and having submitted to me a plan of said wharves, which plan has been examined by a joint committee of the board of aldermen and board of common council, who have certified that " no injury will result to the navigation of the river from the erection and extension of the wharves upon said plan."

Permission is therefore granted to the said William Easby to erect a solid wharf the whole extent of square No. 12, in front thereof, and to extend a wharf in front of square south of square No. 12, thirty feet, fifteen feet of which to be solid, as laid down upon said plan which exhibits the situation of the wharves aforesaid as proposed to be built by his letter of 3d of February, 1840.

Which permission is granted on the terms and subject to all the conditions prescribed by the act entitled " An act to preserve the navigation of the Potomac and Anacostia Rivers, and to regulate the anchoring and mooring vessels therein," approved January 8, 1831; and of any act or joint reso-

ferred to, which exhibits that it was for an unlimited time, and with no provision that the wharf should revert to the Government as in permits of very recent date.

That on May 25, 1846, a committee 'of police, of the lower part of the city councils, presented to that board a report which in effect denied the existence of private rights of wharfing may be conceded. Like the resolution of 1835 it was based upon a superficial inquiry into the subject, and like its predecessor, the resolution of 1835, was " laid upon the table." Various acts of the city council, one dated March 8, 1850, another September 30, 1860, and the other May 3, 1866, appropriating in the aggregate $2600.00 for the repair of sea walls along the Potomac at points between the Long Bridge and the Arsenal grounds, are set out as evidence of an assertion by the city of the right of ownership to all the riparian privileges in that locality. I am unable, however, to see that these circumstances are entitled to the weight claimed for them. Under the wharfing regulations of 1795 the ultimate cost of making a Water street was to be borne by the city, and a sea wall may well be treated as part of such street. The evidence in the record also shows that a goodly portion of the sea walls along the Potomac in the locality referred to was built opposite to the water lots on the north side of Water street and by the owners of such lots, and that some of such owners had graded Water street in front of their lots in order to the exercise of their wharfing privilege. There is nothing in the record to support the claim that if the city had at any time constructed a sea wall, it claimed that the wharfing privileges in front of such wall had been taken away from the opposite lots. And the ordinance of the city councils of February 22, 1839, adopting the plan of William Elliott, clearly rebuts such an inference, for it is there provided that wharves thereafter " to be constructed " should " be erected on piers or piles from a wall running the whole distance of the water line of Water street." In other words, although in

lution that may hereafter. be passed relating to wharves in the city of Washington.

PETER FORCE.

the most solemn form, it was declared that the owners of the water lots should enjoy their wharfing rights by extending their wharves from the sea wall towards the channel, yet it is now argued that the construction of the sea wall destroyed the right of the lot owners to the wharves built by them in accordance with the provisions of the ordinance.

That since the act of March 13, 1863, referred to in the opinion of the court, various enactments have been passed by the corporation or its representatives, asserting power in the nature of private ownership over the wharves on Water street, and not merely the possession of power as trustee for the purposes of public regulation or the protection of navigation, may be conceded. But it is not claimed nor does it appear from the evidence that there has been such interference with or disturbance of the actual possession of the rightful occupants as would constitute an adverse possession in the city operative to bar the lawful claims of the real owners of the wharfing privileges. Similar observations are also applicable to the licenses issued by the chief of engineers for the time being during a part of the period last referred to.

It is not necessary to review the evidence showing the unequivocal possession enjoyed by the wharf owners up to this *time* or to state the proof, as to the expenditures of time, labor or money by the owners of the water lots along the Potomac River — upon the faith of the wharfing regulations and the possession of riparian privileges — the filling in by them of Water street, the erection of sea walls, the filling in of parts of the bed of the river beyond Water street, as well as various other expenditures. Indeed, so self-evident are these things that the court deems it proper that the defendants should be compensated by the Government before being ousted of the possession of such improvements, as wharves and structures thereon. If the demands of equity require that the structures be paid for by the Government, far greater and stronger is the reason for concluding that the right of property, on the faith of which the structures were made, should not be denied or taken away without just compensation. Neither equity nor reason are subserved, it seems to me, by protecting the mere

incidental right whilst uprooting the fundamental principle of property upon which the incident depends.

Having in what has preceded fully expressed my view of the existence of the riparian rights as developed from this record, it remains only to consider certain previous decisions of this court relied upon and referred to in the opinion of the court. Nothing in the views above expressed is in any way affected by the case of *Van Ness* v. *Mayor &c. of Washington*, 4 Pet. 232. That case determined that the public streets in the city of Washington were public property. But the question in this case lies beyond that and is, first, was there a public street proposed around the entire river front or a mere creation of an easement superimposed upon the riparian rights? or, second, granting there was such public street, in view of the contracts between the original proprietors of the division of the squares and lots, and of all the contracts and dealings, can the Government be heard in a case of the character of that before the court, to deny the existence of riparian rights and rights of wharfage in the owners of water lots fronting on the alleged street? True it is that in *Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.*, 109 U. S. 672, the question whether a lot fronting on the Potomac River, lying in that portion of the city formerly constituting the land of Notley Young, had riparian rights, was considered and determined adversely to the lot owner, on the ground that the lots being bounded by Water street on the return and plat of survey, were thereby separated from the river, and hence not entitled to riparian rights. As I have said, from the principle of law therein enunciated I do not dissent, but rest my conclusion on the facts as they are disclosed in this record. That many of the facts which have been considered and stated were not present in the record in the case, is patent from the opinion in that case. Certainly, however, it is not contended that the defendants in this record were either parties or privies to the case there decided. A conclusion on one condition of fact is not binding as to another condition of fact between different parties in a subsequent law suit. I cannot bring my mind to adopt the inferences deduced by the court in the case just

referred to, in view of what I conceive to be the absolutely conclusive proof establishing the existence of riparian rights in favor of the owners of water lots in the city of Washington. To deny them, it seems to me, in view of the record now here, as was said at the outset, would be an act of confiscation. Of course this is said only as conveying my appreciation of the facts.

As it is beyond my power by this dissent to enforce the rights of the owners of water lots to riparian and wharfing privileges, it would serve no useful purpose for me to measure the claims of such owners by the principle which I have endeavored to demonstrate, that is, the existence of the riparian rights. Suffice it for me to say, therefore, that in my judgment, even granting that such rights exist, the owners thereof would not be entitled to compensation if the right was impaired or destroyed as the consequence of work done by the Government in the bed of the river for the purpose of improving navigation, for all riparian rights are held subject to this paramount authority. As a consequence, if injury resulted to riparian rights in the exercise of this controlling governmental power, such injury would be *damnum absque injuria.* But I think that where it is simply proposed, as is the case with many if not all the lots between the Long Bridge and the Arsenal grounds, to appropriate the riparian rights simply by an arbitrary line running along the edge of the water on the map, thereby cutting off all wharves and buildings thereon upon the theory that none of the riparian rights segregated by the line were private property, this is but an appropriation of private property requiring just compensation. By these general principles, in my judgment, the rights of the parties should be determined.

MR. JUSTICE GRAY and MR. JUSTICE McKENNA were not present at the argument, and took no part in the decision.